# Georgia McEaddy

v

## Commonwealth of Massachusetts

### Suffolk County Probate and Family Court

### Suffolk County Appeals Court

#### and the
#### Boston Adoption Bureau

### Redress of Grievances

## JURISDICTION

Security Co-op. Bank v. Inspector of Bldgs. of Brockton, 298 Mass. 5,6 (1937). "This court retains authority to grant relief to correct and prevent errors and abuses in the lower courts "if no other remedy is expressly provided." Chavoor v. Lewis, 383 Mass. 803, 804 n 2 (1981); G.L. 211 sec. 3. Single justice has authority to act where the order sought would have been directed to a lower court. G.L. c. 211, sec.3.

## PETITION FOR A WRIT OF CERTIORARI

Petitioner Georgia McEaddy respectfully petitions for a writ of certiorari to review the Judgement of the Suffolk County Probate and Family /Appeals Courts in this case. In plain contravention of the requirements of the Constitution of the United States, federal law, the Constitution of the Commonwealth of Massachusetts, and state law, the state courts have embarked on an *ad hoc* , standardless , subjective, arbitrary, and lawless exercise of judicial power, which appears designed to thwart the will of the petitioner as well as the considered judgements of the past and present government branches.

# ISSUES PRESENTED

I.   Whether the federal/state governments any longer recognize or respect a blood relative as family.

II.  Whether a non-related person(s) have the constitutional right to a child

III. Whether the Due Process Clause or Equal Protection Clause of the Fourteenth Amendment is violated the Constitutional Rights of G.McEaddy.

IV.  Whether the court each complied with the Federal and State laws and Constitutions.

V.   Whether the correct legal policies and procedures were followed in this case.

VI.  Whether the court erred in not adjudicating paternity of father until June 23, 2001;the test result where given to the court in February.

VII. Whether the court showed bias by not allowing visitation of the child.

VIII.Whether the court showed bias in the testimony of G. McEaddy.

IX.  Whether the court showed bias regarding the income of the grandmother.

X.   Whether the court erred by allowing the Boston Adoption Bureau to represent its self,(Mr. Kaye) the agency, the mother, and the adoptive parents.

XI.  Whether the Suffolk County Probate and Family Court and Appeals Court violated my Constitutional and Civil Rights by not allowing the pro se appellant transcripts.

(9) On September 24,2000, the adoptive parents removed the child outside the state of Massachusetts. RA14

(10) The Court's Findings state, An order of Notice by Publication was issued. This was supposed to be four days *after* Lonnel left the Commonwealth of Massachusetts.

(11) It appears the child was removed from the Commonwealth without the involvement of the Interstate Compact.

(12) If the Interstate Compact was involved, why did this federal agency not comply with the law?

(13) On October 2, 2000, after unsuccessfully trying to get Lonnel returned to her from the Boston Adoption Bureau, Ms. Lemoine informed Mr. Williams.

(14) It was reported she informed Mr. Williams because she was told the biological father was the only person who could have custody after she surrendered her rights.

(15) Mr. Williams signed Paternity papers on October 3, 2000.

(16) Mr. Williams was in a mandatory carpenter's program outside of Boston. He asked his mother, Georgia McEaddy, (thereafter, G. McEaddy) to look into the matter.

(17) On October 5, 2000, G. McEaddy had learned (1) the Boston Adoption Bureau had custody of the child. (2) the child was out of state.

(18) On October 12, 2000, the father went to the Suffolk County Family and Probate Court and filed a Complaint for Paternity and an Objection to the Adoption Petition along with Motions for a Speedy Hearing and Temporary Custody; which all were denied. RA.1

(19) Father's motion for paternity testing was allowed, November 7, 2000. RA.15.

(20) A Motion for the appointment of a Guardian ad Litem was filed, by the Boston Adoption Bureau, on January 8, 2001.RA.5 and Attorney Julia Pearson was appointed, March 22, 2001. RA16.

(21) Paternity testing results of February 13, 2001 indicated Mr. Williams to be Lonnel's father.

(22) On February 20, 2001 the father filed a Motion for Temporary Custody, (denied), Expedited Discovery, and Speedy Trial.

(23) July 23, 24, 25,2001, were the assigned trial dates.

(24) On April 26, 2001, Georgia McEaddy filed a Petition for Guardianship of Lonnel.

(25) July 2, 2001, the child received counsel, Matthew Beaulieu.

(26)  G. McEaddy filed a motion for a person of color to represent the child.  The motion was denied.

(27) July 5, 2001, the motion for visitation was denied.

(28)  G. McEaddy received counsel July
      16, 2001 (not through the court)

(29)  The trial was held at the Suffolk
      Probate and Family Court and heard
      before Judge John Smoot, July 23-
      26 and August 1, 2001.  The 210
      and guardianship Petition were
      heard together.  RA.16

      **A.  the Suffolk and Family Probate
      and Family Court found against G.
      McEaddy for the following reasons:**

      a. G. McEaddy relied upon her
         daughter to pay the rent and
         utilities

      b. G. McEaddy had no reliable
         income.

      c. G. McEaddy had a combative
         relationship with the Department
         of Social Services and other
         agencies.

      d. G. McEaddy did not appropriately
         care for Nathaniel and Nitanju,
         the pre-adoptive children in her
         care.

      e. G. McEaddy did not comply with
         her obligation to submit signed
         service plans.

      f. G. McEaddy did not fully comply
         with service plans

      g. G. McEaddy had ongoing
         disagreements regarding
         arrangements for Parents and

Children Together Funds (PACT).
These funds assist foster
parents with special needs
children.

h. G. McEaddy rejected a plan to
help Nathaniel communicate.
Without consulting any
professionals, she decided she
would teach Nathaniel to speak.
She did not succeed.

i. DSS determined that G. McEaddy
was not able to meet the needs
of these children. The children
were removed and G. McEaddy's
home was closed.  A Fair Hearing
upheld the decision.

j. G. McEaddy was to have said her
grandchild (Lonnel) was spoiled

k. G. McEaddy abandoned Lonnel

l. G. McEaddy did not do childcare
for Lonnel

m. G. McEaddy did not intervene
with her "grandson" D'Arnell,

n. On March 11, 2002, the Court
issued a Decree to Dispense with
Parental Consent to the Adoption
of Lonnel, and dismissed the
Guardianship petition, findings
of facts and rulings.  RA 12,
13, 14-38.

o. G. McEaddy and Mr. Williams filed a timely notice of appeal. RA 39,10.

p. Judge John Smoot refused to give G. McEaddy the trial transcripts.

q. The Appeals Court refused to give G. McEaddy the lower court transcripts.

r. Judge J. Duffy ordered the appeals consolidated in the Appeals Court for purposes of briefing and oral argument on January 9, 2003.

s. Justices Lenk, Kantrowitz, and Trainor denied the appeal on September 26, 2003. (Mailed by the Clerk, October 3, 2003)

t. On October 27, 2003, G. McEaddy requested the Full Appellate Court hear the matter.

## STATEMENT OF FACTS

**The Massachusetts Rules of Professional Conduct states:"** A lawyer should not accept representation in a matter unless it can perform competently, promptly, without improper conflict of interest and to completion."
This was a un-adversary system of justice which had unwritten constitutions. There was a violation of unenumerated rights, allowing Mr. Kaye an inquisitorial hearing.

In order to deny placement of a child the court must prove any or all of the following: child abuse, child neglect, and child abandonment.

**G. McEaddy's Trial Representation**

In February 2000, G. McEaddy asked Attorney Patricia Tellis-Warren if she would represent her at trial. After giving a synopsis of the case, Attorney Tellis-Warren felt the case was complicated. In June, 2001, Attorney Tellis-Warren telephoned Ms. McEaddy and stated that if G. McEaddy had not found representation, she would take the case. On July 16, 2001, Attorney Patricia Tellis-Warren filed an appearance for G. McEaddy. RA15 Three days prior to the court date, Attorney Tellis-Warren went to the home of G. McEaddy to discuss the case. G. McEaddy gave Ms. Tellis-Warren the names, addresses and telephone numbers of approximately twenty-five people to refute the Boston Adoption Bureau's claim of her "long and consistent background of combativeness with professional social workers".(The Suffolk Probate and Family Court's Findings went on to state, "that at times G. McEaddy had gone beyond strong advocacy and moved into the area of contemptuous abuse conduct"). This statement was clearly untrue and bias. No one testified to the erroneous statement. **Profile evidence presents to the trier of fact a stereotypical description.** Commonwealth v. Frias. 4a, 47 Mass. App. Ct. 293, 296 (1999).

Attorney Tellis-Warren felt if she called the witnesses, she would be re-trying the DSS case.

Attorney Tellis-Warren refused to call the witnesses, denying G. McEaddy a defense. **Under Article 12 of the Declaration of Rights of the Massachusetts Constitution, G. McEaddy had the right to dispute Mr. Kaye through witnesses.** Many of the testimony did not appear in the Court' Findings.

Massachusetts General Laws, Rule 1.6 states: A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice based upon race, sex, religion, national origin, disability, age sexual orientation or socioeconomic status and shall not permit staff, court officials and other subject to do so.

To justify their wrong, The Boston Adoption Bureau, the Suffolk County Probate and Family Court willfully, materially, intentionally and negligently misrepresented facts and were libel in their Probate and Family Court Brief/ Appellate Briefs regarding G.McEaddy. The Appeals Court agreed with the lower court's findings.

Judge Dumphy, Chief Justice of the Probate and Family Court, and Administration and Management of the Probate and Family Court failed to act to assure that the judges under his management complied with the Federal and State Statues. He failed to oversee the judges in his department follow the rules and regulation and were not libel. G. McEaddy wrote a letter to Judge Dumphy[i]

with many of the concerns below, prior to the case being heard. The question to Judge Dumphy was, how was a child, surrendered to the Boston Adoption Bureau, September 12, 2000, placed with an out of state adoptive family by September 24, 2000, without the assurance and confirmation notification to the father. There was no reply. **The court showed bias and made erroneous statements to the following:**

After receiving the Commonwealth of Massachusetts Office of Childcare Services report, the Court continued to write the Boston Adoption Bureau did no wrong. Page 18, number 211 states, "The Massachusetts Executive Office of Health and Human Services, Office of Child Care Services investigated the Boston Adoption Bureau's handling of this adoption case and found several violations. (Complaint number 26105). (1A-96-96). Court's findings in reference to the report, line 212, it states, "The violations were administrative in nature and did not impact the substantive rights of the parties." **It did violate our civil rights.**

**It _gravely and directly_ impacted the "substantive rights of the parties involved in this litigation."**

### Judge Smoot's Findings
#### Against Paternal Grandmother, Georgia McEaddy

**a. The court showed bias regarding the income of G. McEaddy. The court erred with grandmother's adult daughter's payment of rent and utilities.**

**Georgia McEaddy does not rely upon her children to support her.** G. McEaddy would be able to fully care for Lonnel. The Court' Findings state, Ms. McEaddy "relies" upon her daughter to pay the rent and utilities. G. McEaddy's daughter attended private parochial school graduating high school before many her age. She went on to a parochial university, left school and then she went into the military.  When she came home, she was a grown woman. G. McEaddy's daughter had been violated; had a baby ;had difficulty relating to her own daughter. At the time of trial, G. McEaddy was her granddaughter's primary daycare provider. She continues to care for her granddaughter without compensation from her daughter. Presently, her daughter lives in her own townhouse, works, and attends school.

**b. The Court also felt G. McEaddy did not have a reliable income to care for Lonnel**. Presently, G. McEaddy receives SSDI due to a serious accident in December 2001. She has not been medically released to return to work full time. **Familial poverty should not be held against a parent in deciding if a parent is unfit.115. <u>Custody of Minor,</u> 389 MASS. 755 ,766 (1983).**

**c.  Georgia McEaddy did not have a combative relationship with the Department of Social Services and other agencies. Exhibit [ii]**
Each social worker (with the exception of Anna Lee Brown, DSS adoption worker) and G. McEaddy had an excellent professional working relationship.  Affidavits of each social worker support G. McEaddy's testimony.

**d-i. The courts erred in its findings of
grandmother against the Department of Social
Services. G. McEaddy gave appropriate care and
services to Nathaniel and Nitanju. G. McEaddy
gave appropriate care and services to Nathaniel
and Nitanju.[iii]**

Julia Pearson, the court appointed Guardian ad
Litem states:  "Mrs. McEaddy was very forthcoming
with me regarding her involvement with DSS. She
was a foster parent for many years with the
department and she had two very special needs
children in her home, and she was advocating very
vigorously on behalf of those two children, and
she was very straight with me you know trying to
get children in her care what they need.
Georgia McEaddy was a foster child and became a
foster mother for many years. And I could see
that about her, that she would, and even the home
study indicated she was a strong advocate.........three
51A's were filed with DSS alleging physical
abuse, and sexual abuse of the two children in
her home as well as neglect regarding some
educational needs of the children.
The sexual abuse and physical abuse were not
supported during the initial investigation
period, but the neglect was supported.
They removed the children and closed her home,
and Mrs. McEaddy did appeal that to a fair
hearing, it was determined that she did not
neglect the child's educational needs, that she
was a surrogate parent capable of disagreeing
with not only DSS but the Department of Education

and was within her sole rights to advocate for
the program she felt was best for her child."

**The court showed bias by deleting the guardian ad
litem report regarding G.McEaddy.**

G. McEaddy had two special needs siblings
residing with her. Each request G. McEaddy asked
the Department of Social Services for, either
came from written recommendations from the
pediatrician, school, or Children's Hospital, or
was in the Massachusetts General Laws.
Nathaniel was diagnosed with Pervasive
Development Disorder long before he lived with G.
McEaddy. He was allowed a parent-aide in his
previous foster home, thus allowing him a parent-
aide and childcare under 110 CMR: Department of
Social Services 7.041 and 7.061, risk due to
physical, development and/or emotional
disability. This was denied.

Nitanju was allowed to attend day care and dance
classes in her former home. The adoption social
worker would not allow Nitanju the same service.
The Department of Social Services refused the
children the services, yet gave the services to
two separate suburban foster parents who housed
Nitanju and Nathaniel.

At the hearing, the Boston Adoption Bureau
objected to include medical reports record from
Children's Hospital, because it would affirm G.
McEaddy's testimony.

**The Court's findings failed to state Nathaniel,
G. McEaddy's former pre-adoptive, had come home,**

**(G. McEaddy's home) with a black eye given to him
by his teacher.**

Paul Cataldo, (then) director of DARE Family
Services did not want G. McEaddy to report the
matter to the Department of Social Services.  His
reason was Paula Braissel, the teacher, would
loose her job.  G. McEaddy took Nathaniel to
their medical facility.  Dr. Leet reported the
matter to the Department of Social Services.  G.
McEaddy called and spoke to the area director,
(then) Rudy Adams, of the Jamaica Plain
Department of Social Service. Brenda Nelson,
Social Worker, had not been assigned until the
end of October 1994. Mrs. Nelson advocated for
Nathaniel. She fully supported Nitanju's
placement.

It appeared Anna Lee Brown, the adoption social
worker did not understand the special needs of
the children.

At trial, Anna Lee Brown stated Nitanju had no
special needs.  The doctors at Children's
Hospital clearly reported something different to
G. McEaddy, written and verbally.  Mr. Kaye
implied Nitanju did not tell the investigator
that G. McEaddy hit her and her brother because
she was not verbal.  Nitanju is verbal, and can
speak. She did not tell the investigator G.
McEaddy hit her because is was not true.  Mr.
Kaye would also imply Nathaniel could not speak.
Nathaniel spoke when and if he wanted to.
**G. McEaddy did not neglect nor abuse the two
siblings.**

The Department of Social Services neglected and
abused them. **e.** G. McEaddy did not sign the
Department of Social Services Service Plan
because the plan omitted information and services
DSS verbally committed to the children.  G.
McEaddy went beyond complying. **f.** G. McEaddy
followed the pediatrician, hospital and school
recommendations for the children. **g.** When
Nathaniel went from DARE Family Services, then to
the Department of Social Services, G. McEaddy was
asked not to work. She received less money after
Nitanju arrived. **h.** The Children' Hospital report
clearly indicates Nathaniel was coming out of his
disorder. Nathaniel spoke when he wanted to
speak. **i.** When the two siblings were taken from
G. McEaddy's home,  they were placed in a
shelter,  then went from foster home to foster
home and then an institution. Presently,
Nathaniel is adopted, Nitanju is living with a
guardian.

## j-1

**j.** G. McEaddy did not stop caring for the baby
because the baby was not spoiled, **nor did she
ever say the baby was spoiled**.

 **k. G. McEaddy did not abandon Lonnel**.

 Massachusetts General Laws, 210 3 page 670
defines abandoned: shall mean being left without
provisions for support, and without any person
responsible to maintain care, custody and control
because the whereabouts of the person responsible
is unknown and reasonable efforts to locate such
a person have been unsuccessful.  A brief and

temporary absence from the home, without the intent to abandon the child shall not constitute abandonment. **This was not abandonment**. This was G. McEaddy's testimony, yet it failed to show in the Findings.

Transcript testimony, 4B-30 line 21-23, G. McEaddy was with the Boston Public School since 1976.  These statements were not included in the court's Findings.

**The court showed bias in the testimony of the Ms. Lemoine against G. McEaddy.**

G. McEaddy tried to support Ms. Lemoine. 4B-71-line 7-22 childcare and baby needs were discussed. 4B72 line 18-4B-78, line 18 trip to New York, Mary indicated she was beginning to sell houses. 4B79 line 8-11 Mary asked if G. McEaddy could watch the baby during Candy's vacation, which she said was in late July. G. McEaddy testified, during the trip to New Jersey with Ms. Lemoine she asked her directly if her son was abusive. Ms. Lemoine's reply was "no" as if G. McEaddy had insulted her. Again, G. McEaddy asked, what was the problem.  Ms. Lemoine's response was. "Your son has too many women."  G. McEaddy gave Ms. Lemoine advice a nun once gave her and that was to care and don't care.  Pretend it does not bother you and see what will happen. For Ms. Lemoine to state that G. McEaddy told her to shut up was not true.

**Ms. Lemoine never indicated she was having financial problems or difficulty caring for the baby.**

1. Testimony between Attorney Tellis-Warren and
Ms. Lemoine, 1B line 21-23 Georgia is going to
care for the baby. 1B-60 and did you ever tell
Ms. McEaddy your friend Candy was going to care
for the child?   Ms. Lemoine was asked and
testified in Court if her friend Candy would keep
the baby, Ms. Lemoine responded, "yes".
Saturday, July 8, 2000, Ms. Lemoine asked G.
McEaddy she if she would watch Lonnel on Monday.
Monday, July 10, 2000 G. McEaddy came to the
house at 7:00 a.m., it was then, and only then,
Ms. Lemoine informed G. McEaddy she was returning
to work and needed her to baby sit.  Ms. Lemoine
knew G. McEaddy worked with the school
department, and would be returning to school in
September. (4B 30 line 21-23) G. McEaddy
testified the Boston Public School Department
employed her. She strongly urged Ms. Lemoine to
find childcare so the baby would be accustomed to
that person prior to September.  Ms. Lemoine
found childcare, which began July 24, 2000.
Ms. Lemoine had no refrigerator in her apartment.
G. McEaddy purchased one for her.  G. McEaddy was
to purchase a washing machine, but found out the
baby was gone.

**k. The court erred in placing the child in an
atmosphere of affluence and notoriety** as opposed
to a loving nurturing environment of the child's
blood relative, his grandmother, G. McEaddy.
The obligation of the court is to make every
reasonable effort to keep families together is
also codified as part of the Department of Social

Services regulations, 110 C.M.R., and the Commonwealth of Massachusetts General Laws. **Many of the testimony did not appear in the Court's Findings.** The court showed bias by ignoring anything G. McEaddy positively said during the testimony in its findings.

G. McEaddy testified to her education. Her educational records were subpoenaed and the court returned the envelope to her unopened. The court was bias in failing to acknowledge G. McEaddy's education in the Findings. The court acknowledged the Wilson's education in the Findings. The Court's wording of the perspective adoptive family live in a wooded, suburban neighborhood of single-family residences. The home is neat and organized. It is located at the end of a **cul-de-sac** where there is little traffic. G. McEaddy resides in a wooded suburban, townhouse residence. Her home is neat and organized, and June Street is a secluded residential area. The Court showed socioeconomic bias in the Findings.

G. McEaddy testified to her work history, yet it was not in the Court's findings.

Ken and Marlene Wilson, are people with no consanguinity.  The Wilson's resides at 13347 Olive Blvd, Chesterfield, MO. Ken Wilson is a hockey sportscaster. [iv]

**G. McEaddy will be able to financially care for Lonnel.**

Julia Pearson, Court appointed Guardian ad Litem testified: 2A-58 "…Mrs. McEaddy wants to help raise Lonnel.  I have no doubt that is a strong

desire of hers and she would bend over backwards to make sure that his needs are met."; 2B-80 Line 14-23 of the transcripts states, Dr. Steven Shapse, (for the Boston Adoption Bureau) testified someone either informed him, or he read in a report, G. McEaddy was abusive.  He was asked, if this were not true should G. McEaddy be considered a caretaker, he said, "yes."  This failed to be noted in the findings.  The Guardian Ad Litem and Mary Lemoine each stated if the abuse reports were not true, they would have given G. McEaddy consideration.  This was not in the Court's Findings.

**The court erred by not adjudicating paternity of father until June 23, 2001, thus not allowing visitation.** [v]

**G. McEaddy is a fit guardian.**

G. McEaddy has worked in the field of human services for over forty years or better. She has advocated in this field for the rights of people. In lieu of the Appeals Court and Probate and Family Courts understanding her professionalism, their conclusions were demeaning. G. McEaddy has worked with the Department of Social Services on issues, was a foster parent for many years, she has worked with the Legislators, on issues the City of Boston all for the betterment of our society. In the above, she was respectfully listened to. G. McEaddy comes forth, trying to undo a wrongful adoption, and the courts justify the wrongs of the adoption agency and the court, helping and supporting the Boston Adoption Bureau

each step of the journey. The Probate and
Family/Appeals Courts are audaciously saying the
Boston Adoption Bureau did no wrong. The Boston
Adoption agency was legally and morally
incorrect, as well as the two courts which heard,
or reviewed this case. Transcript-5A 69-123
Georgia McEaddy called Mr. Kaye and asked what
paper was the **process of service publication** [vii]
in.  Mr. Kaye said "It wasn't, why?"
The Boston Adoption Bureau falsified information
in the pre-trial hearing, the hearing and
Appellate Brief regarding the appellant.  The
Boston Adoption Bureau **never** called nor wrote G.
McEaddy. The Boston Adoption Bureau **never** invited
G. McEaddy to their office.  G. McEaddy invited
herself to the office only to be told she was not
a party to the case (winter 2001). [vi] [viii] When the
Court and the Boston Adoption Agency learned G.
McEaddy knew what they had done with her
grandchild; they put her on trial.  They looked
at her fitness, prolonging the trial so that they
could say it is in the best interest for the
child to remain with the Wilson's.
**The Commonwealth of Massachusetts Probate and
Family Court, as well as the Appeals Court failed
to release a copy of the complete transcripts to
G. McEaddy, pro se.**

 She is well educated in the field of growth and
development, of children as well as school
psychology. G. McEaddy observed during this pre-
trial hearing, that the adoption agency and the
Court was clearly bias adamant the only ones who

could raise this child were the Wilson's with no consideration to Mr. Williams' family.

G. McEaddy applied for guardianship to keep Lonnel within the child's blood family.  G. McEaddy has worked in the field of human services for forty years or better.  She was a foster child. The care and nurturing of a child keeping her families together, is *extremely sensitive* to her.

**ADOPTION OF GABRIELLE,** 39 MASS APP. CT 489. <u>CF.</u> <u>**Adoption of Lars**</u>, 46 Mass. App. CT. 30, 37 (1998) (visitation by biological parents is an element in an evaluation of the child's best interest) In the present case the Court applied impermissible standards in deciding to embrace the Boston Adoption Bureau's plan. The Court fraudulently allowed an adoption agency to come in allowing a child to illegally leave without due process, violating the civil rights of the child's family. The report from the Office for Children said the adoptive family's home study was incomplete, as well as other violations. The court also employed impermissible standards in approving the Boston Adoption Bureaus' incomplete adoption plan, an adoption plan that should never begin. [ix]

The court is required to find that neither the Boston Adoption Bureau nor the child's attorney made any reasonable effort to reunite the family. The agency, nor the attorneys, nor court did this. [x]

The Appellate, Probate and Family Courts and the Adoption Agency did not want the affidavits from professionals and medical information because it would affirm G. McEaddy's testimony. The court must make findings, which detail in nature why G. McEaddy is currently unfit. There must be nexus between G. McEaddy's perceived shortcoming and a serious risk of peril from abuse or neglect to the child.

The Appeals Court also held the Boston Adoption Bureau to a lesser standard of effort based on the investigation report by the Commonwealth of Massachusetts Office of Child Care Services, complaint number 26105 which had seven regulations of non-compliance of the law. The biological mother informed the father nine days *after* the baby was placed with the present adoptive family, and the Suffolk and Probate family Court found her information to the father **m. The court showed bias in the testimony of Desire Sapp against G. McEaddy.** The court and the adoption agency had no proof that D'Arnell was G. McEaddy's grandson, yet G. McEaddy was slandered in the Findings regarding D'Arnell. Expert DNA test results and findings state he is not her grandson. **Exhibit xii, xi**

> **The Suffolk Probate Court and Appeals Court's findings were prejudicial in not allowing the pro se Appellant transcripts.** Her Fifth Amendment rights

were violated. **Exhibit** [xii] The court made a finding harm would come to the child if moved. Foster children are moved daily.

The Commonwealth of Massachusetts Appeals, Probate and Family Courts failed to release the transcripts to G. McEaddy, pro se. The Adoption folder was not included in the record to the Appeals Court. G. McEaddy filed a motion to the Appeals Court asking them for the adoption record. This was denied September 29, 2003. The decision was rendered September 26, 2003.

 G. McEaddy was repeatedly denied the adoption record and transcripts to try to cover the errors of the Suffolk Probate Court. Seeking relief, G. McEaddy went to the appeals court and they too denied her rights as pro se to have material. G. McEaddy was set up to fail.

G. McEaddy asked the Full Appellate Court to return the child to Massachusetts and allow immediate custody. No action was taken on the matter. Rescript had gone to the Family and Probate Court.

Although the father would like to have custody of the child, he also supported having the child placed with G. McEaddy.

**The Court pre-determined the outcome of the trial.**

No Judges in these cases addressed the concern to the lack of due process.

The court and the attorneys failed their
fundamental obligation to legally and morally
correct regarding the Sidebar, Transcript, Lines
2A 127 7-14 **Exhibit** [xiii]

### Argument

Massachusetts General Laws, Rule 1.6 states: A
judge shall perform judicial duties without bias
or prejudice.  A judge shall not, in the
performance of judicial duties, by words or
conduct manifest bias or prejudice based upon
race, sex, religion, national origin, disability,
age sexual orientation or socioeconomic status
and shall not permit staff, court officials and
other subject to do so.
To justify their wrong, The Boston Adoption
Bureau, the Suffolk County Probate and Family
Court willfully, materially, intentionally and
negligently misrepresented facts and were libel
in their Probate and Family Court Brief/
Appellate Briefs regarding G.McEaddy. The Appeals
Court agreed.

On or before September 24, 2000, a Justice in the
Suffolk County Family and Probate Court allowed
the grandson of G. McEaddy to illegally leave the
Commonwealth of Massachusetts with a family with
wealth.  The judge did this action without the
assurance everything was done decently and in
order. When the father learned of the departure

of his son, he sought to have him returned.  He
tried first through the adoption agency, then
through the legal system.  A trial took place,
but the mind of the court had been set.  The
child should remain where he was due to profile
evidence on the part of the adoption agency and
judge. The father and grandmother before him were
substandard compared to his present family. The
judge gave no consideration to the extant
siblings who ask, "Grandma, what happened to my
brother."

The court prejudicially misjudged G. McEaddy. The
case went to the Appeals Court. Having broken her
leg, ankle and foot, G. McEaddy struggled when
she could to the Appeals Court to read page after
page of the transcript, for the judge refused her
the rights of the attorney's to have their own
copy. G.McEaddy sought relief on the Appeals
level for the Transcript, but Motion after Motion
she was denied her Civil, Human and
Constitutional rights. As the Lamb sought the
lamb in the days of old, she is seeking custody
of her grandson.

The definition of a family use to be, the mother,
father, and grandparents, aunts, uncles, nieces,
nephews and cousins.  Individuals related by
consanguinity or affinity.  Today, the family
encompasses a variety of individuals from
stepparents and grandparents, to gay and lesbian
partners to common law spouses, married spouses,
single parents, and others. The court has began

to adapt itself to accommodate the modified
infrastructure of today's' families.

A grandmother is being deprived of a natural
grandmother and child relationship based upon a
unilateral decision of one parent to exclude the
father. A mother has the unilateral power to
choose and an adoptive family based upon her
unilateral exclusion of the biological father.
The father and grandmother came forward to
preserve their liberty immediately after the
mother informed him of her surrendering their
child. The mother, Boston Adoption Bureau and
Suffolk County Courts, unilaterally prevented
them from a relationship. This statutory scheme
grants rights to the natural mother, the Boston
Adoption Bureau from preventing other kinship
from having or building a relationship with the
child.

Statements in this case were falsified to deny
G.McEaddy her grandson.

Petitioner is the paternal grandmother who was
victimized by all respondent judges intentionally
violating the command in §30, of M.G.L. c. 208,
the child-removal statute, which does not allow
the removal of children without the opposing
consent or showing of just cause. Petitioner
opposed the removal of Lonnel. The court never
made an effort to find the family. The petitioner
never was consulted.

The petitioner was victimized by judge's
intentional violation of M.G.L. c. 209 B, §5(a),
the Massachusetts Child Custody Jurisdiction Act.

This Act does not allow the removal of children to another state without a hearing at which the non-consenting parent was present.    would have the opportunity to cross-examine the Boston Adoption Bureau attorney, or adoptive parents Ken and Marlene Wilson.   The evidentiary hearing held before the court allowed the child's removal out of state without the presence of the father or grandmother.

Those acts of intentionally failing to comply, as legislatures contemplated, with duly ratified statutes not only deprived G. McEaddy of due process, notice, and an evidentiary hearing.  By doing so, the judges unlawfully suspended the Laws, in contravention of Article XX of the Massachusetts Declaration of Rights. The Boston Adoption Bureau RA14, refuses to acknowledge they did not follow due process under the Federal and State Constitutions. Federal and Massachusetts's laws clearly state notification should be made. The Court asked Mr. Williams if he knew the name of the adoptive parents, and the state where they reside. Mr. Williams replied, "yes", Mary told me. The Internet told they reside in Chesterfield, Missouri. The adoption case file should have been given to G. McEaddy after the trial. His records should be made available, without being impounded until the court made its final decision. The court is shielding their failure to abide by the law and placed G. McEaddy and her son on trial with false statements and accusations.

G. McEaddy testified the Boston Adoption Bureau *never* called nor wrote G. McEaddy. The Boston Adoption Bureau *never* invited G. McEaddy to their office. G. McEaddy invited herself to the Boston Adoption Bureau. Mr. Kaye informed her she was not a party to the case. When the Court and the Boston Adoption Agency learned G. McEaddy knew what they had done with her grandchild, they put her on trial. They looked at her fitness, prolonging the trial so that they could say it is in the best interest of the child to remain where he is.

If the Interstate Compact was involved in the adoption process, why did they allow a child to leave the state without the biological father's consent?

The court exhibited tendencies of biases by failing to expeditiously give the family a speedy trial, adjudicate paternity of father until June 23, 2001. The child and G. McEaddy's families were denied all rights to visitation.

## Conclusion

G. McEaddy's prayer is you will right the wrong of the Boston Adoption Bureau as well as the Suffolk County Probate and Family Court, the Appeals Court and return her grandson to her custody.

[i] Letter to Judge Dumphy
[ii] Affidavits of Social Workers
[iii] Children's Hospital reports,  Dr. Mary Lou Buyse's reports, school reports, Dept. of Education Report
[iv] Information regarding the Wilson's were downloaded from the internet
[v] page 33 Uniform Parentage Act, Section 631
[vi] M.G.L.  c. 210 Section 2-13 Consent, notice , grandparent
[xi] Paternity Test of D'Arnell Williams
[viii] Rules of Professional Conduct, a lawyer should never knowingly make a false statement
[ix] Office of Child Care Service Report
[x] Petition of the Department of Public Welfare to Dispense with Consent to Adoption. 376 Mass. 252, 266 (1978)

[xii] The U. S. S. Ct. in M.L.B v. S.L.J. 117 S. Ct. 555 (1996) establishes the right to a transcript.
xiii Side Bar
xiv Georgia McEaddy fit guardian

## Side Bar Conference Found in the Court Transcripts

### (2A 12 7-14)

**Mr. Kaye**: I'm sorry your honor.  The issue that I have is that I would like to keep this as clean as possible.  I'm certainly willing to come to the court & counsel what the adoptive father does, but when it comes to names and what he does, it's going to clearly – what he does will clearly identify him to the parties and these people.

**The Court**: I'm sorry what he does will what?

**Mr. Kaye**: May clearly identify him to parties.

**The Court**: The nature of his employment?

**Mr. Kaye**: The nature of his employment, yes.

**Ms. Tellis Warren**: Now I'm more interested.

**Mr. Kaye**: The fact of the matter is, he
has received some mysterious phone
calls as it is, and I'm afraid
something will happen if this case goes
amiss for certain parties.

**The Court**: I understand

**Mr. Robertson**: Is he afraid of the
adoption agency doing something, is
that what it is?

**Mr. Kaye**: No

**The Court**: I'm just trying to figure
out his occupation.  For example, if he
were an astronaut--.

**Ms. Tellis Warren**: Right

**Mr. Kaye**: I would like to protect his
privacy as much as I can.

**The Court**: Yes, I'm just trying to -
the nature of the employment.  If he
were an astronaut, then he could easily
be narrowed down, but if he's—

**Mr. Kaye**: He is involved with the
media.

Mr. Beaulieu: I'm sorry, he's involved
with what?

**Mr. Kaye:** He's involved with the media.

**The Court:** So he's a journalist.

**Mr. Kaye:** No, Can I say, and then maybe the attorney's keep it to themselves?

**The Court:** All right, were all Officers of the Court.  So, I have a commitment from counsel not to disclose to their clients the occupation, until we have further discussion, unless I lift the order, all right?

**Mr. Kaye:** He's a sportscaster on a major network in the Midwest and a very prominent sportscaster for his area, which is a very large area.  I believe that one who's known to this area, they may not know who he is but clearly, if he's identified as that, it's very easy to find him.  And I'm not sure what he does.  I'm not sure what the relevance is to the case.

**Ms.Tellis Warren:** I can address that, if you want?

**The Court:** Yes, go ahead.

**Ms. Tellis Warren**: Your Honor: the
Guardian ad item who he's been
appointed by the court is talking about
the great solution the child is in the
pre adoptive home, in times of
stability and opportunity for material
gains, the opportunity for college,
post-college education.

It brings to mind whether or not
there's some issue of poverty of the
mother and father, versus the income
and education of the pre-adoptive
parents.  That's why I want to know
what she was looking at when she made
the judgment of the balances of the
best intent of the child.

**Mr. Kaye**: Those question's can
certainly be asked without knowing what
he does.

Beaulieu: Your Honor, we could perhaps
make a fictitious occupation of some
stature, perhaps we could suggest that
the adoptive parent is vice-president
of a corporation or something along

those lines.  That way it would have
similar stature, without the notoriety
and perhaps would serve as compensation
for wealth and so forth.  It may very
well be true; he may hold some similar
title in the organization.

**Ms. Tellis Warren:** Your Honor, if I can
I really do not care so much—I really
want to know what type of occupation he
has.  It doesn't bother me not to say
he's a sportscaster; I don't care about
that.  I care about his education.  I
care about how much money he has.  I
care about the house.  I don't think it
makes a difference--.

**Mr. Kaye:** I'm going to submit a
redacted.

**Ms. Tellis Warren:** Whether he's a
sportscaster or a vice-president of a
company.

**Mr. Kaye:** We have a redacted copy of
the home study, so possibly that could
--.

**The Court**: Well, no, counsel can question so let's just strike the occupation.

**Ms. Tellis Warren**: He can strike the question; right?

**The Court**: So far purposes of the transcript, it seems to me that the transcripts will be available to all parties, so will strike this, this conversation can be part of the transcript; but it will strike any reference to what he does.

**Mr. Kaye**: Thank you, Judge.

**The Court**: And to the extent that if he says he's in the media, even that part, or he's a very prominent – strike prominent as well.  So if it's okay with counsel, I'd like to give the stenographer a little bit of discretion and you can review the record carefully when you get the transcripts, to eliminate anything that may possibly identify this individual.

**Ms.Tellis-Warren**: Your Honor, I would like to ask the guardian ad litem if she's aware of his occupation and so much as what difference that may have made in her opinion. So I'll accept any --.

**The Court**: Okay, if you ask in such a way without revealing the occupation, "Are you aware;" and " Did it play a role?" Whatever questions you deem appropriate.

**Ms.Tellis-Warren**: Okay Your Honor, on a cross examination it would be my intention, perhaps to inquire whether his prominence and celebrity played any part in her decision making process that the child's best intent would be served remaining where he is?

**Ms. Tellis-Warren**: Which is my second question?

**Mr. Robertson**: But I would not go into specifics of that. I think that's a fair question.

**Mr. Kaye:** I think it can be asked in a lot of different ways, without asking that specific question.

**Ms. Tellis Warren:** What's your suggestion because I'm going to ask that next.

**Mr. Kaye:** Well, the nature of his job did that influence your decision?

**Mr. Robertson:** Well, if he's a celebrity, I think that's a fair question.

**The Court:** Why don't I let you ask a hypothical, If he were---.

**Mr. Robertson:** But that's not my question.

The Court: I'm sorry.

**Mr. Robertson:** I'm sorry, that's fine, I'm sorry.

**The Court:** If we could agree that it would be in a hypothetical. Giving an example, "If, for example he were a movie actor, would that influence your decision? Is that fair?

**Mr. Kaye:** Is that fair?

**Ms. Tellis Warren**: Well, it's just that there's a real situation, and you're asking a hypothetical one, and I assume the hypothetical one is absolutely not --.

**The Court**: All right so forget that. If you say did his position, his occupation, influence you, why doesn't that cover it?

**Ms. Tellis Warren**:  I would say : Did his position in the community, the small community in which he lives, the larger community in which he lives, make a difference to you?

**The Court**: That's Fair

**Mr. Kaye**: That's Fair

**Mr. Robertson**: I want to ask the question, "Are you aware of prominence in the community, are you aware of a certain kind of recognition in the community"?  And I want to ask the question, "Are you aware of a certain amount of celebrity and what if any, impact did that have on your

assessment". Those are the questions I want to ask.

**The Court:** Are you aware of certain amounts of celebrity? Well, you can be a celebrity in a lot of different ways.

**Mr. Kaye:** Right, he could be a good golfer.

**Mr. Robertson:** That's as far as I'm going to go with that.

**Mr. Kaye:** I'm not sure what that word means "celebrity", actually.

**The Court:** Well it can be good or it can be bad. I guess. All right. These questions will be all right.

**Mr. Kaye:** Okay.

**The Court:** But she doesn't have to answer. I mean, your question is " Are you aware whether he has celebrity status?

**Mr. Robertson:** Right, and assume she says yes, yes, yes. The last question is, "Did it have an impact on.."?

**The Court:** it would not be, well what is it?

**Mr. Robertson**: Right

**The Court**: All right, okay.

**Mr. Robertson**: Correct


(Court and Court Reporter Conference)


**The Court**: Very good.  The court will have the full transcript with everything in it and then if you want to compare, so you'll know what you left out.  If you have any trouble with it you can come in and we'll talk about it.

**Beaulieu**: Your Honor, in that case, since we do have the guardianship case here, as well I would ask the court to impound the guardianship, as well as the paternity and 210 cases.

**The Court**: I'm sorry, impound the---?

**Beaulieu**: We're trying the guardianship which is not an impounded case and the transcript is a part of the record.  So I ask the court to impound the guardianship case.

**The Court**: I can impound the transcript.

(Court and Court Reporter Conference -- Off the record discussion)

**The Court**: That portion of the transcript will be prepared on non-copiable paper.

(End of Side Bar Conference - Parties enter courtroom)

The conversation(s) above is found to be unethical, as well as prejudicial. The Court asked Mr. Williams if he knew the name of the persons who had his son. Mr. Williams said, yes.

50 Georgia McEaddy is the paternal grandmother of Lonnel Williams. She is the mother of Lionel Williams (Hereinafter Grandmother).

51 Grandmother came to the apartment of the mother one week after birth of Lonnel.

52 Mother stated she needed nothing for Lonnel. Grandmother brought diapers, wipes and other child needs during the absence of father.

53 Grandmother attended to child while mother worked, either at mothers or grandmother's home.

54 Grandmother was to return to school in September, mother had informed grandmother Candy would care for child.

Governor Mitt Romney
Commonwealth of Massachusetts
State House
Room 360
Boston, MA 02133

July 28, 2004

Dear Governor Romney,

As the Magistrate of the Commonwealth of Massachusetts, I
beseech you to overturn an illegal adoption based upon the
information below. First, the Boston Adoption Bureau filed
papers for an adoption; then went before a judge at the
Suffolk County Probate and Family Court without following
the laws of the Federal, State, Human and Civil Rights
Laws. When my son learned his son was adopted, he first
went to the Boston Adoption Bureau, 14 Beacon Street,
Boston, MA 02108, only to be denied the right to have our
family member. Legal remedy was sought within the Suffolk
County Judicial System. Apparently, the Boston Adoption
Bureau, the Justices in the Probate and Family, Appeals
Courts intentionally failed to follow mandatory
discretionary statues; or do not fully understand the
Federal and State Constitutions. These acts of
intentionally failing to comply, as legislators
contemplated, with duly ratified statues, not only deprived
the family of due process, notice, in the "first"
evidentiary hearing.
As you know, Franklin D. Roosevelt anticipated a new era in
history of basic rights.  The President defined the Four
Freedoms worth fighting for, the freedom of speech and
expression, the freedom of worship the freedom from want
and the freedom from fear.  As you also know, subsequently
the charter that founded the United Nations led to the
United Nations Universal Declaration of human Rights of
1948, which was essential to the dignity of each human
being.
After loosing the Appeal, I feared going to a higher court.
My son was incarcerated. My fear was because he spoke out
in pursuit of custody of his child, the court would again
incarcerate him. I am pursuing this matter. To me, it is my
God given right and your civic virtue to have my grandson
returned to our family. I pray God will touch your heart
and return my grandson to me.  I have worked long, hard
hours helping other people's children, please help me. From
grandparent to grandparent, place yourself in my place.

I will be out of town from the 27TH of July until August
23,<sup>RD</sup>  I pray upon my return you will have good news for me.
You will be in my prayers.  I may be reached by telephone
at (617) 325-7513 (home) or (617) 448-8360 (cell phone).
You may mail *your* response to the above address.

Sincerely yours,

Georgia McEaddy

**Please note:  Confirmation of receipt was August 2, 2004.  There has been no reply.**

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

PROBATE AND FAMILY COURT
NOS. 00W2422
00A0196

LIONEL WILLIAMS,
PLAINTIFF

V.

MARY KAY LEMOINE AND
KEVIN LEMOINE,
DEFENDANTS

## AFFIDAVIT OF ATTY. ALANNA G. CLINE

I, Alanna G. Cline, do state, swear, and depose as follows:

1. I am an adult person and am admitted to practice law in this Commonwealth. My usual office for the practice of law is 300 Market St., Brighton, MA 02135. In addition to practicing law, I also consult in regard to education issues, and have an A.M. in Secondary Education in addition to my J.D. I attach a copy of my resume. I have been practicing in the area of special education law since 1977 or thereabouts, including before the Bureau of Special Education Appeals.

2. I have had occasion to represent Georgia McEaddy in regard to allegations filed against her under M.G.L. c. 119 s. 51A through the Department of Social Services, and in regard to obtaining services for the children who were the subject of those, and who were her foster children. While my case file is now in storage, based upon my memory, the allegations were made in July, 1997 or thereabouts.

3. Based upon memory, which I feel strongly is reliable, only complaint/allegation was initially substantiated.

4. The allegation which was substantiated was appealed and taken to Fair Hearing. That charge concerned Ms. McEaddy's exercise of rights under Ch. 766 as an appointed Education Decision Maker. The subject child required special education services and programming in a substantially separate school, which was then referred to as a ".5" prototype. Between the Department and Ms. McEaddy, there was no dispute that the child needed extensive services, and services within a .5 prototype in an approved school. However, there was a dispute as to which of several such (local) schools would serve the child best, as well as a dispute regarding additional and different services. ( There was also a dispute in that DSS was unwilling to provide augmented services that it had previously provided, and was understood to generally provided to suburban and non-

and the child's then-current school placement.

10.    Ms. McEaddy's relationship with DSS was one in which I represented her for several years in regard to the subject foster children. She persisted in trying to gain services for her foster children even though DSS repeatedly refused those services. Based upon receipts and records, she, herself, provided augmented services privately, at personal expense, whenever she could.

11.    I was engaged privately by Ms. McEaddy to join her to advocate for the provision of educational placement and services for her (sibling) foster children. My representation and advocacy were at Ms. McEaddy's sole and personal expense, undertaken for the children. For that same reason, I provide this Affidavit at the request of Ms. McEaddy, but without charge.

12.    Please also know that I understand that Ms. McEaddy, herself, has both a master's level degree in education, as well as other post-graduate training in related areas.

Signed under the pains and penalties of perjury this March 28, 2001.


Alanna G. Cline
Attorney at Law
BBO 086860
300 Market St.
Brighton, MA 02135
617 783 5997



*The Commonwealth of Massachusetts*
*Executive Office of Health and Human Services*
*Office of Child Care Services*
*Central Office*
*One Ashburton Place*
*Boston, Massachusetts 02108*

**ARGEO PAUL CELLUCCI**
GOVERNOR

**JANE SWIFT**
LIEUTENANT GOVERNOR

**WILLIAM D. O'LEARY**
SECRETARY

**ARDITH WIEWORKA**
COMMISSIONER

TELEPHONE
(617) 626-2000
FAX: (617) 626-2028
TTY: (617) 626-2066

March 16, 2001

Georgia McEaddy
49 June Street
Roslindale, MA 02131

     Re:   <u>Your Records Request: Boston Adoption Bureau, Inc.</u>

Dear Ms.McEaddy:

     In response to your request for public records regarding Boston Adoption Bureau, Inc. the Office of Child Care Services (OCCS) has compiled the documents necessary to satisfy your request. Pursuant to Massachusetts General Laws (G.L.) chapter 66, section 10(a) OCCS is forwarding to you the following records:

     (1)     Investigation report dated February 8, 2001
     (2)     Statement of Noncompliance dated February 8, 2001

     Any information that identifies any complainant, witness, third party, or other information that would constitute an unwarranted invasion of personal privacy has been redacted, pursuant to G.L. c. 4 §7(26)(a), (c) and (f).

     In accordance with 950 CMR 33.03 and 32.06(3), OCCS assesses a copying fee of $1.40 for 7 pages at a rate of $0.20 per page, as well as the actual cost of postage at $.34. Please forward to my attention your total payment of $1.74, payable to the Commonwealth of Massachusetts.

     You have the right to appeal the denial of a record or any portion of a record to the Supervisor of Public Records, Office of the Secretary of State, in accordance with G.L. c.66, §10(b) and 950 CMR 33.25. Your appeal must be filed in writing within thirty (30) days and must include a copy of the letter by which the request was made, as well as OCCS' response.

The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Office of Child Care Services
**66 Cherry Hill Drive, Beverly, Massachusetts 01915**
Date: July 12, 2001

## AMENDED INVESTIGATION REPORT

Complaint #:        26105      Facility # 400537
Name of Facility:   Boston Adoption Bureau, Inc.
Address:            14 Beacon Street, Boston, MA 02108

## I.  Complaint/Incident Summary

The office received a complaint on Boston Adoption Bureau. The reporter indicated the following:

A Biological mother surrendered her infant to the agency on ▇▇▇▇. She did this without informing the biological father and paternal grandmother who have been involved with the child. The biological mother is married and her husband is on the birth certificate, however she did tell the agency the birth father's whereabouts is "unknown".

When the biological father and paternal grandmother found out about the surrender they notified the agency. The biological father has signed a statement of paternity. The complainant alleges that the program did not give notification to the biological father. The child is now placed in a pre adoptive home out of state. The biological family has obtained an attorney.

## II.  Summary of Investigation Activity

The licensor had several telephone contacts with the agency executive director and conducted a scheduled site visit on October 2, 2000. A review of the birth parent and adoptive parent record was conducted.

## III. Summary of Findings

An interview with the agency executive director and agency attorney revealed:

The agency believes that the biological mother, a Massachusetts resident and the adoptive parents who reside out of state were connected through an agency called "Silverspoons" through an advertisement in the telephone book. The agency indicated that the prospective adoptive couple then called the agency on ▇▇▇▇▇▇▇▇▇. The adoptive couple indicated to the agency that a biological mother wanted to surrender ▇▇▇▇▇▇▇▇ ▇▇▇▇▇ to the prospective adoptive couple.

The agency executive director indicated that she met with the biological mother for the first time on ▇▇▇▇▇▇▇.

The agency executive director indicated that on ▇▇▇▇▇▇▇▇▇, the biological mother and her then husband , (he is not the biological father and they subsequently divorced) met with the executive director and the

prospective foster mother. The ▮▮▮▮ was placed in foster care on ▮▮▮▮▮▮▮▮▮▮▮. The executive director indicated that the biological mother identified the biological father of the ▮▮▮▮, her former boyfriend. The executive director indicated however, that the biological mother said that the biological father was "down south somewhere", but she was not sure where he was. The agency did not request the biological mother to sign an affidavit indicating she did not know the whereabouts of the biological father, nor was there documentation of the executive director asking her for his last known address. The executive director indicated that the biological mother refused birth parent counseling. The refusal of the birth mother to accept birth parent counseling was not located in the birth parent record when it was reviewed by the licensor during the visit to the program. On ▮▮▮ ▮▮▮▮▮, the agency submitted additional documentation which did indicate in writing that the birthmother had refused counseling.

During an interview it was learned that the executive director indicated that after the placement of the ▮▮▮▮ in foster care, the agency needed to transfer the ▮▮▮▮ to a new foster home as the foster mother had developed a medical condition with the sciatic nerve in her back which would require surgery. The biological mother indicated that she didn't want the ▮▮▮▮ to be transfered to a new foster home, rather she wanted the ▮▮▮▮ to go directly to the prospective adoptive family. The ▮▮▮▮ was returned to the biological mother on ▮▮▮▮▮▮▮. ▮▮▮. The ▮▮▮▮ was placed in a second foster home on ▮▮▮▮▮▮▮▮▮▮. The ▮▮▮▮ was placed with the adoptive family on ▮▮▮▮▮▮▮▮▮▮▮.

An interview with the executive director and agency attorney revealed that the biological mother was "charged" fifteen dollars a day for foster care. The interview with agency attorney and executive director revealed that the agency charges birth mothers for foster care. Record review revealed that the agency also charged the adoptive couple for the same foster care a total of $540.00, which is $30.00 per day. The agency makes payments to the foster parents of $25.00 per day. A review of the submitted policies and procedures revealed that the policy states that "all services to birth parents are free of charge" however the policy further states that "foster care services for birth parents shall be provided free of charge if the birth parent surrenders the child to the agency. If the birth parent decides to parent the child, and voluntarily removes the child from foster care she shall be assessed a fee of $15.00 for each day the child is in foster care." In a letter to the Office dated ▮▮▮▮, the agency director stated that the birthmother did not have to pay for foster care. A compliance plan was submitted which addressed the confusion in the agency's policy regarding foster care services.

During the interview with the agency executive director and agency attorney it was learned that on ▮▮▮▮▮▮▮ ▮▮▮▮▮ the biological mother as well as her recently divorced former husband signed the surrender of the ▮▮▮▮ at the agency. The agency attorney indicated that a 210 petition to terminate the biological fathers rights was then filed in Suffolk Probate and Family Court. As the biological fathers whereabouts was listed as "unknown" the court issued a citation for publication, however, that same week the biological father came forward to the court and the agency.

A phone interview on ▮▮▮▮▮▮▮▮▮▮▮ with the agency attorney revealed that the agency has not as yet made a request of the Department of Social Services to examine parental responsibility claims filed with respect to the ▮▮▮▮. The agency attorney indicated this request "usually" takes place in the first few months of a case, prior to the 210 petition being approved by the courts.

A review of the birth parent record revealed that the agency's intake evaluation dated ▮▮▮▮▮▮▮▮▮▮▮▮ is not complete as the evaluation does not document any dates times or places of any meetings with the biological parent nor does it document that the agency was aware that the biological parent had previously been a client of another adoption agency regarding the placement of this ▮▮▮▮.

The agency placed the ████ with the adoptive family as a legal risk placement on ████████████.

On ████████████ the agency was contacted by the biological paternal grandmother and biological father in search of the ████.

A review of the adoptive couples record revealed the adoptive couple record does not contain documentation of an agency application. The review also revealed that the biological parent signed the agencies complaint policy the day of the surrender, ████████████████.

A review of the adoptive couples' record revealed no evidence of a written agreement nor a written contract with the receiving agency.

Adoptive parent record review revealed a homestudy of the adoptive home dated ████████████ and an update of the homestudy dated ████████████ both done by an out of state social worker . The placement of the ████ was done by the agency, however this licensor was unable to find documentation of a homestudy update by Boston Adoption Bureau.

A record review of the adoptive parent record failed to reveal signed copies of the required agency's complaint policy.

A record review of the adoptive family record as well as the ████ and biological parent record revealed lack of documentation of case notes.

### IV. Non-compliances

See attached plan for compliance

**Licensor/Investigator:**
Michael Curran

The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Office of Child Care Services
66 Cherry Hill Drive, Beverly, Massachusetts 01915

VISIT NARRATIVE
November 8, 2002
Boston Adoption Bureau, Inc.

14 Beacon Street
Boston, MA 02108

Executive Director:     Marilyn Speiser, LICSW

## I. Program Summary

A licensing renewal study was conducted at the agency on June 27, 2001 and September 6, 2002. The renewal study activities included an interview with the executive director, chief counsel and social worker. A review of the childrens, foster and adoptive parent records and logs was conducted as well as staff personnel records. Visits, interviews and home inspections of adoptive and foster parent homes was also conducted. Responses to adoptive parent surveys were received and reviewed. An exit interview with the executive director and chief counsel was conducted on October 24, 2002.

## II. Program Synopsis

Facility #: 400537 and 400517

License #: 146298 and 146299

Expiration Date: 5/20/2001

Ages Served: 0 - 18

Program Type: adoptions

Characteristics of Children Served: During this licensing period, domestic newborn and infants, in need of adoption services.

Number of adoption placements: October, 2001 to September, 2002 a total of 14 adoption placements.

Current Number of Approved Homes: foster care: 3

adoption: 5

### III. Additional Observations

The responses to the Office of Child Care Services survey included many positive comments from adoptive families. Some of the written comments received regarding the agency and its staff included: " We really enjoyed our social worker that came to our house, she was very helpful and had a lot of information to share with us", "Honest and straight forward... They provided good advice and kept us calm", "Truthful straight forward communication.", "Their utmost concern and care for the children, their comprehensive knowledge and complete thoroughness for details. They were a pleasure to deal with and made the process a wonderful experience." "They protected us from some very bad decisions we could have made. These are some smart, committed people".

### IV. Updates and Changes

None noted at the time of this licensing study.

### V. Corrective Action Required

See attached Plan for Compliance. Please complete and return your plan within thirty days.

### VI. Technical Assistance / Recommendations / Comments

The licensor wishes to thank the agency director, staff, foster and adoptive parents for their cooperation and assistance during the course of this unusually long licensing renewal study.

Michael Curran
Licensing Specialist

# Statement of Non-compliance

**Date of Report: 10/28/2002**

**Facility Information:**
Facility ID: **400537**      Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

**Licensee Information:**
Licensee ID:   **1400517**     Tel: 617-227-1336
Licensee Name:  Boston Adoption Bureau, Inc.

Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.03(02)(a)04 | A review of submitted documentation revealed a lack of a current agency budget. Licensee shall submit a written plan of financial capability projected for at least a 12 month period. | | | |
| 5.03(02)(a)04(d) | A review of the agency's policies and procedures revealed that the licensee's written policy describing the licensee's, the birth parents', the foster parents', the adoptive parents' and the adoptive parent applicants' respective financial responsibilities, if any, for the entire foster and adoption process is incomplete. Licensee shall submit a policy and fee schedule that details: cost of clinical hour; details of contracted services; an explanation of escrow accounts; an explanation of how the agency helps less affluent persons to become adoptive parents; explanation of agency placement fee's. | | | |
| 5.03(02)(a)05 | A review of submitted documentation revealed an incomplete agency grievance and appeal procedure.  Licensee shall submit a complaint policy which includes a provision that the complaint will be handled by someone other that the person who worked directly on the complainants case and grievance appeal procedure which shall include the opportunity for the complainants to avail themselves of at least one level of administrative review above line staff and their immediate supervisors. | | | |

02/25/2003

021028093314797

# Statement of Non-compliance

**Date of Report: 10/28/2002**

**Facility Information:**
Facility ID:   **400537**                          Tel:  617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

**Licensee Information:**
Licensee ID:   **1400517**                          Tel: 617-227-1336
Licensee Name: Boston Adoption Bureau, Inc.

Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.03(02)(a)09, 5.04(05)(f) | A review of submitted policies and procedures revealed an incomplete agency plan for staff training. Licensee shall sumit a revised plan for staff training which shall include, but not be limited to, current issues in placement. | | | |
| 5.03(02)(a)10, 5.09(04)(b) | A review of the agencies submitted written procedure for the evaluation of children and the development of service plans revealed counseling and medical services are offered to birthmothers from the time of referral to the agency until a couple of months after the birthmother surrenders. The licensee shall submit written procedures for the development of service planning which indicates that the licensee shall make available at no cost to the birthparents, either directly or by referral, any necessary services to the birth parents following adoption placement of their child. These services shall include counseling concerning adoption related issues such as identity, roles and relationships. | | | |
| 5.03(02)(a)12, 5.10(05)(b) | A review of the licensee's submitted policies and procedures revealed that the agency's assessment procedures states that "If necessary, all other members of the adotive parent applicant's household will be interviewed relative to the adoptive process." Licensee shall submit a revised assessment procedure which indicates that the licensee shall interview all other members of the applicants household, appropriate to the age of the member of the household. | | | |

0210280931 4797

# Statement of Non-compliance

**Date of Report: 10/28/2002**

**Facility Information:**
Facility ID:    **400537**
Facility Name: Boston Adoption Bureau, Inc.
              14 Beacon Street
              Boston, MA 02108                    Tel: 617-227-1336

**Licensee Information:**
Licensee ID:    **1400517**
Licensee Name: Boston Adoption Bureau, Inc.
              Boston, MA 02108                    Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.03(02)(a)12 | A review of the agencies submitted procedures for assessment of foster homes states that "If the prospective foster family has already a homestudy, they need only complete an update." Licensee shall submit a revised procedure which indicates that the licensee may perform a limited foster parent assessment if the licensee receives a foster parent assessment completed not more than twelve months prior to the current application for approval. | | | |
| 5.03(02)(b)03 | A review of submitted agency policies and procedures revealed that the agency policy states that the agency "does not place into its care any child above the age of three(3) and therefore no educational plans are necessary". Licensee shall submit revised policy for meeting the educational needs of the children served which includes referals to such services such as Early Intervention. | | | |
| 5.03(03)(a)02 | A review of submitted documentation revealed an incomplete plan for involving adult adoptees in the development of agency policy. Licensee shall submit revised agency plan which involves adult adoptees in the development of agency policy. | | | |
| 5.03(03)(a)03 | A review of the agency's written policy and procedures revealed an incomplete and inconsistent procedure for internal investigations and reporting allegations of child abuse and neglect. Licensee shall submit a complete agency policy and procedure for internal investigations and reporting allegations of child abuse and neglect. | | | |

02/25/2003

021030093114707

# Statement of Non-compliance

**Facility Information:**

Facility ID:    **400537**    Tel: 617-227-1336
Facility Name:Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

Date of Report: **10/28/2002**

**Licensee Information:**

Licensee ID:    **1400517**    Tel: 617-227-1336
Licensee Name: Boston Adoption Bureau, Inc.

Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.03(03)(a)04 | A review of submitted agency policies and procedures revealed inconsistent description of agency salary ranges. Licensee shall submit agency salary ranges. | | | |
| 5.03(03)(b)02, 5.09(04), 5.10(19) | A review of submitted agency policy and procedures revealed a lack of a written description of follow-up services. Licensee shall submit a complete written description of follow-up services | | | |
| 5.04(01)(a)04 | A review of submitted agency policies and procedures revealed that the agency policy regarding services to adult adoptees states that "Since the age of our oldest child placed is only eight years old, the agency has not had the need to adopt a policy with respect to services to be provided to adult adoptees. The agency will develop a policy as the need arises." The agency was established in 1983. Licensee shall submit an updated agency policy regarding services to adult adoptees. | | | |
| 5.04(01)(a)05 | Administrators interview revealed the lack of an agency annual evaluation. Licensee shall submit a statement of purpose which shall include a plan for the annual evaluation of its services, which shall give special attention to its performance in promoting permanency for the children in its care. | | | |

02/25/2003

0210280933 14797

# Statement of Non-compliance

**Facility Information:**

Facility ID: **400537**
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

Tel: 617-227-1336

Date of Report: **10/28/2002**

**Licensee Information:**

Licensee ID: **1400517**
Licensee Name: Boston Adoption Bureau, Inc.

Boston, MA 02108

Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.04(05)(j)04 | A review of agency personnel records revealed inconsistent documentation of employee annual evaluation. Licensee shall submit written assurance that the agency shall maintain a personnel record for each employee which includes an annual evaluation. | | | |
| 5.04(05)(j)05 | A review of agency personnel records revealed an incomplete documentation of employee training. Licensee shall submit written assurance that the licensee shall maintain personnel records for each employee which includes documentation of training and number of training hours. | | | |
| 5.09(01)(i), 5.04(03)(g) | A review of birthparent records revealed that the signed acknowledgement of the receipt of the agency's grievance and appeal procedure revealed that the written grievance and appeal was received by the birth parent, at the time of the surrender of the ●●●● Licensee shall submit written assurance that the agency shall make available to all persons receiving services, a copy of the complaint policy. | | | |
| 5.09(03)(g) | A review of adoptive parent records revealed an "Identified Adoption Agreement" which includes the statement that "payments may be made directly for legally valid reasonable birthmother expences." Licensee shall submit written assurance that no payment shall be made directly to birthparents, or to anyone on behalf of the birthparent, by anyone other than by the licensee. | | | |

02/25/2003

# Statement of Non-compliance

| | | |
|---|---|---|
| **Date of Report:** 10/28/2002 | | |

**Facility Information:**
Facility ID:    **400537**
Facility Name: Boston Adoption Bureau, Inc.    Tel:  617-227-1336
                14 Beacon Street
                Boston, MA 02108

**Licensee Information:**
Licensee ID:    **1400517**
Licensee Name:  Boston Adoption Bureau, Inc.    Tel: 617-227-1336
                Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.10(01)(e) | A review of the agency's submitted policies and procedures revealed that the the agency's financial responsibility statement states that "adoptive parents are presented with a fee schedule describing services and fee's when they receive their application". The licensee shall submit revised agency financial responsibility statement that indicates that the agency shall provide in writing, to all prospective adoptive applicants and upon request to any person, the agency's policy regarding financial responsibilities. | | | |
| 5.10(02)(c), 5.03(02)(a)12 | A review of the agency's submitted policies and procedures revealed an incomplete agency philosophy and policy regarding discipline of children. The licensee shall submit a complete written agency philosophy and policy regarding discipline of children. | | | |
| 5.10(05)(d) | A review of agency homestudy assessments revealed inconsistent written documentation of health history of applicants; attitude of extended family's towards the adoption; recommendation as to the age, sex and characteristics of children. Licensee shall submit written assurance that the agency shall document a complete written homestudy report. | | | |
| 5.13(03)(d) | A record review of foster and adoptive parent records revealed inconsistent documentation of case notes. Licensee shall submit written assurance that the agency shall maintain foster and adoptive parents records which incudes case notes. | | | |

02/25/2003

031028093314797

# Statement of Non-compliance

| Date of Report: **10/28/2002** |
| --- |

**Facility Information:**

Facility ID: **400537**            Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
    14 Beacon Street
    Boston, MA 02108

**Licensee Information:**

Licensee ID: **1400517**            Tel: 617-227-1336
Licensee Name: Boston Adoption Bureau, Inc.

    Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
| --- | --- | --- | --- | --- |

Michael Curran
Licensing Specialist

**I have reviewed the above non-compliances and have specified my plan and date of correction for each non-compliance.**

LICENSEE'S SIGNATURE _____        DATE:_____

0210280933 14797

02/25/2003

# Statement of Non-compliance

| Complaint Number: | 26105 | Date of Report: | 02/08/2001 |
|---|---|---|---|

**Facility Information:**

Facility ID:      **400537**     Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
              14 Beacon Street
              Boston, MA 02108

**Licensee Information:**

Licensee ID:      **1400517**     Tel: 617-227-1336
Licensee Name: Boston Adoption Bureau, Inc.
              Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.04(01)(b) | Adoptive parent record review revealed lack of a written agreement with the agency which conducted the adoptive family homestudy, and is the receiving agency for post placement supervision and Boston Adoption Bureau, the placement agency. Licensee shall submit written plan for OCCS approval describing the agencies plan for documentation describing clearly which services are provied directly by the agency, by referral, or through written agreements with other persons and copies of those agreements | | | |
| 5.06 | Record review of the childs record revealed incomplete intake evaluation. Licensee shall submit a plan detailing how the agency shall, prior to accepting any parents surrender of his/her child for adoption, complete a full evaluation by qualified professionals, unless such an evaluation has been documented in the referral or application. | | | |
| 5.09(03), 5.09 | Interview with agency administrators, record review and review of agencies policies and procedures revealed that the agency charges birth parents for the cost of foster care of a child the agency has placed in a foster home "if the birthparent decides to parent the child, and and voluntarily removes the child from foster care." "The birth parent is assessed a fee of $15.00 for each day the child is in care." Licensee shall submit a revised policy which clearly indicates that birth parents shall neither benefit nor suffer financially as a result of their pregnancy. | | | |

# Statement of Non-compliance

| Complaint Number: | 26105 | Date of Report: | 02/08/2001 |

**Facility Information:**
Facility ID: **400537**
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108
Tel: 617-227-1336

**Licensee Information:**
Licensee ID: **1400517**
Licensee Name: Boston Adoption Bureau, Inc.
Boston, MA 02108
Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.10(05)(e) | Record review of the adoptive family record revealed lack of a homestudy update by Boston Adoption Bureau. Licensee shall submit a plan that details how agency shall perform a limited adoptive parent assessment if the licensee receives a adoptive parent assessment performed in another state in accordance with the laws of such state, completed not more than 12 months prior to the current application for approval. | | | |
| 5.13(02)(a) | Record review of the childs record revealed an incomplete face sheet. Licensee shall submit a written plan detailing how the licensee shall maintain a written record for each child which includes a face sheet which identifies the child by the required information. | | | |
| 5.13(03)(a) | Record review of the adoptive family record revealed a lack of the adoptive family's written application. Licensee shall submit a plan detailing how the agency shall maintain a written record which shall include an adoptive parents written application. | | | |
| 5.13(03)(d) | Record review of the adoptive family record revealed a lack of case notes. Licensee shall submit a plan detailing how the licensee shall maintain a written record for adoptive parents which includes case notes documenting services set forth in CMR 5.10. | | | |

# Statement of Non-compliance

| Complaint Number: **26105** | Date of Report: **02/08/2001** |
|---|---|
| **Facility Information:**<br>Facility ID: **400537**       Tel: 617-227-1336<br>Facility Name: Boston Adoption Bureau, Inc.<br>      14 Beacon Street<br>      Boston, MA 02108 | **Licensee Information:**<br>Licensee ID:   **1400517**<br>Licensee Name: Boston Adoption Bureau, Inc.<br><br>          Boston, MA 02108<br><br>                  Tel: 617-227-1336 |

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| | | | | |

Michael Curran
Licensing Specialist

**I have reviewed the above non-compliances and have specified my plan and date of correction for each non-compliance**

LICENSEE'S SIGNATURE _____  DATE:_____

## NEW ENGLAND BAPTIST MEDICAL ASSOCIATES

**Affiliated with New England Baptist Hospital and CareGroup**

May 15, 2003

### AFFIDAVIT of
### DR. MARY LOU BUYSE

My name is Dr. Mary Lou Buyse and I state the following as true and accurate:

1. I am a licensed physician in Massachusetts

2. I have been the family physician for the McEaddy/Griffith family for eighteen (18) years

3. I have examined and treated every foster child Ms. McEaddy has had placed in her home since 1985

4. Every child's appearance, grooming and attire were excellent

5. They were healthy or seen when ill

6. All psychological referrals were made by me

7. Each foster child was seen by appropriate eye and dental specialist as needed

8. There were never indications of abuse in any form

Nathaniel Hobley was first seen in this office May of 1994. Weeks earlier he was released from the Metro Medical West to his foster home, then to Ms. McEaddys' home. This psychiatric treatment center diagnosed him Pervasive Development Disorder with Autistic-like features and placed Nathaniel on , Clonidine .02 mg three times a day, , Elavil, 20 mg at bedtime and, Ativan 0.25 mg given for agitation. I weaned him from all medications. At the time he wore diapers, ate baby food and was pica. By September, he was toilet trained, ate a regular balanced diet.

## ADOPTIVE HOME STUDY UPDATE

### IDENTIFYING INFORMATION

NAME:   McEADE, Georgia
        49 June Street
        Roslindale, MA 02131

TEL:    (617) 327-9438   325-7513

CHILD IN HOME:
        Dorcas Griffith, DOB: 4/8/81

### REFERENCES

References for Ms. McEaddy's update were all of a positive nature referring to her experience with children.  They also speak to the gains children have made who live with Ms. McEaddy including development of self-confidence and self-awareness as well as behavioral improvements.  They respect Georgia for her strength of character and her educational achievements.

### CRIMINAL RECORDS

Ms. McEaddy has no Board of Probation Record.  An updated CORI and Board of Probation record has been received confirming this.

### CONTACTS

Ms. McEaddy had her first homestudy in our agency in 1985, a copy of which is enclosed.  On June 24, 1987 a Black female child DOB: 7/7/77 was placed with Ms. McEaddy for the purpose of adoption.  This placement was not successful and disrupted on September 28, 1988, due in large part to the very difficult systems issues surrounding the child.

Ms. McEaddy continues to feel committed to the provision of a permanent home to a minority child and applied to our agency for an update of her homestudy after becoming interested in a sibling group in Rhode Island.  This worker had had home visits with Ms. McEaddy in November and December 1988 both to evaluate the previous placement and to discuss an update for future placement.  This update also consisted of an extended home visit on January 8, 1989.

### FAMILY BACKGROUND

The biographical information and family history are extensively detailed in Georgia's previous home study and in the family

## Protestant Social Service Bureau

776 HANCOCK STREET  — WOLLASTON, MASSACHUSETTS 02170     Telephone 773-6203

ROBERT F. TAYLOR, ACSW
    Executive Director

REV. THOMAS W. MARTIN
    President

May 21,2003

TO WHOM IT MAY CONCERN;

This letter is written at the request of the interested party Ms. Georgia Mceaddy of 49 June St-Roslindale, MA. 02131.

Ms. Mceaddy provided foster care services thru La Alianza Hispana located at 409 Dudley Street in Roxbury, MA. She provided foster care for a young boy of hispanic origin for whom she cared for in my opinion quite well.
She placed him in a private school, ensure that his homework was done on a timely manner, collaborated with Alianza in ensuring that the child was ready for siblings visit when ever they scheduled. She openly and honestly discussed issues that were afflicting the child at the time. Her attitude and cooperation was always very positive.

Should you have any questions regarding this letter please call me at 617-288-9500 Ext 192 from 8:30am- 4:30 pm

Attentively;

Josefina Perez
Probation Officer
Dorchester District Court



**Massachusetts**
**Adoption**
**Resource**
**Exchange, Inc.**

Carolyn E. Smith
Executive Director

*Sponsors of "Wednesday's Child" and "Sunday's Child"*

May 19, 2003

To Whom It May Concern:

I placed as child with Georgia McEddy being as an adoption social worker for the Italian Home in 1982. I worked for almost two years with Georgia and Leanne the child I placed with Georgia. Georgia was always very cooperative with me. She would call if she had concerns. She would seek my input and use many of my suggestions in dealing with Leanne, who was a difficult child to parent.

I found George McEddy to be a very caring person and not hard to work with.

Sincerely,

Carolyn E. Smith
Executive Director

### Affidavit of Melvin H. King

I Melvin H. King do swear to the following:

I am a resident of Massachusetts and live at 4 Yarmouth Street, Boston, MA, 02116

I am retired as a professor from the Massachusetts Institute of Technology (MIT) and served as a Massachusetts State Legislator from my district for many years

I have known Georgia McEaddy, her children, Lonnie, Loniel and Dorcas, as well as her Grandchildren, Tasmin, Tevin and Ariana. I met Lonnel once. I have met each of her foster children at my Sunday Brunch.

I have known Georgia for twenty-five years or better. She served as my legislative assistant and is an excellent advocate.

I am impressed at the work she has done with all the children, but, particularly, Nathaniel When Nathaniel began to come to the brunches at my home, he wore diapers, his food had to be mashed, he would not speak and he was easily agitated. Within two months, Nathaniel was toilet trained, his food was not mashed. His agitation diminished and he would smile and laugh. Within a year, Nathaniel was speaking short sentences.

His sister, Nitanju was shy at first, but quickly would express herself and was happy.

I was able to express the growth and development of both children as well as my concern for the disruption of placement at the Fair Hearing.

Georgia did an excellent job raising her children, Lonnie, Loniel and Dorcas. Each was sent to private schools, camps, church. My youngest son and her sons were friends.

At some point Lonnie and Loniel went to New York to live with their father. Lonnie remained, but Loniel returned to Boston. After Loniel returned, he attended English High School.

To me, Georgia taught each child morals, values and manners. Lonnel would receive excellent care once he is returned to his family.

Sworn under the pains and penalties of perjury.

Melvin H King
5/36/03

## AFFIDAVIT OF FREDA B. BELL WILEY

I Freda B. Bell Wiley who lives at 49 Ridgecrest Terrace, West Roxbury, MA do swear and affirm the following:

I am the biological mother of Nathaniel and Nitanju Hobley.  When Nathaniel was 14-18 months old he was diagnosed with pervasive development disorder.

Until my kids were placed with Georgia all I did was complain about their care from their other foster homes.  The only time I had questions about Georgia's care of my kids was before I first met her. It was told to me Nathaniel was taking Xonex and clonadine to control his outburst and that she was not giving him the medications.  I complained to DSS and they said the doctor was taking Nathaniel off the medications.

I never complained about Georgia's care of my children, without having a reason.  The kids have been free to talk to me about their care and they never complained about their care with her.  I'd truly like to know the truth about why my children were removed from her family.  I can only give my support of Georgia's a good mother and role model for me, my kids and her family from the few times I would bump into her, Dorcas and my kids and from talking with her at visits with DSS.

I've no idea why my children were removed from Georgia when it seemed to me they were getting well, they were happy, healthy, well groomed, and well adjusted to being with her.  I've heard rumors alleging sexual abuse, educational abuse, and not supervising them on a regular basis as well as going without food because Georgia was financially unable to care for my children.

I can't support any of these accusations by DSS because I seen the opposite, when I seen my children with Georgia.  In the conversations I had with Nathaniel and Nitanju, they always said they were happy.  Nitanju said, Mommy, I miss you and I love you but you know what, I'm having fun at Grandma's house.  Can you come live with Grandma, me and Nathaniel?

Georgia referred me to a support group which she attends. When I see her she gives me worthwhile advice in a motherly way when I've asked her for advice.

I signed this under the pains and penalty of perjury:

*Freda B. Bell-Wiley*        5/29/2003
Freda B. Bell Wiley        Date
(617) 327-9185

# CLINIC SHEET

PSYCHOLOGICAL CONSULTATION
Developmental Evaluation Center

USE PLATE OR PRINT
**HOBLEY, Nitanju**
DOB: 01-28-92
MR. NO. DOB: 12-12-95 DATE
Age: 3 10/12 years
PT. NAME CH#: 100-01-73

DATE OF BIRTH

---

**Procedures:** Wechsler Preschool & Primary Scale of Intelligence - R
(selected subtests);    Seguin Formboard
Developmental Test of Visual Motor Integration
Binet IV: Picture-Naming Vocabulary;    Absurdities
Vineland Adaptive Behavior Scales (attempted)
Foster Parent Interview & Play Observation

**Background:** Nitanju Hobley is a 3 year, 10 month old African American girl who has been in her current foster home since September, 1995. Since placement with her foster mother, Georgia McEaddy, there have been concerns about developmental delays as a result of environmental deprivation. Nitanju has a complicated psychosocial history, which includes two foster care placements. She is currently in the custody of DSS although parental rights have been terminated and she is free for adoption. It is unclear what services Nitanju received while in her prior foster home placement. It is apparent that she received some developmental stimulation for an uncertain period of time. Nitanju is reported to have a history of toe walking, head banging, and failure to thrive. Her current foster mother reports significant behavioral issues. When angry or pushed to do something she does not want to do, Nitanju reportedly will squat and either defecate or urinate in protest. She will also head bang, and bite or kick. Her foster mother reports that the head banging and other aggressive behaviors have decreased in frequency, however. Nitanju is reported to have significant separation issues with her foster mother. She does not have contact with her biological mother or prior foster mother at this time. She reportedly becomes angry at her foster mother if she unexpectedly leaves her, and may not speak to her for several days while she is angry. Nitanju currently lives with her foster mother, her foster mother's 14 year old daughter, and Nitanju's biological older brother, Nathaniel. Nathaniel has been previously seen by the DEC, and was diagnosed with Pervasive Developmental Disorder/Autistic Disorder. Nitanju also has two other biological brothers who are placed elsewhere. Both of these brothers are reported to have language difficulties. At the time of this evaluation, Nitanju was not receiving any services, nor was she involved in a school program.

**Behavioral Observations:** Nitanju presented as an attractive and extremely engaging child who willingly accompanied the evaluator and her foster mother to the testing room. She was seated at a Rifton chair and table, and sat patiently waiting between tasks. At no time did she request to leave her chair. Although she was generally cooperative with testing tasks, she could become evasive when having difficulty with a given task. Nitanju would also state that she did not know the answer to a question, or did not know how to do a puzzle, as a means of avoiding questions and tasks that she found difficult. She enjoyed naming pictures, although she appeared

CHILDREN'S HOSPITAL, BOSTON, MASSACHUSETTS 02115

03153 10M

to have more difficulty with the processing of complex language.
When asked questions, Nitanju would frequently avoid answering
them.    Attentional issues were apparent, although this was
primarily associated with non-preferred tasks. Nitanju had a solid
ability to attend during tasks she enjoyed.  At one point during
the evaluation session, her foster mother left to speak with a
pediatrician. Although Nitanju initially presented as accepting of
her foster mother's departure, upon her foster mother's return, she
displayed significant anger towards her and told her at one point
to "get out".    Nitanju's separation issues were therefore most
apparent when rejoined with her foster mother.  Nitanju was very
verbal and talkative.   She frequently attempted to redirect the
evaluator's focus on testing tasks by telling short stories.  At
these times, Nitanju often became lost in her stories and it was
difficult to follow the content.   Also at these times, it was
difficult to understand what Nitanju was saying, although generally
her articulation was appropriate.  Fine motor issues were apparent,
especially with the completion of puzzles and drawing tasks.
Nitanju held her pencil in a very high and loose semi-tripod grip,
which appeared to negatively impact her control.   She had
particular difficulty with puzzles having curved pieces.  She was
unable to do puzzles that did not have an outside frame.

<u>Test Results</u>: Nitanju displayed a relative strength in her ability
to complete visual spatial tasks.  She completed the Seguin form-
board quickly, producing an age equivalent score of 4¼ years.  She
could do this task with precision.  Nitanju had more difficulty
with the puzzles for the Object Assembly subtest of the WPPSI-R.
As noted previously, she could not complete puzzles which did not
have an outside frame.   In particular, she could not complete the
car or the dog puzzles.   She was able to place the head on the
teddy bear, and could place the eye and the mouth on the face.  She
frequently gave up on these puzzles as they were difficult for her,
producing an age equivalent score of 3 years on this subtest.
Nitanju had more success with the Picture Completion task and the
Animal Pegs task.   She obtained age equivalent scores of 4¼ years
on both of these tasks.   It is notable that she quickly learned the
coding sequence for the Animal Pegs test.   While completing this
test, she did not refer to the coding scheme, but clearly had it
memorized.  Nitanju also completed the Mazes subtest of the WPPSI-
R.  Her performance appeared to be hindered by the aforementioned
fine motor control issues, and she obtained an age equivalent score
of 3¼ years on this task.  When the 4 performance WPPSI-R subtests
were prorated, Nitanju obtained a Performance IQ score of 101.
This is indicative of average intelligence in this area.

Nitanju had more difficulty with verbally-based items.  Her pre-
academic skills appear to just be developing.  Nitanju has very
poor counting ability, and often, when counting by item, will count
the same item twice.  Although she does understand concepts such as
biggest and tallest, she does not understand quantitative concepts.
Nitanju achieved an age equivalent score of less than 3 years on
the Arithmetic subtest.  She had more success with the Information
subtest of the WPPSI-R, reflective of the span of information she
has about her world.   Her performance on this task was
inconsistent, and she would frequently miss items of limited
difficulty while correctly answering items of greater difficulty.
This inconsistent performance may be reflective of environmental
deficits. Nitanju does not know colors. When asked what color is

grass, she pointed to the evaluator's chair which was blue, and stated "that color". She could not name the color however. While scoring in the 3½ year level on the Information subtest, Nitanju achieved a less than 3 year age level for the Comprehension subtest. This appeared to be the result of her unwillingness to answer lengthy questions. When asked questions, she often produced associations to questions. For example, when asked "why do you wash your face", Nitanju replied "and brush your teeth". It is notable, however, that Nitanju was most evasive during the WPPSI-R verbal subtests. She had much greater success with the Picture-Naming Vocabulary of the Binet IV, where she was able to name all the pictures except one, that of the bridge, achieving an age equivalent score of 4 years, 1 month. Similarly, she had significant success with the Absurdities subtest of the Binet IV, achieving a 4½ year age equivalent score. It is notable that both of these subtests were enjoyable to her and held her attention, which the verbal subtests of the WPPSI-R did not.

When administered the Developmental Test of Visual Motor Integration (VMI), Nitanju scored at an age appropriate level. It is notable, however, that her fine motor difficulties were most apparent on this test. She was able to draw vertical and horizontal lines, as well as circles. She could not draw crossed lines or a square. She requested hand over hand assistance in drawing several of the more difficult figures. She was very accepting of hand over hand assistance and appeared to enjoy the contact.

The Vineland Adaptive Behavior Scales were attempted with the foster mother as informant. Although these scales could not be scored, due to the foster mother's relatively new exposure to Nitanju, it does appear that there are delays in self-care skills. Ms. McEaddy is also concerned about Nitanju's emotional functioning. She reports that Nitanju has recently begun play therapy. Although behavioral issues were noted, the foster mother currently feels that these are workable for her. At the current time, it is the foster mother's impression that Nitanju's emotional issues are negatively impacting her socialization.

<u>Discussion</u>: Nitanju currently presents as a very needy and dependent child who is adjusting to a new living and caregiving situation. Although cognitive deficits were not apparent during this evaluation, she is clearly at risk given her psychosocial history. At the current time she appears to feel quite uprooted. She will need significantly more time to adjust to her new living situation. Her visual motor skills appear to be an area of relative strength for her, and she has apparently average intelligence in this area. Fine motor issues were apparent which merit further consideration. Nitanju appears to have more difficulty with verbally-based items. Although Picture-Naming is a relative strength for her within this area, she has more difficulty with complex language. She requires a broader exposure to learning opportunities, both at school and in her general environment. It is questionable at this time whether her weaknesses in the speech and language area are a result of negative social and environmental experiences, or a more general learning issue. This merits further consideration over time.

<u>Impression</u>:     Adjustment reaction (309.9).
                 Receptive and expressive language delays (315.31).

PATIENT'S LAST NAME (PLEASE PRINT)
HOBLEY, Nitanju        - 4 -

FIRST NAME
PCN#:    100-01-73

RECORD NO.
A

## Considerations:

1.    Given Nitanju's age, she is in need of a thorough CORE evaluation, including an occupational therapy evaluation to further consider her fine motor issues.  She would appear to be best served in an integrated preschool program, with weekly speech and language therapy.  An integrated program would also help to capitalize on her social relatedness and interest in others, while simultaneously increasing her exposure to speech and language skills.

2.    Given Nitanju's apparent adjustment and separation issues, we support her continued participation in play therapy.  This should be particularly focused on her sense of being uprooted and her adjustment to her new living situation.

3.    Although it is recognized that Ms. McEaddy feels able to assist Nitanju in overcoming her behavioral problems, it is suggested that in-home behavioral consultation be provided as part of Nitanju's special needs school program, should behavioral problems continue or intensify.  Such in-home behavioral consultation would serve to provide consistency with a behavioral program that is implemented in the school system.  Ms. McEaddy was encouraged to seek behavioral services as needed.

4.  Given Nitanju's complicated psychosocial history as well as her current speech and language delays, it is recommended that she be reevaluated by the psychologist and speech and language therapist of this team after one year.  Continued monitoring of Nitanju's developmental progress would appear to be appropriate given that she is at significant risk.

Christine Darsney, M.A.
Psychology Fellow

Bruce Cushna, Ph.D.
Supervising Psychologist

CD/sg
Date Received: 12/16/95
Date Typed: 12/17/95





**Train with an NHL Pro this Sur**

**BLUENOTESH❄P**
**TOLL FREE:1-800-258-3716**

Game Day | Live Scoreboard | News Releases | Publications | Forum | Gallery | Affiliates | Conta

🏠 | **Team** | **Schedule** | **Statistics** | **Tickets** | **Fan Stuff** | **Kids** | **History**

Players | Coaches | Front Office

**Front Office**



SPONSORED BY:

ST. LOUIS BLUES
MasterCard® Credit Card
APPLY TODAY!

# Ken Wilson
TV Play-by-Play

Ken Wilson, 49, enters his 18th season as the "Voice of the St. Louis Blues." Baby!" exclamation at climatic moments has become a major part of Blues h the years.

A graduate of the University of Michigan, Wilson delivered play-by-play of co minor league hockey prior to reaching the NHL with the Chicago Blackhawks has broadcast NHL games for ESPN and Sportschannel America, as well as th Games for Turner Broadcasting.

A four-time Mid-America Emmy winner for his hockey play-by-play, Wilson is noted major league baseball broadcaster. He has broadcast for the Oakland / California Angels, St. Louis Cardinals, Cincinnati Reds, Chicago White Sox an Mariners.

Ken and his wife Marlene have three sons, Ryan, Grant and Keaka, and one ( Sophia. The Wilson's make their home in Chesterfield, Missouri.



# The Commonwealth of Massachusetts
## Department of Revenue
### Child Support Enforcement Division

Alan L. LeBovidge
Commissioner
Marilyn Ray Smith
Deputy Commissioner

April 16, 2003

Mr. Lenell Williams
33 Wenonah Street
Dorchester, MA. 02121

RE:    Custodial Parent: Desare Sapp
       Child: D'Anell Edward Williams

Dear Mr. Williams:

The Child Support Enforcement Division of the Massachusetts Department of Revenue (DOR) received the results of the paternity tests conducted in the paternity action filed against the putative father named above. A copy of the results is enclosed.

The test results indicate that you are not the father of the child named above. Notice of further court proceeding will be mailed to you under separate cover.

Please contact me at the number below within seven (7) days of the date of this letter if you have any questions regarding this case. Assuming there is no challenge to the paternity test results, in sixty (60) days DOR will take the steps necessary to close this case.

Thank you.

Sincerely,

Barbara Dillon DeSouza, Counsel
Massachusetts Department of Revenue
Child Support Enforcement Division
239-245 Causeway Street, 3rd Floor
Boston, MA 02139
(617) 619-0800 ext. 32628

BDD:lrb
Encl.

*This child is not ours, yet Judge make a judgment without evidence*

**AFFIDAVIT OF BLOOD TESTING RESULTS**

STATE OF LOUISIANA, PARISH OF JEFFERSON
RELIAGENE CASE #    2003-114308
PARISH/COUNTY:  METROPOLITAN, MA
CHILD SUPPORT CASE NO.:  03-003186578

I, Megan D. Shaffer, having been duly sworn under oath state the following:

1. ReliaGene Technologies, Inc. was requested to perform paternity tests on the following individuals for the purpose of reasonably proving or disproving the probability of the Defendant's paternity of the child(ren) set forth below:

      Alleged Father:  **LONIEL WILLIAMS**

          Mother:  **DESSERE SAPP**

           Child:  **D ANELL WILLIAMS**

2. My full name is: Megan Danielle Shaffer.

3. I am qualified as an examiner of inherited characteristics included but not limited to those found in blood and tissue samples and to administer the test.

4. My address is: ReliaGene Technologies, Inc., 5525 Mounes Street, Suite 101, New Orleans, LA 70123.  My telephone number is: (504) 734-9700 or 1-800-PATERNITY.

5. My qualifications are as follows, to wit:
    - Highest Degree: Ph.D. in Microbiology and Immunology
    - Present Position: Assistant Director at ReliaGene Technologies, Inc.
    - Past and Present Memberships:
        American Society for Microbiology
        Association for Research In Vision and Ophthalmology

6. My education is as follows, to wit:
    - B.S. Degree 1993, Major-Biology
    - Ph.D. Degree 2000, Major-Microbiology and Immunology

7. My experience is as follows, to wit:
    - Over 7 years of laboratory and research experience in Microbiology
    - Assistant Director of ReliaGene Technologies, Inc.
    - Author of numerous scientific research papers and abstracts

8. Identification of individuals:  The tested individuals were identified when the samples were collected, as follows, to wit: By photograph, fingerprint, and/or identification card. See attached Identification/Chain of Custody document(s).

9. Who Collected Test Samples: See attached Identification/Chain of Custody Client Identification document(s).

10. How Test Samples Were Collected: Test samples were collected as follows, to wit: see attached Identification/Chain of Custody document(s).

11. When Test Samples Were Collected: Test samples were collected on the following date(s) and time(s), to wit: See attached Identification/Chain of Custody document(s).

12. Where Test Samples Were Collected: Test samples were collected at the following location(s), to wit: See attached Identification/Chain of Custody document(s).

13. The chain of custody of the test samples from the time collected until the tests were completed is as follows, to wit: See attached Identification/Chain of Custody document(s), which is signed by the individual collecting samples, as well as the individual packing and sealing the samples. The samples were delivered to the laboratory. The specimen container was examined for integrity. The Identification/Chain of Custody document(s) was(were) signed by the person opening the samples in the laboratory. There was no evidence of tampering during transit and, once received by the laboratory, the samples were then at all times in the care and custody of ReliaGene Technologies in an electronically secured facility under my direct supervision. Furthermore, the Chain of Custody documentation was made at or near the time of sample collection and was made in the course of regularly conducted business activity.

14. The results of the tests are follows, to wit: See attached laboratory report. Furthermore, the report containing the results of the initial testing has been prepared under my direct supervision.

15. If the tested man could not be excluded, the defendant's probability of paternity of the child(ren), as calculated by an expert based on the test results, is as follows, to wit: See attached laboratory report.

16. The procedure performed to obtain the test results are as follows, to wit: ReliaGene Technologies, Inc. performs paternity determinations by DNA analysis in accordance with medically accepted procedures as defined by the Standards of American Association of Blood Banks and the conclusions are correct as reported. The testing fees have been previously agreed upon by the client.

ReliaGene Technologies, Inc. is accredited by the Parentage Testing Committe of the American Association of Blood Banks and by the New York State Department of Health (CLIA # 19D0665242, PFI # 1978).


Signature
Megan D. Shaffer, Ph.D.
Assistant Director

SWORN TO AND SUBSCRIBED BEFORE ME
THIS 9 DAY OF April 2003

RONALD M. BEAGLE, NOTARY PUBLIC
COMMISSIONED FOR LIFE



**RELIAGENE**
TECHNOLOGIES, INC.

# Parentage Test Results
## Case 114308
### METROPOLITAN, MA, p69

| Tested Man: | LONIEL WILLIAMS | (B) | 03-13446 | 03/27/03 |
|---|---|---|---|---|
| Mother: | DESSERE SAPP | (B) | 03-13444 | 03/13/03 |
| Child: | D ANELL WILLIAMS | | 03-13445 | 03/13/03 |

**SUMMARY OF FINDINGS:** LONIEL WILLIAMS is not the biological father of D ANELL WILLIAMS.

| TEST | OBSERVED PHENOTYPES | | | |
|---|---|---|---|---|
| | Mother | Child | Tested Man | |
| D16S539 | 9, 11 | 11, 12 | 11, 14 | Inconsistent |
| D19S433 | 13.2, 15.2 | 15.2, 16 | 11, 15.2 | Inconsistent |
| D21S11 | 27, 29 | 29 | 27, 28 | Inconsistent |
| D3S1358 | 15 | 15, 18 | 15, 16 | Inconsistent |
| D8S1179 | 13, 14 | 13, 14 | 10, 14 | |
| FGA | 22, 25 | 22, 25 | 19, 23 | Inconsistent |
| TH01 | 7, 8 | 7, 9.3 | 9, 9.3 | |
| vWA | 16, 17 | 14, 17 | 17 | Inconsistent |

**Conclusion:**

*Our opinion of NON-PATERNITY is based on the above noted inconsistencies. The term "inconsistency" means that the band sizes of the tested man do not match the obligate paternal band sizes in the child. Based on the absence of these DNA markers (as determined by DNA analysis) the tested man cannot be the biological father of the child.*

This is to certify that all the biological samples were drawn and forwarded to Reliagene Technologies, Inc., as stated in the attached Chain of Custody Documentation. Reliagene Technologies, Inc. is accredited by the Parentage Testing Committee of the American Association of Blood Banks. The conclusions are correct to the best of my knowledge. In calculating the PI value, where applicable, the mutation frequency is taken into consideration.

Sudhir K. Sinha, Ph.D., Lab Director
Michael Murray, Ph.D., Assoc. Director
Jaiprakash Shewale, Ph.D., Asst. Director
Megan D. Shaffer, Ph.D., Asst. Director

Date: 4/9/3

5525 Mounes Street, Suite 101, New Orleans, Louisiana, 70123
Phone 800-256-4106 or 800-PATERNITY (728-3764) or 504-734-9700
Fax 800-256-4556 or 504-734-9787 • www.reliagene.com

# ReliaGene Technologies, Inc.

5525 Mounes Street, Ste. 101   New Orleans, LA 70123   800-PATERNITY / 504-734-9700

**RELIAGENE**
TECHNOLOGIES, INC.

## SOP #101W    CHAIN OF CUSTODY DOCUMENT
### DATE: 3-13-2003

## MOTHER:

Name: Last __Sapp__  First __Desare__  MI __M__

Social Security # ~~████████~~  Client Race __Black__  DOB __6-7-1970__  Type of ID __MASS DTA__

ID # ~~████████~~

Have you received a blood transfusion in the last 90 days? ✓NO ___YES  (if yes to either of these questions, 4 buccal swabs must be collected)

Have you ever received a bone marrow transplant? ✓NO ___YES

| SAMPLE #---FOR LAB USE ONLY--- |
| 03 – 13444 |

Under the pains and penalty of perjury, I certify the above information is correct.  I grant permission for biological specimens to be taken for the purpose of disputed parentage study.  I understand the results may be used in statistical evaluations.

CLIENT SIGNATURE: __Desere Sapp__

MOTHER'S RIGHT THUMBPRINT

## CHILD:

Name: Last __Williams__  First __D'Anell__  MI __E__

Social Security # ~~████████~~  DOB __10-14-2000__  Type of ID __S.S. card__  ID# ~~████████~~

Have you received a blood transfusion in the last 90 days? ✓NO ___YES  (if yes to either of these questions, 4 buccal swabs must be collected)

Have you ever received a bone marrow transplant? ✓NO ___YES

| SAMPLE #---FOR LAB USE ONLY--- |
| 03 – 13445 |

Under the pains and penalty of perjury, I certify the above information is correct.  I grant permission for biological specimens to be taken for the purpose of disputed parentage study.  I understand the results may be used in statistical evaluations.

CLIENT SIGNATURE: __Desere Sapp__
If under 18, legal guardian

CHILD'S RIGHT THUMBPRINT

## ALLEGED FATHER:

Name: Last _____  First _____  MI _____

Social Security #_____  Client Race_____  DOB_____  Type Of ID_____

ID #_____

Have you received a blood transfusion in the last 90 days?____NO____YES  (if yes to either of these questions, 4 buccal swabs must be collected)

Have you ever received a bone marrow transplant? ____NO____YES

| SAMPLE #----FOR LAB USE ONLY---- |

Under the pains and penalty of perjury, I certify the above information is correct.  I grant permission for biological specimens to be taken for the purpose of disputed parentage study.  I understand the results may be used in statistical evaluations.

ALLEGED FATHER'S RIGHT THUMBPRINT

CLIENT SIGNATURE:_____  Print Name:_____

## USE SEPARATE DOCUMENT FOR EACH ADDITIONAL CHILD AND/OR ALLEGED FATHER

Fill out the following for each individual.
(Even if all parties are not being drawn at this time)

# Samples collected

Client's initials verifying
samples labeled correctly

Mother: **Sapp, Desare**

4
☐ blood
☒ buccals

**DS**

Child: **Williams, D'Anell**

4
☐ blood
☒ buccals

**DS**

eged Father: **Williams, Lenell**

___
☐ blood
☐ buccals

___

**TO BE COMPLETED BY PHLEBOTOMIST AND/OR WITNESS AT DRAW SITE:**

I, **Athea Scarborough**, hereby certify that I have collected specimens from the person(s) listed
   (Print name of person collecting specimens)

on this document at **11:am** on **3-13-2003**,
                      (Time of day)      (Today's month, day and year)

in **Suffolk Probate Court  Boston, Mass**, as well as packaged the
   (Location: Site, City, State)

specimens for shipment to ReliaGene Technologies, Inc. Under the pains and penalty of perjury, all the above
information is correct.

**PHLEBOTOMIST SIGNATURE:** *Athea Sca*

I hereby certify that I have witnessed the actual collection of specimens from the individual(s) listed above for
shipment to ReliaGene Technologies, Inc. Under the pains and penalty of perjury, all the above information is correct.

**FIELD REPRESENTATIVE SIGNATURE:** *Sylvia Lorenzi*
(NOT TO BE COMPLETED IF THERE IS NO FIELD REPRESENTATIVE)

3-13-2003



Sapp, Desare (M)
Williams, D'Anell (C)
Desare Sapp

ALLEGED FATHER
MUST
SIGN AND DATE
THE PHOTO

STAPLE

PHOTO OF

ALLEGED FATHER

HERE

**DO NOT WRITE BELOW THIS LINE - FOR LAB USE ONLY**

nder the pains and penalty of perjury, I certify that I received the specimens obtained from the individual(s)designated above.
here is no evidence that the package has been opened or tampered with. The specimens are intact. Samples received at:

GI    JRE:                           ReliaGene Technologies, Inc.
                                      5525 Mounes St. Ste. 101
ATE: **3/18/03**   TIME OF DAY: **10:06**   New Orleans, LA 70123
                                      800-PATERNITY / 504-734-9700

EX. 6

# REGISTRY DIVISION OF THE CITY OF BOSTON

### COUNTY OF SUFFOLK, COMMONWEALTH OF MASSACHUSETTS, UNITED STATES OF AMERICA

Certificate R № 017546

*I, the undersigned, hereby certify that I hold the office of* ................................
*City Registrar of the City of Boston and I certify the following facts appear on the*
*records of Births, Marriages and Deaths kept in said City as required by law.*

---

**The Commonwealth of Massachusetts**
DEPARTMENT OF PUBLIC HEALTH
REGISTRY OF VITAL RECORDS AND STATISTICS
STANDARD CERTIFICATE OF LIVE BIRTH

**STATE USE ONLY**

9D. REGISTERED NUMBER

V 7884

**CHILD**

| 3C. CITY/TOWN | BOSTON |
| 3B. COUNTY | SUFFOLK |

3. PLACE OF BIRTH

3A. FACILITY NAME-IF NOT IN FACILITY, NUMBER AND STREET
BRIGHAM AND WOMENS HOSPITAL

| NAME 4A. FIRST | 4B. MIDDLE | 4C. LAST |
|---|---|---|
| D'ANELL | EDWARD MACEO | WILLIAMS |

| 5. SEX | 6A. PLURALITY | 6B. BIRTH ORDER | 7. TIME | 8. DATE OF BIRTH (Month, Day, Year) |
|---|---|---|---|---|
| MALE | SINGLE | --- | 10:03 AM | OCTOBER 14, 2000 |

**CERTIFIER**

| 9A. NAME | | 9B. TITLE |
|---|---|---|
| AVIVA LEE-PARRITZ | | MD |

| 9C. CERTIFIER TYPE | 9D. LICENSE NUMBER |
|---|---|
| AT-BIRTH | 73393 |

| 9E. NUMBER AND STREET | 9F. CITY/TOWN | 9G. STATE | 9H. ZIP CODE |
|---|---|---|---|
| 75 FRANCIS ST | BOSTON | MA | 02115 |

**MOTHER**

| NAME 10A. FIRST | 10B. MIDDLE | 10C. LAST | 10D. MAIDEN SURNAME |
|---|---|---|---|
| DESARE | MARIE | SAPP | SAPP |

| BIRTHPLACE 11A. CITY/TOWN | 11B. STATE/COUNTRY | 12. DATE OF BIRTH (Month, Day, Year) |
|---|---|---|
| BOSTON | MASSACHUSETTS | JUNE 7, 1970 |

| RESIDENCE 13A. NUMBER AND STREET (Do not use mailing address) | 13B. CITY/TOWN | 13C. COUNTY | 13D. STATE | 13E. ZIP CODE |
|---|---|---|---|---|
| 14 WHITE PINE RD | BOURNE | BARNSTABLE | MA | 02532 |

**FATHER**

| NAME 14A. FIRST | 14B. MIDDLE | 14C. LAST |
|---|---|---|
| --- | --- | --- |

| BIRTHPLACE 15A. CITY/TOWN | 15B. STATE/COUNTRY | 16. DATE OF BIRTH (Month, Day, Year) |
|---|---|---|
| --- | --- | --- |

**INFORMANT**

17A. I (WE) CERTIFY THAT THE PERSONAL INFORMATION APPEARING ABOVE IS TRUE AND CORRECT.

17B. RELATIONSHIP TO CHILD
MOTHER

Desere Sapp

| 17C. DATE SIGNED (Month, Day, Year) | 17D. MAILING ADDRESS (If different from item # 13 above) | NUMBER AND STREET | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| OCTOBER 16, 2000 | | | | | |

**CLERK**

| 18. DATE OF RECORD (Month, Day, Year) | 19. SUPPLEMENT FILED (Month, Day, Year) | 20. CLERK/REGISTRAR |
|---|---|---|
| OCT 2 0 2000 | | Judith A. McCarthy |

21. DPH USE ONLY



**BellaGene Technologies, Inc.**
5525 Mounes Street, Ste. 101, New Orleans, LA 70123
504-734-9700 · 800-256-4106 · 800-PATERNITY

## CHAIN OF CUSTODY DOCUMENT

| Date 3-27-03 | Jurisdiction Suffolk | State Boston, MA |
|---|---|---|
| Client Case # 03-C03.186.578 | Reference # | |

### Mother

| Last Name (Please Print) | First Name | MI |
|---|---|---|
| | | |

Race (Check one) ☐ Caucasian ☐ Black ☐ Hispanic ☐ American Indian ☐ Other (Please Specify)_____

| Social Security # | DOB | Type of Identification | Identification # |
|---|---|---|---|
| | | | |

| Address | City | State | Zip |
|---|---|---|---|
| | | | |

Have you received a blood transfusion in the past 90 days? ☐ Yes ☐ No    Have you ever received a bone marrow transplant? ☐ Yes ☐ No
(If yes to either of the questions, four buccal swabs must be collected)
I hereby certify that the above information is correct. I have granted permission for biological samples to be taken for the purpose of disputed parentage study. I understand the results of this study may be used in statistical evaluations.

Print Name _____ Signature _____ Date _____

*Mother's Right Thumbprint*

### Child

| Last Name (Please Print) | First Name | MI | Sex ☐ Male ☐ Female |
|---|---|---|---|
| | | | |

| Social Security # | DOB | Type of Identification | Identification # |
|---|---|---|---|
| | | | |

Have you received a blood transfusion in the past 90 days? ☐ Yes ☐ No    Have you ever received a bone marrow transplant? ☐ Yes ☐ No
(If yes to either of the questions, four buccal swabs must be collected)
I hereby certify that the above information is correct. I have granted permission for biological samples to be taken for the purpose of disputed parentage study. I understand the results of this study may be used in statistical evaluations.

Print Name _____ (If under 18, legal guardian) Signature: _____ Date _____

*Child's Right Thumbprint*

### Alleged Father

| Last Name (Please Print) Williams | First Name Laniel | MI E |
|---|---|---|

Race (Check one) ☐ Caucasian ☒ Black ☐ Hispanic ☐ American Indian ☐ Other (Please Specify)_____

03-13446

| Social Security # | DOB 4-19-68 | Type of Identification MA Lic | Identification # |
|---|---|---|---|

| Address 33 Wenonah St | City Dorchester | State MA | Zip 02121 |
|---|---|---|---|

Have you received a blood transfusion in the past 90 days? ☐ Yes ☒ No    Have you ever received a bone marrow transplant? ☐ Yes ☒ No
(If yes to either of the questions, four buccal swabs must be collected)
I hereby certify that the above information is correct. I have granted permission for biological samples to be taken for the purpose of disputed parentage study. I understand the results of this study may be used in statistical evaluations.

Print Name Laniel Williams Signature LLWE Date 3/27/03

*Alleged Father's Right Thumbprint*

### Please complete for any other parties in this case not listed above

| Name | Relation | Social County |
|---|---|---|
| | | |
| | | |

**USE A SEPARATE DOCUMENT FOR EACH ADDITIONAL CHILD AND/OR ALLEGED FATHER**

Sample Inventory (Client should sign to verify,    samples are labeled properly)

| Relation | Sample Type | # Swabs/ Tubes | Client Signature (Verifying that samples were labeled properly |
|----------|-------------|----------------|----------------------------------------------------------------|
| Mother | ☐ blood tube(s) ☐ buccal swabs | | |
| Child | ☐ blood tube(s) ☐ buccal swabs | | |
| Alleged Father | ☐ blood tube(s) ☑ buccal swabs | 4 | _Lal W_ |

**Collection Site (Name, City, State)**
_Suffolk Prob., Boston, MA_

**Collection Date** _3-27-03_     **Collection Time** _9:20 a.m._

I hereby certify that I have collected, packaged, and sealed the samples collected from the person(s) listed on this document.

Specimen Collector's Name _Althea Scarborough_

Specimen Collector's Signature _Althea Scarbro_

Witness Verification (if applicable)

Witness' Name _Sandra Fernandez_

Witness' Signature _Sandra Fernandez_

**Payment Information (if applicable)**

☐ Cashier's Check   ☐ Money Order

Amount Enclosed $ _____

Collector's Initials _____

**ReliaGene Use Only**

Amount Received $ _____

Money Order/Check # _____

Initials _____   Date _____

## Mother or Legal Guardian Must Sign and Date Photo

Staple

Photo

of

Mother and Child(ren)

Here

## Alleged Father Must Sign and Date Photo

_3-27-2003_



_Williams, Loniel (AF)  S(_

_Lal W_

---

**DO NOT WRITE IN THE SPACE BELOW – FOR RELIAGENE USE ONLY**

I hereby certify that I have received the specimens obtained from the individual(s) designated above. There is no evidence that the package had been opened or tampered with. The specimens are intact.

Print Name _Christine Vigne_

Signature _Chr_

_3-29-03_   Time of Day _9:50?_

ReliaGene Technologies, Inc.
5525 Mounes St., Suite 101
New Orleans, LA 70123
(504) 734-9700 or (800) PATERNITY

HARMON & ROBERTSON, P.C.
ATTORNEYS AT LAW
85 MERRIMAC STREET, FOURTH FLOOR
BOSTON, MASSACHUSETTS 02114
(617) 742-5900
FAX (617) 742-5911

NANCY T. HARMON
HAROLD ROBERTSON

IMPOUNDED

May 5, 2003

Ashley Ahearn, Clerk
Appeals Court
1500 New Courthouse
Boston, MA 02108

Re: Matter of Lonnel Williams, 2002-P-1668

Dear Ms. Ahearn:

You called me on Friday regarding the above. I attempted to
return your call but there was a voice mail problem. Hence,
this letter.

I served a corrected brief in this case on counsel and Ms.
McEaddy on March 26, 2003. I had already served the
transcript on counsel on February 27, 2003. I did not serve
Ms. McEaddy with a copy of the transcript pursuant to an
Order by Judge Duffly of January 28, 2003 keeping an order
of the trial court in effect regarding her access to the
transcript. I indicated to Ms. McEaddy my understanding of
that Order was she was not to receive a copy of the
transcript unless and until there was a further Order from
the Appeals Court.

Enclosed herewith are copies of the Certificates of
Service, Judge Duffly's Order, and Judge Smoot's Order in
the Suffolk Probate Court.

Kindly let me know if there is anything additional I may
provide in this matter, and I will await further direction
regarding Ms. McEaddy's copy of the transript.

Thank you.





Train with an NHL Pro this Sun

**BLUENOTESHOP**
**TOLL FREE:1-800-258-3716**

Game Day | Live Scoreboard | News Releases | Publications | Forum | Gallery | Affiliates | Conta

**Team**   Schedule  Statistics   Tickets   Fan Stuff   Kids   History
Players | Coaches | Front Office

**Front Office**



SPONSORED BY:

**ST. LOUIS BLUES**
MasterCard®Credit Card
**APPLY TODAY!**

# Ken Wilson
## TV Play-by-Play

Ken Wilson, 49, enters his 18th season as the "Voice of the St. Louis Blues." Baby!" exclamation at climatic moments has become a major part of Blues h the years.

A graduate of the University of Michigan, Wilson delivered play-by-play of co minor league hockey prior to reaching the NHL with the Chicago Blackhawks has broadcast NHL games for ESPN and Sportschannel America, as well as th Games for Turner Broadcasting.

A four-time Mid-America Emmy winner for his hockey play-by-play, Wilson is noted major league baseball broadcaster. He has broadcast for the Oakland / California Angels, St. Louis Cardinals, Cincinnati Reds, Chicago White Sox an Mariners.

*This is who my Grandson lives*
Ken and his wife Marlene have three sons, Ryan, Grant and Keaka, and one ( Sophia. The Wilson's make their home in Chesterfield, Missouri.

*Name changed*

3-19-97

To: The Department of Social Services
City of Boston

From: George W Bishop
56 Kingsdale St Boston, MA 02124
Boston Police Detective
Area E-13   3345 Washington St
Boston, MA 02
H 288-2677   W-343 5628

Subject: Nathan Hobley b/m 8 yrs word of
Georgia McEachly 49 June St
Boston, MA 02131.

To Whom it may Concern,

I am a friend of the McEachly and has
been so for a great number of years I he
been to the home when Nathaniel was
going to school and being picked up
Georgia would wait at the door for him
when he arrived home. When leaving she
would sometimes take him to the bus Oth
times she would watch as he got on the
from the door. This a very _____ location.
Bus enters the court you _____ there is no ob-
_____



**William F. Weld**
Governor
◆
**Argeo Paul Cellucci**
Lieutenant Governor
◆
**Gerald Whitburn**
Secretary
◆
**Linda K. Carlisle**
Commissioner

# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Social Services
## Morton Street Area Office
123 Morton Street, Jamaica Plain, Massachusetts 02130
Tel (617) 524-5474 ✦ Fax (617) 524-5296

Ms. Georgia McEaddy
49 June Street
Roslindale, MA
    02131

July 11, 1997

Dear Ms. McEaddy;

    I am writing for several reasons. First, when we last spoke we had talked about discussing some of Nathaniel's behaviors while at camp. Anna Lee Brown had tried several times to set up some time for this discussion; however was not able to connect with you. Would you be able to come into the office next week, preferably the afternoon of 7/17/97 (Thursday)? I also have times available Tuesday afternoon, all day Wednesday and all day Friday. Please let me know if any of these times would be convenient.

    Secondly, to address the issue of PACT payments for Nitanju, I had talked with you about bringing the issue to a Fair Hearing to determine what, if any monies are owed to you. Attached, please find instructions for requesting a Fair Hearing.

    Additionally, as we discussed when reviewing the service plan, the Department was to make a referral to the PACT team (Pre and Post Adoption Consultation Team) who would help you address issues of adoption. I have made the referral and I am waiting for a response from the program.

    Finally, you had asked me to state, in writing, my reasons for not supporting a transfer from LCDC to the May Institute for Nathaniel. My reasons stem from the need for children, like Nathaniel, to have a consistent educational program. The May Insitute has a different theoretical approach to educating their students, than the LCDC program. Reports have indicated that Nathaniel has done well with this program and I do not believe that there is sufficient justification to move him. I know that you do not agree


**EDCO** *Collaborative*

*Education Collaborative for Greater Boston, Inc.*

*Educational Surrogate Parent Program*
*P.O. Box 1184*
*Westboro, MA 01581*
*Telephone: (508) 792-7679*
*FAX: (508) 616-0318*

October 31, 1997

Ms. Anna Lee Brown, Social Worker
Department of Social Services
123 Morton Street
Jamaica Plain, MA 02130

Dear Ms. Brown:

This letter is to bring closure to an investigation conducted by this Program in response to concerns raised, by you, in your August 6, 1997 letter. The concerns raised in that letter regarded the actions of Ms. Georgia McEaddy in her role as educational decision-maker for her then foster child, Nathaniel Hobley.

This letter addresses only the educational issues and the appropriateness of Ms. McEaddy's actions as educational decision-maker for Nathaniel.

Upon receipt of your letter, immediate action was taken to appoint an Educational Surrogate Parent Program Consultant, Jeanne Voss, as Advisor to assist Ms. McEaddy in obtaining educational services for Nathaniel.

Several interviews were conducted by both Ms. Voss and me to determine the status of Nathaniel's educational situation, needs and necessary action. Individuals from Language and Cognitive Development Center (LCD, Boston Public Schools, DSS, and Ms. McEaddy herself were interviewed. Documentation from LCDC, Children's Hospital, and Boston Public Schools, and DSS was reviewed.

## OBSERVATIONS

- All parties involved in the investigation by this office were cooperative except the Morton Street Department of Social Services, the complainant: three telephone calls which I placed to DSS were not returned; information which you agreed to send Ms. Voss has not been received to date. Updated information regarding Nathaniel's placement status pre and post removal of Nathaniel from Ms. McEaddy's home was not provided to either Ms. Voss or me.

- Reports, assessments, and evaluations are actually quite complementary to the efforts of Ms. McEaddy on Nathaniel's behalf as both care provider and advocate of Nathaniel's needs. This, despite occasional incidents requiring intervention or clarification on the part of LCDC staff.

Page 3/Ms. A. Brown/DSS
October 31, 1997

In the educational process it is not uncommon for individuals to disagree. It is a question of knowing the student, the student's needs, and making the decision about what type of programming is appropriate for a particular student. Ms. McEaddy appeared to believe that a program of behavioral intervention would best suit Nathaniel's needs at this time. A position shared by Ms. Jeanne Voss, Nathaniel's current educational decision-maker.

Further, Nathaniel's stay at LCDC, according to Ms. McEaddy, could last for only a couple more years until he aged out of the program. His placement at BIP (Behavioral Intervention Program) affords him the opportunity of consistent programming through the age of twenty-two, if need be, and to do so in a less restrictive setting. It appears that Ms. McEaddy made an informed decision.

Based upon information collected as part of this investigation it appears that Ms. McEaddy was operating well within the scope of her responsibilities as educational decision-maker for Nathaniel. Both State and Federal Special Education Law require the appointment of Educational Advocate/Educational Surrogate Parents for students in the care or custody of a state agency. Paragraph 212.2 of the Chapter 766 Regulations states:

> The Educational Advocate shall have the same rights and responsibilities as a parent in special education matters relating to a child, including the right to represent the child in the identification, evaluation and educational placement of the child and in the provision of a free appropriate public education.

Further, Paragraph 212.4 indicates:

> Social workers, supervisors, and all other employees of the Department of Social Services (DSS) are expressly prohibited from serving as educational advocates for any student in care or receiving services from DSS, and are also prohibited from accepting, rejecting or otherwise signing the IEPs of any such student.

Your activity in this case, in my opinion, was at best counterproductive, and outside of the relationship that is outlined in the DOE/DSS Operational Protocols: Responsibilities of the Department of Social Services and School Districts for Children in DSS Custody, February 1996 , Federal Special Education Law IDEA, and Chapter 766.

Sincerely,

Bernice P. Updyke
Program Director

cc: Jeanne Voss, Consultant
cc: Georgia McEaddy, Educational Decision-Maker

BPU/emb

# CLINIC SHEET

PSYCHOLOGICAL CONSULTATION
Developmental Evaluation Center

HOBLEY, Nitanju
DOB: 01-28-92
MR. NO.  DOB: 12-12-95  DATE
Age: 3 10/12 years
PT. NAME CH#: 100-01-73

DATE OF BIRTH

---

<u>Procedures</u>: Wechsler Preschool & Primary Scale of Intelligence - R
(selected subtests);   Seguin Formboard
Developmental Test of Visual Motor Integration
Binet IV: Picture-Naming Vocabulary;   Absurdities
Vineland Adaptive Behavior Scales (attempted)
Foster Parent Interview & Play Observation

<u>Background</u>:   Nitanju Hobley is a 3 year, 10 month old African
American girl who has been in her current foster home since
September, 1995.  Since placement with her foster mother, Georgia
McEaddy, there have been concerns about developmental delays as a
result of environmental deprivation.  Nitanju has a complicated
psychosocial history, which includes two foster care placements.
She is currently in the custody of DSS although parental rights
have been terminated and she is free for adoption.  It is unclear
what services Nitanju received while in her prior foster home
placement.   It is apparent that she received some developmental
stimulation for an uncertain period of time.  Nitanju is reported
to have a history of toe walking, head banging, and failure to
thrive.  Her current foster mother reports significant behavioral
issues.  When angry or pushed to do something she does not want to
do, Nitanju reportedly will squat and either defecate or urinate in
protest.  She will also head bang, and bite or kick.  Her foster
mother reports that the head banging and other aggressive behaviors
have decreased in frequency, however.  Nitanju is reported to have
significant separation issues with her foster mother.  She does not
have contact with her biological mother or prior foster mother at
this time.   She reportedly becomes angry at her foster mother if
she unexpectedly leaves her, and may not speak to her for several
days while she is angry.  Nitanju currently lives with her foster
mother, her foster mother's 14 year old daughter, and Nitanju's
biological older brother, Nathaniel.  Nathaniel has been previously
seen by the DEC, and was diagnosed with Pervasive Developmental
Disorder/Autistic Disorder.  Nitanju also has two other biological
brothers who are placed elsewhere.  Both of these brothers are
reported to have language difficulties.  At the time of this
evaluation, Nitanju was not receiving any services, nor was she
involved in a school program.

<u>Behavioral Observations</u>:  Nitanju presented as an attractive and
extremely engaging child who willingly accompanied the evaluator
and her foster mother to the testing room.  She was seated at a
Rifton chair and table, and sat patiently waiting between tasks.
At no time did she request to leave her chair.  Although she was
generally cooperative with testing tasks, she could become evasive
when having difficulty with a given task.  Nitanju would also state
that she did not know the answer to a question, or did not know how
to do a puzzle, as a means of avoiding questions and tasks that she
found difficult. She enjoyed naming pictures, although she appeared

CHILDREN'S HOSPITAL, BOSTON, MASSACHUSETTS 02115

03153 10M

to have more difficulty with the processing of complex language. When asked questions, Nitanju would frequently avoid answering them. Attentional issues were apparent, although this was primarily associated with non-preferred tasks. Nitanju had a solid ability to attend during tasks she enjoyed. At one point during the evaluation session, her foster mother left to speak with a pediatrician. Although Nitanju initially presented as accepting of her foster mother's departure, upon her foster mother's return, she displayed significant anger towards her and told her at one point to "get out". Nitanju's separation issues were therefore most apparent when rejoined with her foster mother. Nitanju was very verbal and talkative. She frequently attempted to redirect the evaluator's focus on testing tasks by telling short stories. At these times, Nitanju often became lost in her stories and it was difficult to follow the content. Also at these times, it was difficult to understand what Nitanju was saying, although generally her articulation was appropriate. Fine motor issues were apparent, especially with the completion of puzzles and drawing tasks. Nitanju held her pencil in a very high and loose semi-tripod grip, which appeared to negatively impact her control. She had particular difficulty with puzzles having curved pieces. She was unable to do puzzles that did not have an outside frame.

**Test Results:** Nitanju displayed a relative strength in her ability to complete visual spatial tasks. She completed the Seguin form-board quickly, producing an age equivalent score of 4½ years. She could do this task with precision. Nitanju had more difficulty with the puzzles for the Object Assembly subtest of the WPPSI-R. As noted previously, she could not complete puzzles which did not have an outside frame. In particular, she could not complete the car or the dog puzzles. She was able to place the head on the teddy bear, and could place the eye and the mouth on the face. She frequently gave up on these puzzles as they were difficult for her, producing an age equivalent score of 3 years on this subtest. Nitanju had more success with the Picture Completion task and the Animal Pegs task. She obtained age equivalent scores of 4½ years on both of these tasks. It is notable that she quickly learned the coding sequence for the Animal Pegs test. While completing this test, she did not refer to the coding scheme, but clearly had it memorized. Nitanju also completed the Mazes subtest of the WPPSI-R. Her performance appeared to be hindered by the aforementioned fine motor control issues, and she obtained an age equivalent score of 3½ years on this task. When the 4 performance WPPSI-R subtests were prorated, Nitanju obtained a Performance IQ score of 101. This is indicative of average intelligence in this area.

Nitanju had more difficulty with verbally-based items. Her pre-academic skills appear to just be developing. Nitanju has very poor counting ability, and often, when counting by item, will count the same item twice. Although she does understand concepts such as biggest and tallest, she does not understand quantitative concepts. Nitanju achieved an age equivalent score of less than 3 years on the Arithmetic subtest. She had more success with the Information subtest of the WPPSI-R, reflective of the span of information she has about her world. Her performance on this task was inconsistent, and she would frequently miss items of limited difficulty while correctly answering items of greater difficulty. This inconsistent performance may be reflective of environmental deficits. Nitanju does not know colors. When asked what color is

grass, she pointed to the evaluator's chair which was blue, and stated "that color". She could not name the color however. While scoring in the 3½ year level on the Information subtest, Nitanju achieved a less than 3 year age level for the Comprehension subtest. This appeared to be the result of her unwillingness to answer lengthy questions. When asked questions, she often produced associations to questions. For example, when asked "why do you wash your face", Nitanju replied "and brush your teeth". It is notable, however, that Nitanju was most evasive during the WPPSI-R verbal subtests. She had much greater success with the Picture-Naming Vocabulary of the Binet IV, where she was able to name all the pictures except one, that of the bridge, achieving an age equivalent score of 4 years, 1 month. Similarly, she had significant success with the Absurdities subtest of the Binet IV, achieving a 4½ year age equivalent score. It is notable that both of these subtests were enjoyable to her and held her attention, which the verbal subtests of the WPPSI-R did not.

When administered the Developmental Test of Visual Motor Integration (VMI), Nitanju scored at an age appropriate level. It is notable, however, that her fine motor difficulties were most apparent on this test. She was able to draw vertical and horizontal lines, as well as circles. She could not draw crossed lines or a square. She requested hand over hand assistance in drawing several of the more difficult figures. She was very accepting of hand over hand assistance and appeared to enjoy the contact.

The Vineland Adaptive Behavior Scales were attempted with the foster mother as informant. Although these scales could not be scored, due to the foster mother's relatively new exposure to Nitanju, it does appear that there are delays in self-care skills. Ms. McEaddy is also concerned about Nitanju's emotional functioning. She reports that Nitanju has recently begun play therapy. Although behavioral issues were noted, the foster mother currently feels that these are workable for her. At the current time, it is the foster mother's impression that Nitanju's emotional issues are negatively impacting her socialization.

<u>Discussion</u>: Nitanju currently presents as a very needy and dependent child who is adjusting to a new living and caregiving situation. Although cognitive deficits were not apparent during this evaluation, she is clearly at risk given her psychosocial history. At the current time she appears to feel quite uprooted. She will need significantly more time to adjust to her new living situation. Her visual motor skills appear to be an area of relative strength for her, and she has apparently average intelligence in this area. Fine motor issues were apparent which merit further consideration. Nitanju appears to have more difficulty with verbally-based items. Although Picture-Naming is a relative strength for her within this area, she has more difficulty with complex language. She requires a broader exposure to learning opportunities, both at school and in her general environment. It is questionable at this time whether her weaknesses in the speech and language area are a result of negative social and environmental experiences, or a more general learning issue. This merits further consideration over time.

<u>Impression</u>:    Adjustment reaction (309.9).
          Receptive and expressive language delays (315.31).

| PATIENT'S LAST NAME (PLEASE PRINT) | | FIRST NAME | RECORD NO. |
|---|---|---|---|
| HOBLEY, Nitanju | - 4 - | PCN#: 100-01-73 | A |

## Considerations:

1. Given Nitanju's age, she is in need of a thorough CORE evaluation, including an occupational therapy evaluation to further consider her fine motor issues. She would appear to be best served in an integrated preschool program, with weekly speech and language therapy. An integrated program would also help to capitalize on her social relatedness and interest in others, while simultaneously increasing her exposure to speech and language skills.

2. Given Nitanju's apparent adjustment and separation issues, we support her continued participation in play therapy. This should be particularly focused on her sense of being uprooted and her adjustment to her new living situation.

3. Although it is recognized that Ms. McEaddy feels able to assist Nitanju in overcoming her behavioral problems, it is suggested that in-home behavioral consultation be provided as part of Nitanju's special needs school program, should behavioral problems continue or intensify. Such in-home behavioral consultation would serve to provide consistency with a behavioral program that is implemented in the school system. Ms. McEaddy was encouraged to seek behavioral services as needed.

4. Given Nitanju's complicated psychosocial history as well as her current speech and language delays, it is recommended that she be reevaluated by the psychologist and speech and language therapist of this team after one year. Continued monitoring of Nitanju's developmental progress would appear to be appropriate given that she is at significant risk.

Christine Darsney, M.A.
Psychology Fellow

Bruce Cushna, Ph.D.
Supervising Psychologist

CD/sg
Date Received: 12/16/95
Date Typed: 12/17/95

# DR. BRUMFIELD JOHNSON CHRISTIAN ACADEMY

9 - 19 OTISFIELD STREET · DORCHESTER, MA 02121 · 617-427-7598 · FAX:

November 6, 1997

To Whom It May Concern:

Nitanju Hobley was a student here at the Dr. Brumfield Johnson
Christian Academy during the 1996-97 school year.  It was stated
by a parent that she was playing with her son's penis. When it
was fully investigated it was found that Nitanju only unbuckled
the boys belt.

When the social worker, Ms Anna Lee Brown, inquired of the
incident, Ms. Salisman and I shared this information with her.
Little boys often ask other children and adults to unbuckle their
belts because they can't do it.  We are insisting that they don't
wear belts they can't unbuckle or open.

I further discussed the ideas of the social worker of my concerns
on the telephone and in person of her wanting to meet and discuss
Nitanju and Ms. McEaddy without the presence of Ms. McEaddy.
In this school we work as a team and Ms. McEaddy supported our
teachers 100%.

Nitanju could be stubborn and belligerent at times, but we could
always discuss and work with Ms. McEaddy with any problems that
arose.

I probably need to state that tuition was $65.00 per week not
including transportation, meals and snacks of which Ms. McEaddy
faithfully paid.  In April of 1997, Ms. McEaddy informed me of
the fact that she was taking her daughter out of school because
funds were forthcoming to support her in school.  We regretted
that Nitanju had to leave school.  She was doing well in her
classes.  We were pleased see to her when she came back to visit
us.

We regret that Nitanju and Nathaniel are no longer living with
Ms. McEaddy.  They were happy with her and were given good care.

Sincerely
Nellie C. Yarborough,
Principal

## TABLE OF CONTENTS

Table of Authorities............................iii

Issues Presented................................. 1

Statement of the Case............................ 1

Statement of Facts............................... 2

    A.    The mother's background.................. 2

    B.    The father's background.................. 3

    C.    The child's infancy...................... 4

    D.    The child's surrender.................... 5

    E.    The child's placement.................... 7

Summary of Argument.............................. 8

Argument........................................10

I.    The trial court found the father unfit and terminated his parental rights based on a close reading of the evidence and on credibility decisions well-within its discretion regarding the father's history of irresponsibility towards his multiple children and his background of violence..................................10

    A.    Standard of review....................... 10

    B.    The father's pattern of infrequent contact with his other children and general lack of responsibility for them provides prognostic evidence of his unfitness to parent the subject-child........................... 11

    C.    The father's record of violence and history of abusive conduct towards women poses a threat to the child if the child was returned to his custody................................. 15

II.    The trial court found by clear and convincing evidence that it was in the child's best interests to remain in the care of the adoptive parents given the father's and grandmother's demonstrated inability to meet the subject-child's needs.................................. 19

i

## TABLE OF AUTHORITIES

### Cases

*Adoption of Don,*
    435 Mass. 158 (2001)....................10, 28

*Adoption of Emily,*
    25 Mass. App. Ct. 579 (1988)...............25

*Adoption of Gabrielle,*
    39 Mass. App. Ct. 484 (1995)...............27

*Adoption of Hugh,*
    35 Mass. App. Ct. 346 (1993)...........26, 27

*Adoption of Inez,*
    428 Mass. 717 (1999)...............12, 14, 22

*Adoption of Jenna,*
    33 Mass. App. Ct. 739 (1992)...............14

*Adoption of Katharine,*
    42 Mass. App. Ct. 25 (1997).........18, 19, 31

*Adoption of Kimberly,*
    414 Mass. 526 (1993).......................13

*Adoption of Larry,*
    434 Mass. 456 (2001)...............24, 26, 27

*Adoption of Mary,*
    414 Mass. 705 (1993).......................20

*Adoption of a Minor,*
    343 Mass. 292 (1961).......................27

*Adoption of a Minor,*
    17 Mass. App. Ct. 993 (1984)...............10

*Armstrong v. Manzo,*
    380 U.S. 545 (1965)........................26

*Adoption of Sherry,*
    435 Mass. 331 (2001).......................10

*Bezio v. Patenaude,*
    381 Mass. 563 (1980).......................20

*Care and Protection of Laura,*
    414 Mass. 788 (1993).......................10

## Issues Presented

I.    Did the trial court find the father
      unfit and terminate his parental rights
      based on a close reading of the evidence
      and on credibility decisions well-within
      its discretion when it decided that the
      father had a history of irresponsibility
      towards his multiple children and had a
      background of violence?

II.   Did the trial court find by clear and
      convincing evidence that it was in the
      child's best interests to remain in the
      care of the adoptive parents when it
      relied on evidence indicating that the
      father and grandmother were unable to
      meet the subject-child's needs?

## Statement of the Case

This is an appeal from orders entered on March 11,
2003 in the Suffolk Division of the Probate and Family
Court ("trial court") by Smoot, J. finding the birth
father[1] unfit to parent his son ("subject-child" or
"child"), dismissing the guardianship petition of the
child's paternal grandmother ("grandmother") and finding
it in the child's best interests to be adopted by his
current caretakers. R.30-31[2].

On September 24, 2000, the Boston Adoption Bureau
("Bureau") filed a petition to terminate the father's
parental rights to consent to the child's adoption
pursuant to G.L. c.210, §3. R.5, F.6[3]. The Bureau is a

---

[1] The parties are referred to by descriptive titles to
protect their privacy.
[2] "R.30-31" refers to Appellee-Bureau's Record Appendix,
pages thirty and thirty-one.
[3] R.5, F.6 refers to Appellee-Bureau's Record Appendix
page five, trial court's finding of fact number 6.

1

F.3.

The mother has three children from her previous relationships. R.8, F.36. The oldest child was born in 1978 and lives independently. Id. The other two children were born in 1984 and 1993 respectively and reside with their birth father. R.8, F.36.

The mother was convicted in 1996 in federal court of embezzling 2.3 million dollars from her employer. F.38. She served twenty-seven months of a thirty-seven month sentence for the offense. R.8, F.38-39. The mother resided in a halfway house in Boston from April 1999 to September 1999 to complete her sentence. R.8, F.40.

B    The father's background.

In mid-1999, the father met the mother at the halfway house in Boston. R.8, F.42. The father was completing a six year sentence for distribution of cocaine base, possession of a firearm with an obliterated serial number and possession of ammunition. R.8, F.43.

The mother and father began a sexual relationship while both resided at the halfway house. R.8, F.44. The relationship violated both the rules of the halfway house and the mother's and father's probation. R.8, F.44. The mother and father lived together in the fall of 1999 after each was released from the halfway house. R.8, F.45-46.

relations with other woman at the time. Id. The mother
did not see him again until August 23, 2000. R.10, F.66.
The father came by her apartment three times in
September, but was not admitted. R.10, F.70.


D.    The child's surrender.

The mother first considered placing the child for
adoption in the late spring and early summer of 2000.
R.9, F.57. She did so because she did not believe the
father would support her and the child. R.9, F.57. She
decided she could not raise the child alone. Id.

The mother, the prospective adoptive parents and
the Bureau worked together throughout the late summer to
arrange the child's adoption. R.10-11, F.72-79. The
mother told the Bureau the name of the child's father.
R.11, F.77.

But the mother misled the Bureau about her and the
father's background as well as the father's whereabouts.
R.12, F.89. The mother told the Bureau that she did not
know the father's whereabouts and that she did not have
an address for him. R.11, F.77. In truth, the mother was
able to contact the father without difficulty if
necessary. R.12, F.89.

The mother, working with the Bureau, placed the
child in foster care on August 26, 2000. R.11, F.80. The
mother removed the child from foster care on August 31,
2000 when an injury to the foster mother would have

5

T:179. R.12, F.90. The mother required a brace on her arm, medication and physical therapy because of the assault. T:180.

The mother filed charges of assault and battery against the father after the attack. T:180. R.19, F.170, She also obtained a restraining order against him, which he subsequently violated. T:180-181. R.19, F.173. See T:967 (father knew of order and contacted anyway). The mother did not tell the father about the adoption prior to placing the child because she believed he would have killed her. T:304.

The trial court found that the father had engaged in several other acts of violence or abuse directed at the mother. They include:

- grabbing the mother by the hair. T:292. R.19, F.171.

- pushing her several times while she was pregnant. T:291-292. R.19, F.171.

- throwing a brick through the windshield of her car when she was nine months pregnant. T:297. R.19, F.171.

- threatening her with physical harm by telling her that "[i]f you're not with me, you're not safe ... [a]nybody can put their hands on you. .. [r]emember that." T:294. R.19, F.171.

- taking her car and abandoning her at the side of the road in 92 degree heat when she was nine months pregnant. T:295-296. R.19, F.172.

The father challenges none of these findings of fact regarding his abuse of the mother. They must be accepted as true. *Richards*, 278 Mass. at 551-552

17

n.9, citing G. L. c. 208, § 31 (1994 ed.)("[i]n determining whether temporary shared legal custody would not be in the best interest of the child, the court shall consider ... whether any member of the family has been the perpetrator of domestic violence").

The trial court properly terminated the father's parental rights to consent because clear and convincing evidence showed that his irresponsibility and history of domestic violence rendered him incapable of providing the child with a safe, stable and nurturing environment. *Katharine*, 42 Mass. App. Ct. at 32 (1997)(trial court need not wait for "inevitable disaster to happen").

**II. The trial court found by clear and convincing evidence that it was in the child's best interests to remain in the care of the adoptive parents given the father's and grandmother's demonstrated inability to meet the subject-child's needs.**

A.    Standard of Review

"[P]arents have a fundamental interest in their relationships with their children that is constitutionally protected." *Opinion of the Justices to the Senate*, 427 Mass. 1201, 1202 (1998)(citations omitted). "This interest is one of the 'liberty' interests protected by art. 10 of the Massachusetts Declaration of Rights, and the due process clause of the Fourteenth Amendment to the United States Constitution." *Id.* (citations omitted).

"However, parents' interests in their relationships with their children are not absolute, because '[t]he

19

the time of trial despite being unemployed. Id.

The father conceded that he did not "do much of anything" to support himself during the mother's pregnancy. T:1025. His description of his work history indicates that he is hardly working at all. T:1021-23.

The GAL confirmed that the father's employment is sporadic. T:420 (father "doesn't work steady"). See T:420 (father not looking for work); Ex.399-400 (father's parole officer confirms that he is "supposed to be working and that is one area he is not doing well with"). The father's employment history is analogous to the relationship he has with his children. R.14, F.116 (evaluations show father "careless, works slowly, wastes time, learns with difficulty, evades responsibility and shows little to no initiative").

The father expressed little understanding of the extreme trauma the subject-child would overcome if removed from its current long-term placement and placed in his care. The effects of a transition will be dramatic on the child. T:569-571; T:574-575.

The father thought that building a bond with the child if it was returned would be "more or less easy." T:1146. The GAL believed that the father did not understand what it would take if the child was returned. T:378. T:390. See T:621-622 (Bureau's expert believes that father's previous conduct makes him not a good exposure risk).

21

Mass. at 723 ("[a]judge may not decline to dispense with consent based on a faint hope that the family will succeed if reunited").

The father has had ample time to improve himself and prepare for the child. The mother told the father she was pregnant in October 2000. The father had almost two years prior to trial to seek steady employment, improve his parenting skills and otherwise accept his responsibilities. He choose not to do so. See R.5-6, F.6-7 (mother places child when it is clear dad will not be any help).

The father also chose not to discuss the situation with the Bureau. He refused every offer by the Bureau to discuss the situation. Ex.396; T:74; T:77 (father would not meet adoptive parents).

The Bureau's offers indicate that it was open to exploring all available options; it even stated at trial that if the father had met with them and had "checked out" that the child would have been placed with him. T:131. The father and grandmother, however, refused to discuss the situation with the Bureau and instead just talked about getting a lawyer. T:112-113. As the trial court found, the Bureau has no opportunity to offer services to someone who is not interested in working with them or even meeting with them. R.21, F.242.

The trial court decided that the father could not meet the needs of the child. R.23, F.228. The trial

23

T:574-576 (Bureau's expert anticipates problems in
child's future relationships, in future achievement, and
in sociability if removed from current placement).

The child should not be put through a painful
transition just to find out if the father is capable of
parenting him especially where the evidence of the
father's past and current conduct indicates that he is
unable to care for the child. T:403. The child has been
in the adoptive family's home since September 2000 and
requires permanency. See *Adoption of Emily*, 25 Mass.
App. Ct. 579, 581 (1988)("Speedy resolution of cases
involving issues of custody or adoption is desirable").

The evidence reflects that the father has sporadic,
short-term employment, short term relationships, no
record of long-term consistent parenting and a
background of violence. The trial court's order
terminating his parental rights should be affirmed.

C.   The trial court's decision dismissing the
     grandmother's guardianship petition is supported by
     clear and convincing evidence given her combative
     relationship with social service agencies which
     resulted in her foster home being closed and her
     inability to meet the subject-child's needs.

The paternal grandmother petitioned the trial court
to name her the child's guardian. R.6-7, F.21. The trial
court denied her request and dismissed her petition
after the trial. R.31. The trial court's decision is
based on ample facts in the record and is supported by
clear and convincing evidence.

25

due process rights were not violated under the factual
circumstances of the case. See generally, *Hugh*, 35 Mass.
App. Ct. 346 (1993).

2.   The trial court's different conclusions from the
     same evidence fails to support the grandmother's
     claim that the trial court was biased.

The grandmother's claims of bias appear to be based
on the fact that she drew different conclusions from the
evidence than the trial court. There is a difference not
just in degree, but in kind between a trial court which
is biased and predetermines the outcome and a trial
court which reviews all the evidence, makes credibility
determinations of witnesses and reaches conclusions at
odds with what a party desires. See *Larry*, 434 Mass. at
467 (trial court's "findings were based on [its]
assessment of the credibility of the witnesses and the
weight of the evidence ... [the trial court] was in the
best position to determine the facts").

The grandmother also fails to demonstrate how any
supposed bias by the trial court - even if true - makes
her a fit guardian, the father a fit parent or ensures
the safety of the child if he were placed with either of
them. See *Adoption of a Minor*, 343 Mass. 292, 294
(1961)("[t]he paramount consideration [must be] the
welfare of the child"). In any case, the record supports
the trial court's lack of bias. See *Adoption of
Gabrielle*, 39 Mass. App. Ct. 484, 486-487 (1995)(record
"clear that a motion for recusal would not have
prevailed").

27

with professional social workers has at times gone
beyond strong advocacy and moved into the area of
contemptuous and abusive conduct." R.26, F.252.

The grandmother has demonstrated that she is
unable to control her behavior even after it begins
to effect the children in her care. The department
closed her foster home because she was unable to
meet the needs of the children that had been placed
with her and that the ongoing conflict between her
and the department was effecting the children.
T:659-660. See T:662-663 (ignores professional
advice as to needs of child and does what she wants
without a specific plan or further consultation).

The mother herself considered the grandmother
as a placement for her child prior to the court or
GAL being involved. The mother was concerned
because of the grandmother's foster children being
removed, her home being closed and of her and her
children's history of suffering domestic abuse.
T:307-308. The mother decided to place the child
for adoption.

The grandmother was not entirely truthful
about her personal circumstances when speaking with
the GAL. T:347-349. The grandmother's lack of
honesty with the GAL raises questions as to why she
was not being truthful and whether she was trying
to hide anything. T:442-443. The GAL concluded that

29

grandmother's guardianship petition should be affirmed. See *Katharine*, 42 Mass. App. Ct. at 32 (1997)(trial court need not wait for "inevitable disaster to happen").

## Conclusion and Relief Sought

For all of the foregoing reasons and in the interest of the integrity of the civil law in Massachusetts, the trial court's finding that the father is unfit, that the grandmother is not a suitable guardian and that it is in the child's best interests to terminate the father's parental rights and deny the grandmother's guardianship petition should be AFFIRMED.


Respectfully submitted,


DAVID A.F. LEWIS, Esq.
Appellate Attorney for Appellee-Bureau,
BBO # 566089
One Broadway, Suite 600
Cambridge, MA 02142
617.621.1551

JEFFREY M. KAYE, Esq.
Trial Attorney for Appellee
BBO #262520
302 Broadway
Methuen, MA 01844
978.682.4413


31

## Table of Contents:
## Appellant's Record Appendix

### Trial Exhibits:

#1.  Manilla envelope addressed to father at 33 Wenonah
     St., Dorchester, MA 02121,
     postmarked September 9, 2000....................5

#2.  Marked pages from a desk calendar kept by mother,
     dated January 2000 through December 2000........6

#3.  Report of the Guardian ad Litem,
     dated June 18, 2001...........................384

#4.  Investigation Report of the Commonwealth of
     Massachusetts Executive Office of Health and Human
     Services, dated February 8, 2001..............405

#5.  Letter from Commonwealth of Massachusetts Executive
     Office of Health and Human Services to grandmother,
     dated March 16, 2001..........................412

#6.  Birth Certificate of
     D'Anell Edward Maceo Williams.................414

#7.  Curriculum Vitae of Steven N. Shapse, Ph.D....415

#8.  Stipulation of the parties as to father's
     criminal convictions..........................422

#9.  Father's records from the Boston Carpenter's
     Apprenticeship................................423

#10. Father's records form the Massachusetts Carpenters
     Central Collection Agency.....................468

#11. Updated copy of home-study prepared by Hope Heller,
     Ph.D., dated August 23, 2000..................474

#12. Letter from Attorney Jeffrey Kaye and Marilyn
     Speiser, dated April 4, 2001, to Ms. Foran,
     Director of Residential Placement; Reply letter,
     dated July 11, 2001; Amended Investigation Report
     from the Office of Child Care Services, dated July
     12, 2001......................................481

#13. 51B report, dated July 16, 1997..............490

#14. Fair hearing decision concerning grandmother,
     dated April 24, 1998..........................519

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

SUFFOLK DIVISION                                     DOCKET NO. 01P0855

## IN THE MATTER OF LONNEL ELLIOT WILLIAMS

Decree of Dismissal

After hearing, it is ordered that the petition for guardianship filed by Georgia McEaddy on April 20, 2001 is dismissed.

March 11, 2002

_____
John M. Smoot
Associate Justice

Loniel W. et al v. BAB, Inc.
2003-P-1668
R.31



# COMMONWEALTH OF MASSACHUSETTS
## TRIAL COURT
### PROBATE AND FAMILY COURT DEPARTMENT
### SUFFOLK DIVISION

| | |
|---|---|
| PETITION TO DISPENSE WITH PARENTAL CONSENT TO THE ADOPTION OF LONNEL ELLIOT WILLIAMS | DOCKET NO.    00 A 0196 |
| GUARDIANSHIP OF LONNEL ELLIOT WILLIAMS | DOCKET NO.    01 P 0855 |
| LONIEL WLLIAMS<br>v.<br>MARY LEMOINE | DOCKET NO.    00 W 2422 |

## BACKGROUND

1.  On June 23, 2000, Mary Lemoine ("Ms. Lemoine" or "mother") gave birth to Lonnel Elliot Williams ("Lonnel").

2.  At the time of Lonnel's birth, the mother was married to Kevin Lemoine. The mother and Kevin Lemoine were married in 1983, separated in 1996, and divorced in August 2000.

3.  On September 12, 2000, the mother signed an adoption surrender form concerning Lonnel.

4.  On September 12, 2000, Kevin Lemoine signed an adoption surrender form concerning Lonnel. Kevin Lemoine is not Lonnel's father but he signed a surrender form because he was the mother's husband at the time of Lonnel's birth.

5.  The mother placed Lonnel with the Boston Adoption Bureau, Inc. ("Boston Adoption Bureau"). The Boston Adoption Bureau is a licensed adoption agency in Massachusetts.

6.  On September 24, 2000, the Boston Adoption Bureau filed a petition to dispense with parental consent to the adoption of Lonnel pursuant to G. L. Chapter 210 section 3 ("the 210 petition"). [Docket No. 00 A 0196]

1

filed a petition to be appointed Lonnel's guardian. [Docket No. 01 P 0855]

22. On May 15, 2001, the pre-trial conference scheduled for June 11, 2001 was continued to June 22, 2001.

23. On June 4, 2001, this court allowed Attorney Appleyard's motion to withdraw as counsel for the mother. The motion to withdraw was filed on the basis that the Committee for Public Counsel Services determined that the mother was not entitled to state paid counsel because she had surrendered Lonnel for adoption.

24. Attorney Pearson filed her guardian ad litem report on June 22, 2001.

25. On June 22, 2001, this court allowed a motion filed by the father requesting funds to retain an expert.

26. On July 2, 2001, this court appointed Attorney Matthew H. Beaulieu to represent Lonnel.

27. On July 16, 2001, Attorney Patricia Tellis-Warren filed an appearance on behalf of Ms. McEaddy.

28. On July 23, 2001, the first day of trial, a judgment of paternity entered by agreement of all interested parties adjudicating Loniel Williams to be Lonnel's father.

29. The remaining two cases, the 210 petition and the guardianship action, were tried together on July 23, 24, 25, 26, and August 1, 2001.

## MOTHER AND FATHER

30. Ms. Lemoine is Caucasian. Mr. Williams is African-American.

31. The mother is a high school graduate who also took some college courses. She is 43 years old and is currently employed as an insurance analyst. (1A-140)

32. The mother has been married four times. Her first marriage ended upon the death of her spouse, her second marriage ended in divorce, her third marriage ended in divorce or was annulled, and her fourth marriage ended in divorce. (1B-41)

33. The mother married James Bissell in 1976. Mr. Bissell died in December 1978.

34. Between 1978 and 1983, she married and divorced a man named Wickstrom. She also married a man named Katusky. That marriage lasted a day and either ended in divorce or was annulled.

35. In 1983, the mother married Kevin Lemoine.

51.  As of January 2000, the father had contributed nothing toward the household expenses of the parties. The mother, fearing that she would receive no financial help from the father, contemplated abortion. When she discussed this issue with Mr. Williams, he told her that she had better not have an abortion and that it was not in her best interests. The mother took this statement as a threat against her personal safety. (1A-149, 150)

52.  On January 19, 2000, the mother asked Mr. Williams to vacate the apartment.

53.  Among other things, she was upset because she was paying all the household bills and getting no help from Mr. Williams. She was also upset that Mr. Williams would take her car and return it "on empty." Furthermore, she was upset that he was out "all hours of the night" with friends and girlfriends. (1A-152)

54.  When she asked Mr. Williams to leave, he pushed her and told her that she was only safe with him. (1A-152)

55.  Mr. Williams returned to the apartment and spent the night there on January 23, 2000. He also spent the nights of January 24, 27, 29 and 30, 2000 at the apartment. (Exhibit 2)

56.  Mr. Williams spent about 16 nights at the apartment in February, 15 nights in March, 12 nights in April, 10 nights in May, and 4 nights in June. Mr. Williams was also having sexual relations with other women during this period. (Exhibit 2)

57.  Prior to Lonnel's birth, the mother began to look into adoption because she did not believe that the father would support her and the baby and she feared that she could not raise the baby by herself.

58.  The mother contacted an adoption agency in California. The agency sent her four or five family profiles.

59.  The mother contacted a family selected from the profiles and suggested that the family contact an adoption agency in Massachusetts.

60.  On June 23, 2000, Mr. Williams drove the mother to the hospital and was with the mother when Lonnel was born.

61.  Kevin Lemoine put Lonnel on his health insurance to ensure payment of the hospital bills.

62.  The mother and the baby were released from the hospital on June 25, 2000. Mr. Williams spent a few days at the apartment before he left to visit his father who lived out of state and was ill.

63.  Two weeks after Lonnel was born, the mother returned to her employment. Ms. McEaddy cared for Lonnel for two weeks after the mother's return to employment.

74.    Ms. Speiser scheduled appointments for the mother to come to the agency but the mother did not keep the appointments.

75.    In the beginning of August 2000, the prospective adoptive family contacted the Boston Adoption Bureau to inform the agency that they had received another call from the mother informing them that she had given birth and that she wished to place Lonnel for adoption. (1A-63)

76.    The mother then called the Boston Adoption Bureau and scheduled an appointment.

77.    Ms. Speiser interviewed the mother in a private office at the mother's place of employment, Sports Podiatry Resources. This interview lasted for approximately one and one-half hours. At this meeting, the mother told Ms. Speiser the name of Lonnel's father. She then told Ms. Speiser that she thought the father was "down south" possibly in South Carolina. The mother told Ms. Speiser that she didn't have an address for Mr. Williams and that his last known address was her own address in Dorchester. The mother also told Ms. Speiser that Mr. Williams had family somewhere in New York. (1A- 68)

78.    At this initial meeting, Ms. Speiser recommended to the mother that she place Lonnel in a foster care setting to allow her some time to separate from the child to confirm her decision concerning adoption. (1A-64)

79.    Ms. Speiser offered to provide the mother with counseling services either through the agency or privately. The mother declined the offer for counseling. (1A-65)

80.    On August 26, 2000, the mother appeared at the Boston Adoption Bureau and placed Lonnel in foster care. (Exhibit 3)

81.    The mother met with the foster mother. She also received the foster mother's telephone number in case she chose to visit with the child. (1A-66)

82.    A few days later, the mother called the Boston Adoption Bureau to inform the agency that she wanted to take Lonnel out of foster care. She then called back to say that she had changed her mind and that she wanted to proceed with the adoption. (1A-67)

83.    Thereafter, the foster mother injured her back and Lonnel needed to be moved to a different foster mother. When the mother was informed of the plan to move Lonnel, she requested his return and picked him up at the adoption agency on August 31, 2000.

84.    On September 11, 2000, the mother contacted Ms. Speiser and told her that she was now sure that she wanted to place Lonnel with the prospective adoptive family, that she did not require a period of separation, and that she did not want the child placed in foster care again. (1A-69; Exhibit 3)

85.    On September 12, 2000, the mother and her then husband, Kevin Lemoine executed the

74. Ms. Speiser scheduled appointments for the mother to come to the agency but the mother did not keep the appointments.

75. In the beginning of August 2000, the prospective adoptive family contacted the Boston Adoption Bureau to inform the agency that they had received another call from the mother informing them that she had given birth and that she wished to place Lonnel for adoption. (1A-63)

76. The mother then called the Boston Adoption Bureau and scheduled an appointment.

77. Ms. Speiser interviewed the mother in a private office at the mother's place of employment, Sports Podiatry Resources. This interview lasted for approximately one and one-half hours. At this meeting, the mother told Ms. Speiser the name of Lonnel's father. She then told Ms. Speiser that she thought the father was "down south" possibly in South Carolina. The mother told Ms. Speiser that she didn't have an address for Mr. Williams and that his last known address was her own address in Dorchester. The mother also told Ms. Speiser that Mr. Williams had family somewhere in New York. (1A- 68)

78. At this initial meeting, Ms. Speiser recommended to the mother that she place Lonnel in a foster care setting to allow her some time to separate from the child to confirm her decision concerning adoption. (1A-64)

79. Ms. Speiser offered to provide the mother with counseling services either through the agency or privately. The mother declined the offer for counseling. (1A-65)

80. On August 26, 2000, the mother appeared at the Boston Adoption Bureau and placed Lonnel in foster care. (Exhibit 3)

81. The mother met with the foster mother. She also received the foster mother's telephone number in case she chose to visit with the child. (1A-66)

82. A few days later, the mother called the Boston Adoption Bureau to inform the agency that she wanted to take Lonnel out of foster care. She then called back to say that she had changed her mind and that she wanted to proceed with the adoption. (1A-67)

83. Thereafter, the foster mother injured her back and Lonnel needed to be moved to a different foster mother. When the mother was informed of the plan to move Lonnel, she requested his return and picked him up at the adoption agency on August 31, 2000.

84. On September 11, 2000, the mother contacted Ms. Speiser and told her that she was now sure that she wanted to place Lonnel with the prospective adoptive family, that she did not require a period of separation, and that she did not want the child placed in foster care again. (1A-69; Exhibit 3)

85. On September 12, 2000, the mother and her then husband, Kevin Lemoine executed the

7

Lonnel a caring and loving environment for him to be raised in. She deceived the agency as to Mr. Williams' whereabouts because she believed that Mr. Williams would never support Lonnel. She also believed that Mr. Williams would not be a "father" to Lonnel.

98. The issue, however, is not the mother's motives. The father did in fact receive notice of the 210 petition and he did file a timely objection. The questions now are whether or not the father is fit to meet the needs of this child and whether or not the father is able to serve the child's best interests.

99. The evidence is clear and convincing that the father is not fit to meet Lonnel's needs and is unable to serve Lonnel's best interests.

## FATHER

100. Mr. Williams is a thirty-three year old man who at the time of trial resided on the third floor at 33 Wenonah St., Boston, where he has resided at various times since he was a teenager. (3A-34)

101. The third floor apartment at 33 Wenonah St. consists of a living room, bedroom, kitchen and bath. (3A-65) Mr. Williams testified that if the Lonnel were to live with him he would convert the living room into a second bedroom. (3B-75)

102. Mr. Williams attended school up until twelfth grade. He later acquired a GED. (3B-14, 15)

## EMPLOYMENT

103. Mr. Williams was released from the halfway house on September 21, 1999. He was unemployed until November 1999 when he was hired by Greyhound Bus Lines as a baggage handler. He worked there for about six weeks. (3B-7, 8; 4A-62)

104. Mr. Williams was unemployed from January 2000 until April 2000. (3B-8, 20, 21)

105. Mr. Williams became a member of Union Hall Local 67 in the carpenters' apprenticeship program. (3B-5; Exhibit 3)

106. Mr. Williams received a $250.00 a week stipend in March 2000 for walking a picket line. (4A-68, 69)

107. Mr. Williams was hired by the F. J. Alfred Co. as a carpenter's apprentice the last week of April 2000 where he was steadily employed until the last week of July 2000. (4A-73)

108. Mr. Williams claims that with the exception of two weeks off when his father died and one day off when Lonnel was born, he did not miss a day of work at F. J. Alfred. (4A-75, 76)

## PARENTHOOD

122.　Mr. Williams has four children: Tasmin (age 11), Tevin (age 9), Lonnel (age 1), and D'Anell (age 1).

123.　Tasmin was born on August 3, 1990. (3A-59) Tasmin's mother is Shamicka Skeen. Ms. Skeen filed a complaint for child support against Mr. Williams prior to his imprisonment.

124.　Mr. Williams testified that Tasmin wanted for nothing before he went to prison. (4A-30) However, at the time, Tasmin was receiving WIC benefits which supplied her with formula, juice and milk. (4A-195)

125.　Mr. Williams testified that when Tasmin was born, her mother "like most women" received welfare benefits. Tasmin's mother did receive welfare from the time of Tasmin's birth until at least 1993. (4A-197, 198)

126.　Mr. Williams testified that he didn't like to deal with people who are lazy and that he told Tasmin's mother to obtain full time employment and forego any public assistance. (4A-198, 199)

127.　Mr. Williams could not state the amount of support or frequency of payments made to Tasmin's mother prior to his incarceration in 1993. (4A-31, 200, 201)

128.　Mr. Williams claims that he sees Tasmin about once a month. Tasmin does not have any overnight visits with Mr. Williams.

129.　Mr. Williams does not see Tasmin on a regular and consistent basis. Furthermore, he does not pay child support for Tasmin.

130.　Tevin was born on December 20, 1992. Tevin's mother is Tammy Olgesby. Mr. Williams claims that he sees Tevin about twice a month. (3B-16, 58, 62; 4A-55) Tevin does not have any overnight visits with Mr. Williams. (2A-100,190)

131.　Mr. Williams does not see Tevin on a regular and consistent basis. Furthermore, he does not pay child support for Tevin.

132.　Lonnel was born on June 23, 2000.

133.　While earning $520.00 a week at F.J. Alfred, Mr. Williams gave no support to Ms. Lemoine for Lonnel. (4A-90, 91)

134.　Ms. Lemoine received so little support, financial or otherwise, from Mr. Williams during the period after Lonnel was born that Ms. Lemoine applied to Catholic Charities through her employer and received some clothes for the baby, some diapers and a stroller. (1A-172)

11

be placed with her as opposed to her son because she felt that her son needed to go to parenting classes and have a better understanding of child raising. (5A-99)

## ANALYSIS

148. Mr. Williams has no history of paying support for his four children. Tasmin's mother reports that he has "helped out" sporadically. There is no documentation to support this claim. Nevertheless, he has never consistently paid support to any of the mothers of his children. Furthermore, he has never consistently visited any of his children. (Exhibit 3)

149. Mr. Williams' abandonment of his fourth child who is only four months younger than Lonnel provides a more accurate picture of Mr. Williams as a parent than the one he attempted to portray at trial. His motive for aggressively seeking to assert parenthood and custody of one son while abandoning the other to a person he claimed to be a crack cocaine addict is more likely than not connected to a belief that there may be a civil action against the Boston Adoption Bureau.

150. Mr. Williams tried to keep D'Anell's existence quiet. He told the Guardian Ad Litem that he had three children including Lonnel. He left out D'Anell. (Exhibit 3)

## SEXUAL RELATIONSHIPS

151. While living with Ms. Lemoine, Mr. Williams had sexual relationships with other women. (Exhibit 2)

152. Mr. Williams had a sexual relationship with Desiree Sapp while he was living with Ms. Lemoine.

153. Mr. Williams used Ms. Lemoine's car on several occasions to drive down to Bourne to see Ms. Sapp. (4A-88)

154. Prior to Lonnel's birth, Mr. Williams had a sexual relationship with a woman named Jocelyn Choate. (4A-109)

155. Mr. Williams testified that he has had sexual relations with between ten to twenty women since his release from prison. (4A-163)

## DOMESTIC SKILLS

156. Mr. Williams did not know how to prepare Lonnel's formula (1B-95) nor did he ever express any interest in learning how to do so. (1B-96)

157. Mr. Williams relies on friends and relatives to shop and prepare meals for him. He is unable to specify his financial contribution to the cost of this food. (4A-141, 142, 143, 144)

13

169. Ms. Lopes suffered a nasal fracture as a result of the hit she took from Mr. Williams. (Exhibit 42)

170. On October 2, 2000, Mr. Williams was charged with assault and battery against Ms. Lemoine. That case was pending at the time of trial. (4A-10)

171. During his relationship with Ms. Lemoine, Mr. Williams grabbed her by the hair (1B-102), pushed her several times including when she was pregnant (1B-101-102), threw a brick through the windshield of her car and threatened her with physical harm. (1B-104)

172. Mr. Williams also abandoned the mother on the side of the road in 92 degree heat while she was pregnant by leaving with her automobile after an argument. (1B-105, 106)

173. On November 6, 2000, Mr. Williams pled guilty to seven counts of violation of a Domestic Abuse Prevention Order. He was sentenced to six months in prison. The jail sentence was suspended. As part of his sentence he was also required to complete a forty week certified batterer's program which he was attending at the time of trial but had not yet completed.

174. Mr. Williams was also placed on three months house arrest for violation of his federal probation.

## GEORGIA MCEADDY

### MS. MCEADDY - GRANDMOTHER

175. Georgia McEaddy resides at 49 June St., Roslindale, Massachusetts in a subsidized apartment. (4B-18)

176. Ms. McEaddy described this residence in High Point Village as multi cultural, middle-class and secluded. (4B-44, 45)

177. Ms. McEaddy has three children: Lonnie, Loniel, and Dorcas. Dorcas and Dorcas' nine month old child reside with Ms. McEaddy. (4B-19, 20)

178. In July 2001, Ms. McEaddy signed a consulting contract with EDCO for the period from June 2001 to January 2002. The contract work involves acting as an educational advocate for children. The amount paid to her depends on the number of children serviced. She will be paid from zero to a maximum of $2000.00 for the period covered by the contract.

179. This is Ms. McEaddy's sole source of income.

180. Ms. McEaddy relies upon her daughter to pay the rent, the phone bill and the light bill. (5A-13)

## MS. MCEADDY - FOSTER MOTHER

194.  Ms. McEaddy has been a foster parent for Italian Home for Children, Protestant Social Services, Alianza Hispana, Dare Family Services and the Department of Social Services. (4B-33)

195.  Ms. McEaddy terminated her services for the Italian Home after one year because "there was a concern with the chid that [she] had and [the child's] ability to manipulate a social worker who took the place of [another] social worker." (4B-34)

196.  Ms. McEaddy terminated her services for Protestant Social Services after one year because "[t]he child had difficulty accepting the fact that her mother was expecting another child, and so the social worker and [Ms. McEaddy] felt that it was in the best interests of everybody that she be placed some place else." (4B-35)

197.  Ms. McEaddy terminated her services for Alianza after a year when it appeared that Alianza was ending its child placement program.

198.  In May 1994, Boston Children's Services through DARE placed a special needs child named Nathaniel (born October 24, 1988) in Ms. McEaddy's home.

199.  Ms. McEaddy had a combative relationship with DARE. (Exhibits 19, 20, 21, 22, 25, 26, 27, 28, 29, 30, 31)

200.  After one year with DARE, Ms. McEaddy's services and current foster child were transferred to DSS supervision because "[DARE] felt it was in everybody's best interests to have the child go to the Department of Social Services." (4B-43)

201.  In September 1995, DSS placed Nathaniel's sister, Nitanju (born January 28, 1992), in Ms. McEaddy's home. (Exhibit 14)

202.  Ms. McEaddy's relationship with the Department of Social Services was as combative as it was with DARE.

203.  She did not comply with her obligation to submit signed service plans. She did not fully comply with service plans. (2B-103; Exhibit 14)

204.  Ms. McEaddy and DSS had ongoing disagreements regarding arrangements for PACT (Parents and Children Together) funds. There are funds which can be paid to foster parents to assist children with identified special needs. (Exhibit 14)

205.  Ms. McEaddy rejected a plan to help Nathaniel learn to communicate because the plan included the use of sign language. Ms. McEaddy, without consulting any professionals, decided that she would teach Nathaniel to speak. She did not succeed. (2B-113, 114)

218.    The prospective adoptive mother is not employed and is at home full time. She is a
        college graduate. (2A-139-140; 2B-58)

219.    The prospective adoptive parents live in a wooded, suburban neighborhood of single-
        family residences. (2A-141)

220.    The home is neat and organized. It is located at the end of a cul-de-sac where there is
        little traffic. (2B-16)

221.    Lonnel is healthy, comfortable and thriving in the prospective adoptive home. The
        prospective adoptive parents are loving, nurturing, and capable parents. Lonnel is
        attached and bonded to his prospective adoptive family. (Exhibit 3)

222.    Dr. Steven Shapse is a licensed psychologist with twenty years experience. Dr.
        Shapse's specialty is child-custody evaluations and psychological testing. (2B-4, 6, 9;
        Exhibit 7)

223.    Dr. Shapse spent approximately seven hours with the pre-adoptive parents. (2B-16) Dr.
        Shapse observed Lonnel as well as Sophia.

224.    Dr. Shapse observed that Lonnel was easily comforted by both adoptive parents and
        reached out to them when in need. Lonnel smiled a lot. Lonnel and Sophia also reached
        out to each other. When Sophia left the room, Lonnel looked for her. (2B-17)

225.    Dr. Shapse concluded as does this court that Lonnel clearly has a warm and secure
        attachment to the pre-adoptive family. (2B-19)

### LONNEL'S NEEDS

226.    Lonnel had an adjustment period upon being placed in the pre-adoptive home. He
        required a lot of consoling and needed to be held frequently. He also had some trouble
        sleeping. (2A-86)

227.    When Lonnel first arrived at the pre-adoptive home he was sullen and very serious
        looking. When the guardian ad litem visited the pre-adoptive home, Lonnel was laughing
        and had a "sparkle." (2A-87, 88)

228.    Lonnel needs consistency, continuity, routine and predictability. Mr. Williams cannot
        provide these things. (2A-38)

229.    If Lonnel is removed from the pre-adoptive home, his need for predictability, structure,
        security and routine will increase dramatically. (2A-56)

230.    Mr. Williams has not held a job consistently, has had no consistency of relationships, and
        has not consistently visited his other children. (1B-181)

Loniel W. et al v. BAB, Inc.
2003-P-1668
R.23

239. Dr. Bachop acknowledged that Mr. Williams' relationships with his other three children could provide a prognosticative measure of his parenting of Lonnel. (3A-148)

240. Dr. Bachop also acknowledged that an environment of domestic violence is not an appropriate environment in which to rear a child. (3A-152)

## CONCLUSIONS

241. This is not a case involving parental abandonment. The mother carefully selected a suitable home for Lonnel. She chose the pre-adoptive family from among many choices available to her including placement of Lonnel with his father or paternal grandmother. Mr. Williams, on his part, claimed paternal responsibility as soon as he found out about the adoption proceedings.

242. The father had no significant opportunity to receive social services because the mother concealed Mr. Williams' location until after Lonnel was placed for adoption and Mr. Williams refused offers to meet with the Boston Adoption Bureau.

243. Lonnel has now been with his pre-adoptive family for more than a year. The Boston Adoption Bureau acted in Lonnel's best interests when they did not disrupt his pre-adoptive placement when Mr. Williams filed his objection to the adoption. The mother raised serious and, as has been demonstrated, well founded concerns about Lonnel's well being if he were placed in the care of Mr. Williams.

244. Mr. Williams is a violent man who physically abused Lonnel's mother. He broke the nose of a neighbor of his youngest child. He has a serious criminal record. His most recent conviction was for violation of an abuse prevention order.

245. Mr. Williams has not had any contact with Lonnel since September 2000. The circumstances of this case prevented the establishment of a meaningful relationship. However, Mr. Williams has had unrestricted opportunities to establish strong relationships with his other three children and he has failed to take advantage of these opportunities. He has completely ignored his youngest son.[1]

---

[1] "[P]rior history does have prognostic value." Adoption of Carla, 416 Mass.510, 517 (1993) The court can properly rely on prior patterns of ongoing, repeated, serious parental neglect, abuse or misconduct in determining current unfitness. Carla, 416 Mass. 510, 517.n. 7 (1993); Adoption of Diane, 400 Mass. 196, 204 (1987) [A]n assessment of prognostic evidence derived from an ongoing pattern of parental neglect or misconduct is appropriate in the determination of future fitness and the likelihood of harm to the child. Custody of a Minor, 377 Mass 876, 882 (1979) In determining parental fitness to care for a child, "neither agencies responsible for the welfare of children nor judges sitting on cases involving custodial questions need wait for inevitable disaster to happen," but, instead, "may consider parents' past conduct to predict future ability and performance." Adoption of Katherine, 42 Mass. App. Ct. 25 (1997) However, for the purpose of dispensing with consent to adoption, the unfitness element must have a predictive dimension in that it must be so probative and persuasive that it can serve as a predicate for a judge's finding that the parent's shortcoming will continue undiminished in the future with an attendant harmful effect on the child.

Loniel W. et al v. BAB, Inc.
2003-P-1668
R.25

Desare Sapp

Steven N. Shapse  Ph.D.

Ann Marie Brown

Marilyn Speiser - Director of Boston Adoption Bureau

Janice Smith

Michael Bachop  Ph.D.

Loniel Williams - biological father

Georgia McEaddy - paternal grandmother

## EXHIBITS

258.   The following exhibits were introduced at trial:

Exhibit 1.    Manilla envelope addressed to Mr. Williams at 33 Wenonah St., Dorchester, MA 02121 postmarked September 9, 2000

Exhibit 2.    Marked pages from a desk calendar kept by Ms. Lemoine dated January of 2000 to December of 2000

Exhibit 3.    Report of the Guardian ad Litem dated June 18, 2001

Exhibit 4.    Investigation Report of the Commonwealth of Massachusetts Executive Office of Health and Human Services dated February 8, 2001

Exhibit 5.    Letter from Commonwealth of Massachusetts Executive Office of Health and Human Services to Georgia McEaddy dated March 16, 2001

Exhibit 6.    Birth Certificate of D'Anell Edward Maceo Williams

Exhibit 7.    Curriculum Vitae - Steven N. Shapse  Ph.D.

Exhibit 8.    Stipulation of the parties as to Mr. Williams's criminal convictions

Exhibit 9.    Mr. Williams's records from Boston Carpenters Apprenticeship

Exhibit 10.    Mr. Williams's records from Massachusetts Carpenters Central Collection Agency

Exhibit 11.    Updated copy of home-study dated August 23, 2000 prepared by Hope Heller  Ph.D.

Exhibit 30.   Memo to Paul Cataldo from Georgia McEaddy dated November 22, 1994 regarding meeting of November 18, 1994

Exhibit 31.   Letter to Paul Cataldo from Georgia McEaddy dated November 22, 1994

Exhibit 32.   Letter to Georgia McEaddy dated September 22, 1995 from Rudy Adams - Area Director - Morton Street DSS

Exhibit 33.   Letter to Georgia McEaddy dated November 16, 1995 from Susan Griffen Supervisor - Morton Street DSS

Exhibit 34.   Letter to "To whom this may concern" dated February 13, 1996, from Mauan Bynoe  LICSW

Exhibit 35.   Letter to Anna Lee Brown - DSS Social Worker - dated October 31, 1997 from Bernice Updyke - Program Director - EDCO

Exhibit 36.   Letter to Georgia McEaddy dated December 30, 1995 from Arnold Miller Ph.D.

Exhibit 37.   Letter to "To Whom It May Concern" dated July 14, 2000 from Mary Lou Buyse  M.D.

Exhibit 38.   DARE Bi-Monthly Mentor Quality Assurance Review regarding Georgia McEaddy dated March 5,1995

Exhibit 39.   DARE Bi-Monthly Mentor Quality Assurance Review regarding Georgia McEaddy dated June 1995

Exhibit 40.   DARE Bi-Monthly Mentor Quality Assurance Review regarding Georgia McEaddy dated April 1995

Exhibit 41.   Letter to Georgia McEaddy dated August 29, 1997 from Anna Lee Brown DSS Social Worker, Deborah Wingard - Adoption Supervisor, and Paul Creelan - Area Program Manager

Exhibit 42.   Falmouth Hospital Records

March 11, 2002

John M. Smoot
Associate Justice