THE UNITED STATES DISTRICT COURT
BOSTON, MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 OCT -5 P 2: 08

U.S. DISTRICT COURT
DISTRICT OF MASS.

GEORGIA MCEADDY, et al., pro se,
Petitioner

v

THE COMMONWEALTH OF MASSACHUSETTS
Respondent

SUFFOLK COUNTY
PROBATE AND FAMILY COURT,
APPEALS COURT
AND THE
BOSTON ADOPTION BUREAU

PETITION FOR A WRIT OF CERTIORARI
To the
United States District Court

GEORGIA McEADDY, pro se
49 June Street
Roslindale, MA 02131
(617) 325-7513

For the Commonwealth of Massachusetts
Office of Attorney General Tom Reilly
One Ashburton Place
Boston, MA 02108

For the Boston Adoption Bureau
David F. Lewis
One Broadway
Sixth Floor
Cambridge, MA 02142

Georgia McEaddy, 49 June Street, Roslindale, MA 02131

**Susan Jennes**
Pro Se Clerk
United States District Court
1 Courthouse Way
Suite 2300
Boston, MA 02210

Dear Ms. Jennes,                                    October 5, 2004
Two weeks ago, A Writ of Certiorari was submitted to the Office of Pro Se.
The submitted Writ was both un-professtonal and incomplete.

Enclosed, please find a corrected Writ of Certiorari.

Thank you, for you time and patience in this matter.  If you may have
questions, I may be reached at the above address or telephoned at the
number below.

Sincerely yours,

Georgia McEaddy, Pro Se
(617) 325-7513

1

# THE UNITED STATES DISTRICT COURT
# BOSTON, MASSACHUSETTS


## GEORGIA MCEADDY, et al., pro se,
### Petitioner

v

## THE COMMONWEALTH OF MASSACHUSETTS
### Respondent


SUFFOLK COUNTY
PROBATE AND FAMILY COURT,
APPEALS COURT
AND THE
BOSTON ADOPTION BUREAU


## PETITION FOR A WRIT OF CERTIORARI
### To the
### United States District Court
_____


**GEORGIA McEADDY, pro se**
49 June Street
Roslindale, MA 02131
(617) 325-7513


**For the Commonwealth of Massachusetts**
Office of Attorney General Tom Reilly
One Ashburton Place
Boston, MA 02108

**For the Boston Adoption Bureau**
David F. Lewis
One Broadway
Sixth Floor
Cambridge, MA 02142

# UNITED STATES DISTRICT COURT
## District of Massachusetts

**Georgia McEaddy**

v.

CIVIL ACTION
NO._____

**Commonwealth of Massachusetts**

**Suffolk County Probate and Family Court**

**Suffolk County Appeals Court**
**and the**
**Boston Adoption Bureau**

## COMPLAINT

### Parties

1. The plaintiff is a resident of Roslindale, in Suffolk County, Massachusetts and a citizen of the United States.

2. The defendants are the Commonwealth of Massachusetts Suffolk County Family and Probate Court; the Appeals Court; the Boston adoption Bureau,

3. The Suffolk County Probate and Family Court is located at 24 New Chardon Street, Boston, MA 02114; the Appeals Court is located at 3 Centre Plaza, seventh floor; Boston Adoption Bureau is located at 14 Beacon Street, sixth floor, Boston, MA 02108

**JURISDICTION:**    Federal Question under 28 U.S.C.

### PETITION FOR A WRIT OF CERTIORARI

Petitioner Georgia McEaddy respectfully petitions for a writ of certiorari to review the Judgement of the Suffolk County Probate and Family /Appeals Courts in this case. In plain contravention of the requirements of the Constitution of the United States, Federal Law, the Constitution of the Commonwealth of Massachusetts, and state law, the state courts have embarked on an *ad hoc*, standardless, subjective, arbitrary, and lawless exercise of judicial power, which appears designed to thwart the will of the petitioner as well as the considered judgements of the past and present government branches

**TABLE OF AUTHORITIES**

**Federal Law**

The United States Supreme Court states: "The court has found discrimination against the poor unconstitutional. When it deprives the indigent of a fundamental right of interest."

**The United States Supreme Court's Quarterly Guide to the United States Supreme Court Quarterly**

**U.S Constitution, Article 6,cl 2**

Clause 2 of Article VI reads in pertinent part. "This Constitution and the Laws of the United States which shall be made in Pursuance thereof…shall be the supreme Law of the Land; and the judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

**U.S. Constitution, First Amendment**

The First amendment provides, in pertinent part" "No person shall…be deprived of life, liberty, or property, without due process of law." Congress shall make no law abridging the freedom of speech, or of the press; or the right of the people…to petition the Congress for a redress of grievances."

**United States Fifth Amendment**

The Fifth Amendment provides, in pertinent part: "No person shall…be deprived of life, liberty, or property, without due process of law."

405 U.S. at 657, 92 S. Ct at 12216 Publication of notice to unknown respondents.

**United States Constitution, Sixth Amendment**

The right to confront and cross-examine a witness applied to state by the 14TH Amendment due process clause

**United States Constitution, Fourteenth Amendment, Section 1.**

Section 1. The Fourteenth Amendment reads in pertinent part, "No state shall make or enforce any

3

law which shall abridge the privileges or immunities
of citizens of the United States; nor shall any state
deprive any person life, liberty or property, without
due process of law; nor deny to any person within its
jurisdiction the equal protection of the laws." Equal
Protection of the law; Due Process

**Title 42  s. 5116-8**
Respite Service for children who have disabilities

**United States Code, 1994 Edition 2002**

**Massachusetts  General  Law,  Chapter  215  Section  5A**
Notice  and  opportunity  to  be  heard;  proper  parties
(Massachusetts Child Custody Jurisdiction Act)

**405 U.S. at 657, 92  S. Ct at 12216.**

Publication of notice to unknown respondents.

**Section 5A of Chapter 209B** reads  in  pertinent  part,
"Reasonable  notice  in  conformity  with  section  six  and
an  opportunity  to  be  heard  shall  be  given  to  the
contestants

**Section 56A of chapter 215**

**Uniform Putative and Unknown Fathers Act**

**Section 2 Rights to Determination of Paternity**

C. C. v. A.B., Mass. Sup. Jud. Ct., 406 Mass. 6798
(2/19/90), 16 FLR 1328; Smith v. Cole, La Sup. Ct. No.
9-C-1134 (12/11/89), 16 FLR 1087; and Michael K.T. v.
Tina L.T., W.VA Sup. Ct, App. No. 18989 (12/21/89), 16
FLR 1149; While an opinion from such a divided court
will  be  narrowly  construed,  nevertheless  it  sends  a
chilling message to those who may father a child of a
married woman that, even if they "act like a father"
and "develop a relationship with their offspring," the
sanctity  of  the  "unitary  marital  family"  may  be
upheld.   The  above  case  indicates  there  may  be  some
weakening of the conclusive presumptions based merely
on  the  marital  status  of  the  mother  at  the  time  of
birth.
**Section 3. Notice of Judicial Proceeding for Adoption
or Termination of Parental Rights.**

4

**(a)** In an adoption or other judicial proceeding that may result in termination of any man's parental rights with respect to a child, the person seeking termination shall give notice to every putative father of the child known to that person.

**(b)** The notice must be given(i)at a time and place and manner appropriate under the {rules of civil procedure for the service of process in a civil action in this State} or (ii)at a time and place and in a manner as the court directs and which provides actual notice.

**(d)** If, at any time in the proceeding, it appears to the court that there is a putative father of the child who has not given notice, the court shall require notice of the proceeding to be given to him in accordance with subsection (b).

## Uniform Parentage Act
### 42U.S.§666(a)(D)(i)(II)

Section 623. Admission of Paternity Authorized

(b) If the court finds that the admission of paternity satisfies the requirements of this section and finds that there is no reason to question the admission, the court shall issue an order adjudicating the child to be the child of the man admitting paternity.

### Hearing and Adjudication UPA (1973)§14

### Section 631 Rules for Adjudication of Paternity

(2) Unless the results of the genetic testing are admitted to rebut other results of genetic testing, a man identified as the father of a child under Section 505 must be adjudicated the father.


**Uniform Parentage Act** (UPA) (1973) §2 and **Massachusetts General Laws**, ch. 209C § 1 From a legal and social policy perspective, this


The United States Supreme Court states: "The court has Pursuance thereof…shall be the supreme Law of the Land; and the judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Constitution, First Amendment The First amendment provides, in pertinent part" "No person shall…be deprived of life, liberty, or property, without due process of law." Congress shall make no law abridging the freedom of speech, or of the press; or the right of the people…to petition the Congress for a redress of grievances."

**M.B.L. v. S.L.J.**, 65 U.S.L.W. 4035, 4040 (U.S. Dec, 1996);


Section 5A of Chapter 209B reads in pertinent part, "Reasonable notice in conformity with section six and an opportunity to be heard shall be given to the contestants

### Section 56A of chapter 215

**Uniform Putative and Unknown Fathers Act**

**Section 2 Rights to Determination of Paternity**

**C. C. v. A.B., Mass. Sup. Jud. Ct., 406 Mass. 6798**
(2/19/90), 16 FLR 1328; Smith v. Cole, La Sup. Ct. No. 9-C-1134 (12/11/89), 16 FLR 1087; and Michael K.T. v. Tina L.T., W.VA Sup. Ct, App. No. 18989 (12/21/89), 16 FLR 1149; While an opinion from such a divided court will be narrowly construed, nevertheless it sends a chilling message to those who may father a child of a married woman that, even if they "act like a father" and "develop a relationship with their offspring," the sanctity of the "unitary marital family" may be upheld.  The above case indicates there may be some weakening of the conclusive presumptions based merely on the marital status of the mother at the time of birth.

**Section 3. Notice of Judicial Proceeding for Adoption or Termination of Parental Rights.**

**(a)** In an adoption or other judicial proceeding that may result in termination of any man's parental rights with respect to a child, the person seeking termination shall give notice to every putative father of the child known to that person.

**(b)** The notice must be given (i) at a time and place and manner appropriate under the {rules of civil procedure for the service of process in a civil action in this State} or (ii) at a time and place and in a manner as the court directs and which provides actual notice.

**(d)** If, at any time in the proceeding, it appears to the court that there is a putative father of the child who has not given notice, the court shall require notice of the proceeding to be given to him in accordance with subsection (b).

6

**Uniform Parentage Act**

**42U.S. §666(a)(D)(i)(II)**

Section 623. Admission of Paternity Authorized

(b) If the court finds that the admission of paternity satisfies the requirements of this section and finds that there is no reason to question the admission, the court shall issue an order adjudicating the child to be the child of the man admitting paternity.

**Hearing and Adjudication UPA (1973)§14**

**Section 631 Rules for Adjudication of Paternity**

(2) Unless the results of the genetic testing are admitted to rebut other results of genetic testing, a man identified as the father of a child under Section 505 must be adjudicated the father.

**Title 42s. 5116-8** Respite Service for children who have disabilities

**United States Code, 1994 Edition 2002**

**The U.S Supreme Court in M.L.B. v. S.L.J**

**117 S. Ct. 555 (1996),** establishes a right to Transcripts. Schall v. Martin, 467 U.S. 253,268 (1984) quoting Snyder v. Massachusetts 291 U.S. 97, 105 (1934) and Leland v. Oregon 343 U.S.790, 798 (1952).25

Does the practice accord with Due Process, but it is plainly worth considering in determining whether the practice accords with due process, but it is plainly worth considering whether the practice offends some principle of justice so rooted in the traditions and conscience of our people to be ranked fundamental.

The trial court's findings are not supported by clear and convincing evidence. The burden of proving parental unfitness is on the department. **Santosky v. Kramer 455 us. 745, 769 (1982)**.

Educational Advocate-Department of Education Pursuant to **USC § 401**

## STATE
## Massachusetts Rules of Professional Conduct

Preamble: **1.** a lawyer is a representative of clients, an officer of the legal system, and a public citizen having special responsibility for the quality of justice.

**2.** (last sentence) A lawyer acts as an evaluator by examining a client's legal affairs and report about them to the client and others.

**4.** (last part) While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.

**5.** As a public citizen, a lawyer should seek improvement of the law, the administration of justice, and the quality of service rendered by the legal profession.

**8.** In the nature of law practice, however conflicting responsibilities are encountered. Virtually all-difficult ethical problems arise from conflict between a lawyer's responsibility to clients, to the legal system, and to the lawyer's own interest in remaining an upright person while earning a satisfactory living. Many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by basic principles underlying the Rules.

**Rule 1.2** Legal representation should not be denied to people who are unable to afford legal services, or whose cause is controversial or the subject of popular disapproval.

**Rule 1.3** A lawyer shall act with reasonable diligence and promptness in representing a client. The lawyer shall represent a client zealously within the bounds of the law.
{1A} It is implicit . . . a lawyer may not intentionally prejudice or damage his client during the course of the professional relationship.

**Rule 1.6** Confidentiality of Information
Almost without exception, clients come to lawyers in order to determine what their rights are and what is, in the maze of laws a regulation, deemed to be legal and correct.

Uniform Parentage Act (UPA) (1973) §2 and Massachusetts General Laws, ch. 209C § 1 From a legal and social policy perspective, this... pursue life-

8

styles at odds with the average is not a basis for depriving the parents custody.

## Massachusetts Constitution, part the first, Declaration of Rights, Article XXIX

Article XXIX reads, "It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, *impartial,* and independent as the lot of humanity will admit. It is therefore, not only the best policy, but for the security of the rights of the people, and of every citizen.

261. **210 v. Patented** 381 Mass. 563, 579 (1980). 262. It is not enough to state that a parent has a particular condition without detailing the ways in which that condition renders the parent unfit.

**Custody of a Minor (no 2) see also Care and Protection of Bruce,** 44 Mass. App. CT. 758, 761 (1998) findings must indicate that the parent is currently so bad as to place a child at serious risk of peril from abuse, neglect, or other activity harmful to the child.

A parent's poverty is not alone a sufficient basis for a finding of unfitness. **Custody of a Minor, 21 Mass. App. CT. 1, 7 (1985). Profile Evidence presents to the trier of fact a stereotypical description. Commonwealth v. Frias, 4a, 47 Mass. App. CT. 293, 296 (1999).** Profile Evidence is nothing more than an expert's opinion as to certain characteristics that is common to some or most of the individuals in a specific group. **id. at 296.**

An agency is required to make every effort to strength then and encourage family life before it may proceed with plans to sever family ties permanently. **Petition of the Department of Public Welfare to Dispense with Consent to Adoption.** 376 Mass. 252, 266 (1978).

The obligation to make every reasonable effort to keep families together is also codified as part of the **Departments Regulations 110 C.M.R. § 1.01.**

The court must take some recognizable action directing a parent to someone or some program, which can address or correct the need the department identified. The

means employed by the department to provide a service must reasonably to accomplish the service. ecf. **Adoption of Hugh** **35 Mass. app. CT. 346 (1993).**

Appellate Review in custody matters is not done in assess the evidence Di Nova but rather to determine whether the judge findings however, is not whether the parent is a good one, let alone an ideal one; rather the inquiry is whether the parent is so bad as to place the child in serious risk of peril from abuse, neglect, or other activity harmful to the child. **"Care and Protection of Bruce, 44 Mass. app. CT. 25, 28 (1997).** The idea of parental unfitness means grievous shortcomings that put the child's welfare much at hazard.

"parental unfitness, as developed in the care law, means more ineptitude, handicap, character flaw, conviction of crime, unusual life style or inability to do good a job as the child's foster parent. **"Adoption of Katherine, 42 Mass. app. CT. 25, 28 (1997).**

The irrevocable removal of a child from its parents and the severance of legal relations between parent and children are exceptionally far reaching exercises of the state's power. **Adoption of Katherine, 42 Mass. App. Ct 25, at 27 (1997).** **Cf. Lassiter v. Department of Social Services.,** 452 U.S. 18, 27 (1981); **M.B.L. v. S.L.J.,** 65 U.S.L.W. 4035, 4040 (U.S. Dec, 1996); **Petition of the Department of Welfare to Dispense with Consent to Adoption,** 383 Mass 573, 588-589 (1981);**Petition of Boston Children's Services Association to Dispense with Consent to Adoption;** 20 Mass. App. Ct.566, 566-567 (1985). Such action should be regarded as extreme steps. **Petition of the Department of Social services to dispense with Consent of Adoption,** 391 Mass. 113, 119 (1984)

In recognition of the significance of such an exercise of state power and the constitutional rights of parents in maintaining their bond with their children, the courts have set a high standard for proof of parental unfitness. A judge must find by clear and convincing evidence that a parent is currently unfit to further the child's best interest. **Santosky v, Kramer,** 455 U.S. 745,769 (1982). **Adoption of Carlos,** 413 Mass 339, 348-350 (1992). **Adoption of Stuart,** 39, Mass. App. Ct. 380, 381 (1995).

Parents will not be deprived of this fundamental, constitutionally protected right to family integrity

10

unless some affirmative reason is shown for doing so. **Petition of Worcester Children's Friend Society to Dispense with Consent to Adoption**, 9 Mass. App. Ct. 594, 595 (1980).

Good intention and genuine concern for the welfare of the child are not satisfactory substitute for clear and convincing evidence. **Adoption of Iris**, 43 Mass. App. Ct. 95. at 102 (1997).

In any hearing on these issues, the burden of proving a parent unfit and the burden of proving each element of its case are on the petitioner, here the Department of Social Services. **286. Petition of the Department of Social Services to Dispense with Consent to Adoption**, 392 Mass. 696 (1984) The petitioner has the burden of showing parental unfitness by clear and convincing evidence.  The evidence must be sufficient to convey to a high degree of probability that the proposition is true. **Iris at 105 Tosti v.Avik. 394 Mass. 482, 493 n. 9 (1985). 484 U.S. 964** The requisite proof must be strong and positive; it must be full, clear and decisive."(1987).

Limits should not be such that a party is prevented from presenting its entire case to the fact finder. **Clark vs. Clark 47 Mass App. Ct. 737 (1999)** citing **Goldman vs. Ashkins**, 266 Mass. 374, 380 (1929) and **Chandler vs. FMC Corp.** Mass. App. Ct. 332, 338 (1993) vacating judgment and remanding for a new trial, **Guardianship of Brandon 424 Mass 482 (1997)**

The rules of procedure and evidence common law have been has been shunted throughout the proceeding.

The plaintiff should have been able to challenge a witness through cross-examination and other means. **Adoption of Paula, 45 Mass. App. Ct. 727, 732, (1998).**

Absent the ability to cross-examine and rebut any adverse material. **Adoption of Tina , 45 Mass App. Ct. 727, 732** (1998)  Hearsay contained in a report is admissible for its truth when there is an opportunity to refute the investigator and the investigators sources through cross-examination and other means.

11

**Massachusetts General Law** c. 210 § 2-13 **Consent, Notice, Grandparents**

**Massachusetts General Law 210 § 4A Father of Children Born Out of Wedlock**

No other petition shall be allowed without proof of compliance with this section.

**The Department of Social Service, 110 C.M.R. § 1.01, 7.041, 7.500, 7.061**

... pursue life-styles at odds with the average is not a basis for depriving the parents (grandmother) custody. 261. **210 v. Patented** 381 Mass. 563, 579 (1980). 262. It is not enough to state that a parent has a particular condition without detailing the ways in which that condition renders the parent unfit.

**Custody of a Minor (no 2) see also Care and Protection of Bruce**, 44 Mass. App. CT. 758, 761 (1998) findings must indicate that the parent is currently so bad as to place a child at serious risk of peril from abuse, neglect, or other activity harmful to the child.

A parent's poverty is not alone a sufficient basis for a finding of unfitness. **Custody of a Minor**, 21 Mass. App. CT. 1, 7 (1985). **Profile Evidence presents to the trier of fact a stereotypical description.** **Commonwealth v. Frias**, 4a, 47 Mass. App. CT. 293, 296 (1999). **Profile Evidence** is nothing more than an expert's opinion as to certain characteristics that is common to some or most of the individuals in a specific group. **id. at 296.** An agency is required to make every effort to strength then and encourage family life before it may proceed with plans to sever family ties permanently. **Petition of the Department of Public Welfare to Dispense with Consent to Adoption.** 376 Mass. 252, 266 (1978).

The obligation to make every reasonable effort to keep families together is also codified as part of the **Departments Regulations 110 C.M.R. § 1.01.**

The trial court's findings are not supported by clear and convincing evidence. The burden of proving parental unfitness is on the department. **Santosky v. Kramer 455 U.S. 745, 769 (1982).** Appellate Review in custody matters is not done in assess the evidence Di Nova but rather to determine whether the judge findings however, is not whether the parent is a good one, let alone an ideal one; put the child's welfare much at hazard.

"parental unfitness, as developed in the care law, means more ineptitude, handicap, character flaw,

conviction of crime, unusual life style or inability
to do good a job as the child's foster parent.
"**Adoption of Katherine, 42 Mass. App. CT. 25, 28
(1997).**

**Adoption of Katherine,** 42 Mass. App. Ct 25, at 27
(1997). **Cf. Lassiter v. Department of Social
Services.,** 452 U.S. 18, 27 (1981**Petition of the
Department of Welfare to Dispense with Consent to
Adoption,** 383 Mass 573, 588-589 (1981);**Petition of
Boston Children's Services Association to Dispense
with Consent to Adoption;** 20 mass. App. Ct.566, 566-
567 (1985). Such action should be regarded as extreme
steps. **Petition of the Department of Social services
to dispense to dispense with Consent of Adoption,** 391 Mass. 113,
119 (1984)

In recognition of the significance of such an exercise
of state power and the constitutional rights of
parents in maintaining their bond with their children,
the courts have set a high standard for proof of
parental unfitness. A judge must find by clear and
convincing evidence that a parent is currently unfit
to **further the child's best interest. Santosky v,
Kramer, 455 U.S. 745,769 (1982). Adoption of Carlos,
413 Mass 339, 348-350 (1992). Adoption of Stuart, 39,
Mass. App. Ct. 380, 381 (1995).**

Parents will not be deprived of this fundamental,
constitutionally protected right to family integrity
unless some affirmative reason is shown for doing so.
**Petition of Worcester Children's** Friend Society to
Dispense with Consent to Adoption, 9 Mass. App. Ct.
594, 595 (1980).

Good intention and genuine concern for the welfare of
the child are not satisfactory substitute for clear
and convincing evidence. **Adoption of Iris, 43 Mass.
App. Ct. 95. at 102 (1997).**
In any hearing on these issues, the burden of proving
a parent unfit and the burden of proving each element
of its case are on the petitioner, here the Department
of Social Services. 286. **Petition of the Department of
Social Services to Dispense with Consent to Adoption,
392 Mass. 696 (1984)** The petitioner has the burden of
showing parental unfitness by clear and convincing
evidence. The evidence must be sufficient to convey
to a high degree of probability that the proposition
is true. **Iris at 105 Tosti v.Avik. 394 Mass. 482, 493
n. 9 (1985). 484 U.S. 964** The requisite proof must be
strong and positive; it must be full, clear and
decisive."(1987).
Limits should not be such that a party is prevented
from presenting its entire case to the fact finder.

13

**Clark vs. Clark** 47 Mass App. Ct. 737 **(1999) citing
Goldman vs. Ashkins**, **266 Mass. 374, 380 (1929) and
Chandler vs. FMC Corp.** **Mass. App. Ct. 332, 338 (1993)**
vacating judgment and remanding for a new trial,
**Guardianship of Brandon** **424 Mass 482 (1997)**
The rules of procedure and evidence common law have
been has been shunted throughout the proceeding
Limits should not be such that a party is prevented
from pursuing its entire case to the fact finder.
**Clark v. Clark** **47 Mass. App. Ct. 737** (1999) citing
**Goldman v Askins,** **266** Mass.374, 380 (1929), Chandler v
FMC Corp., Mass. App. Ct. 332,338 (1993)    vacating
judgment and remanding for a new trial. Guardianship
of Brandon 424 Mass. 482 (1997).
The plaintiff should have been able to challenge the
Boston Adoption Bureaus' attorney through cross-
examination and other means. **Adoption of Paula,** 45
Mass. App. Ct. 727, 732, (1998).
Absent the ability to cross-examine and rebut any
adverse material. **Adoption of Tina** , 45 Mass App. Ct.
727, 732 (1998)   Hearsay contained in a report is
admissible for its truth when there is an opportunity
to refute the investigator and the investigators
sources through cross-examination and other means.

## ISSUES PRESENTED

I.      Whether the Due Process Clause or Equal Protection Clause of the
        Fourteenth Amendment is violated the Constitutional Rights of
        G.McEaddy.

II.     Whether the court each complied with the
        Federal and State laws and Constitutions.

III.    Whether the correct legal policies and
        procedures were followed in this case.

IV.     Whether the court erred in not adjudicating
        paternity of father until March 11, 2002,the
        test results where given to the court in
        February.

V.      Whether the court showed bias by not
        allowing visitation of the child.

VIII.   Whether the court showed bias in the
        testimony of G. McEaddy.

IX.     Whether the court showed bias regarding the
        income of the grandmother.

X.      Whether the court erred by allowing the
        Boston Adoption Bureau's attorney to
        represent himself,(Mr. Kaye) the agency, the
        mother, and the adoptive parents.

I.      Whether the Suffolk County Probate and
        Family Court and Appeals Court violated The
        Plaintiff's Constitutional and Civil Rights
        by not allowing the pro se appellant
        transcripts.

15

## STATEMENT OF THE CASE

(1)  On April 19, 1968, Loniel Elliott Williams was born to Lonnie Edward Williams Sr., and Georgia (McEaddy) Williams.

(2)  On June 23, 2000,Loniel Williams (father), and Mary Lemoine (mother) had, (child), Lonnel.

(3)  Lonnel has extant siblings.

(4)  Ms. Lemoine surrendered the child to the Boston Adoption Bureau on September 12, 2000 to be adopted, without notification to the biological father.

(5)  The Boston Adoption Bureau did not notify the biological father, by either mail or publication of their intent to have Lonnel adopted.

(6)  Ms. Lemoine was married to Kevin Lemoine at the time of the child's birth.

(7)  Court papers from the Boston Adoption Bureau states Kevin Lemoine's "whereabouts are unknown", signed September 19, 2000.

(8)  Ms. Lemoine lists Mr. Williams as the biological father on the adoption papers as, "whereabouts unknown."

(9)  The Suffolk County Probate and Family Court failed to affirm notification was sent to the biological father of an adoption.

(10) On September 24,2000, the adoptive parents removed the child outside the state of Massachusetts. RA14

16

(11) The Court's Findings state, An order of
Notice by Publication was issued. This was
supposed to be four days **after** Lonnel left
the Commonwealth of Massachusetts.

(12) It appears the child was removed from the
Commonwealth without the involvement of the
Interstate Compact.

(13) If the Interstate Compact was involved, why
did this federal agency not comply with the
law?

(14) On October 2, 2000, after unsuccessfully
trying to get Lonnel returned to her from
the Boston Adoption Bureau, Ms. Lemoine
informed Mr. Williams.

(15) It was reported she informed Mr. Williams
because she was told the biological father
was the only person who could have custody
after she surrendered her rights.

(16) Mr. Williams signed Paternity papers on
October 3, 2000.

(17) Mr. Williams was in a mandatory carpenter's
program outside of Boston.  He asked his
mother, Georgia McEaddy, (thereafter, G.
McEaddy) to look into the matter.

(18) On October 5, 2000, G. McEaddy had learned
(1) the Boston Adoption Bureau had custody
of the child. (2) the child was out of
state.

(19) On October 12, 2000, the father went to the
Suffolk County Family and Probate Court and
filed a Complaint for Paternity and an
Objection to the Adoption Petition along

17

with Motions for a Speedy Hearing and
Temporary Custody; which all were denied.
RA.1

(20) Father's motion for paternity testing was
allowed, November 7, 2000. RA.15.

(21) A Motion for the appointment of a Guardian
ad Litem was filed, by the Boston Adoption
Bureau, on January 8, 2001.RA.5 and Attorney
Julia Pearson was appointed, March 22, 2001.
RA16.

(22) Paternity testing results of February 13,
2001 indicated Mr. Williams to be Lonnel's
father.

(23) On February 20, 2001 the father filed a
Motion for Temporary Custody, (denied),
Expedited Discovery, and Speedy Trial.

(24) July 23, 24, 25,2001, were the assigned
trial dates.

(25) On April 26, 2001, Georgia McEaddy filed a
Petition for Guardianship of Lonnel.

(26) July 2, 2001, the child received counsel,
Matthew Beaulieu.

(27)  G. McEaddy filed a motion for a person of
color to represent the child.  The motion
was denied.

**(28)** July 5, 2001, the motion for visitation was
denied.

(28) G. McEaddy received counsel July
16, 2001 (not through the court)

(29) The trial was held at the Suffolk
Probate and Family Court and heard
before Judge John Smoot, July 23-

26 and August 1, 2001.  The 210
and guardianship Petition were
heard together.  RA.16

**A.   the Suffolk and Family Probate
and Family Court found against G.
McEaddy for the following reasons:**

a. G. McEaddy relied upon her
   daughter to pay the rent and
   utilities

b. G. McEaddy had no reliable
   income.

c. G. McEaddy had a combative
   relationship with the Department
   of Social Services and other
   agencies.

d. G. McEaddy did not appropriately
   care for Nathaniel and Nitanju,
   the pre-adoptive children in her
   care.

e. G. McEaddy did not comply with
   her obligation to submit signed
   service plans.

f. G. McEaddy did not fully comply
   with service plans

g. G. McEaddy had ongoing
   disagreements regarding
   arrangements for Parents and
   Children Together Funds (PACT).
   These funds assist foster
   parents with special needs
   children.

19

h. G. McEaddy rejected a plan to help Nathaniel communicate. Without consulting any professionals, she decided she would teach Nathaniel to speak. She did not succeed.

i. DSS determined that G. McEaddy was not able to meet the needs of these children. The children were removed and G. McEaddy's home was closed.  A Fair Hearing upheld the decision.

j. G. McEaddy was to have said her grandchild (Lonnel) was spoiled

k. G. McEaddy abandoned Lonnel

l. G. McEaddy did not do childcare for Lonnel

m. G. McEaddy did not intervene with her "grandson" D'Arnell,

n. On March 11, 2002, the Court issued a Decree to Dispense with Parental Consent to the Adoption of Lonnel, and dismissed the Guardianship petition, findings of facts and rulings.  RA 12, 13, 14-38.

o. G. McEaddy and Mr. Williams filed a timely notice of appeal. RA 39,10.

p. Judge John Smoot refused to give G. McEaddy the trial transcripts.

q. The Appeals Court refused to give G. McEaddy the lower court transcripts.

r. Judge J. Duffy ordered the appeals consolidated in the Appeals Court for purposes of briefing and oral argument on January 9, 2003.

s. Justices Lenk, Kantrowitz, and Trainor denied the appeal on September 26, 2003. (Mailed by the Clerk, October 3, 2003)

t. On October 27, 2003, G. McEaddy requested the Full Appellate Court hear the matter.

## STATEMENT OF FACTS

**The Massachusetts Rules of Professional Conduct states:**" A lawyer should not accept representation in a matter unless it can perform competently, promptly, without improper  conflict of interest and to completion."
This was a un-adversary system of justice which

had unwritten constitutions. There was a

violation of unenumerated rights, allowing Mr.

Kaye an inquisitorial hearing.

In order to deny placement of a child the court

must prove any or all of the following: child

abuse, child neglect, and child abandonment.

### G. McEaddy's Trial Representation

In February 2000, G. McEaddy asked Attorney

Patricia Tellis-Warren if she would represent her

at trial.  After giving a synopsis of the case,

Attorney Tellis-Warren felt the case was

complicated. In June, 2001, Attorney Tellis-

Warren telephoned Ms. McEaddy and stated that if

G. McEaddy had not found representation, she

would take the case. On July 16, 2001, Attorney

Patricia Tellis-Warren filed an appearance for G.

McEaddy. Three days prior to the court date,

Attorney Tellis-Warren went to the home of G.

McEaddy to discuss the case. G. McEaddy gave Ms.

Tellis-Warren the names, addresses and telephone

numbers of approximately twenty-five people to

refute the Boston Adoption Bureau's claim of her

"long and consistent background of combativeness

with professional social workers".(The Suffolk

Probate and Family Court's Findings went on to

state, "that at times G. McEaddy had gone beyond

strong advocacy and moved into the area of
contemptuous abuse conduct"). This statement was
clearly untrue and biased. No one testified to
the erroneous statement. **Profile evidence
presents to the trier of fact a stereotypical
description.** <u>**Commonwealth v. Frias.**</u> **4a, 47
Mass. App. Ct. 293, 296 (1999).**
Attorney Tellis-Warren felt if she called the
witnesses, she would be re-trying the DSS case.
Attorney Tellis-Warren refused to call the
witnesses, denying G. McEaddy a defense.
**Under Article 12 of the Declaration of Rights of
the Massachusetts Constitution, G. McEaddy had
the right to dispute Mr. Kaye through witnesses.**
Many of the testimony did not appear in the
Court' Findings.

II.  Judge Dumphy, Chief Justice of the Probate
     and Family Court, and Administration and
     Management of the Probate and Family Court
     failed to act to assure that the judges,
     under his management, complied with the
     Federal and State Statues. He failed to
     oversee the judges in his department, follow
     the rules and regulation and were not libel.
     G. McEaddy wrote a letter to Judge Dumphy[i]
     with many of the concerns below, prior to
     the case being heard. The question to Judge
     Dumphy was, how was a child, surrendered to
     the Boston Adoption Bureau, September 12,
     2000, placed with an out of state adoptive
     family by September 24, 2000, without the

23

assurance and confirmation notification to
the father. There was no reply.

**The court showed bias and made erroneous
statements to the following:**

After receiving the Commonwealth of Massachusetts
Office of Childcare Services report, the Court
continued to write that the Boston Adoption
Bureau did no wrong. Page 18, number 211 states,
"The Massachusetts Executive Office of Health and
Human Services, Office of Child Care Services
investigated the Boston Adoption Bureau's
handling of this adoption case and found several
violations. (Complaint number 26105). (1A-96-96).
Court's findings in reference to the report, line
212, states, "The violations were administrative
in nature and did not impact the substantive
rights of the parties." **It did violate our civil
rights.**

**It gravely and directly impacted the "substantive
rights of the parties involved in this
litigation."**

<u>**Judge Smoot's Findings**</u>

<u>**Against Paternal Grandmother, Georgia McEaddy**</u>

**a. The court showed bias regarding the income of
G. McEaddy. The court erred with grandmother's
adult daughter's payment of rent and utilities.
Georgia McEaddy does not rely upon her children to support her.** G.
McEaddy would be able to fully care for Lonnel.
The Court' Findings state, Ms. McEaddy "relies"
upon her daughter to pay the rent and utilities.
G. McEaddy's daughter attended private parochial
school graduating high school before many her

24

age. She went on to a parochial university, left
school and then went into the military.  When she
came home, she was a grown woman. G. McEaddy's
daughter had been violated; had a baby ;had
difficulty relating to her own daughter. At the
time of trial, G. McEaddy was her granddaughter's
primary daycare provider. She continues to care
for her granddaughter without compensation from
her daughter. Presently, her daughter lives in
her own townhouse, works, and attends school.

**b. The Court also felt G. McEaddy did not have a reliable income to care for Lonnel.** Presently, G. McEaddy receives SSDI
due to a serious accident in December 2001.
She has not been medically released to return to
work full time. **Familial poverty should not be held against a parent in deciding if a parent is unfit.**115. **Custody of Minor,** 389
MASS. 755 ,766 (1983).

**c.  Georgia  McEaddy  did  not  have  a  combative relationship  with  the  Department  of  Social Services and other agencies. Exhibit** [ii]
Each social worker (with the exception of Anna
Lee Brown, DSS adoption worker) and G. McEaddy
had an excellent professional working
relationship.  Affidavits of each social worker
support G. McEaddy's testimony.

**d-i. The courts erred in its findings of grandmother against the Department of Social Services. G. McEaddy gave appropriate care and services to Nathaniel and Nitanju. G. McEaddy gave appropriate care and services to Nathaniel and Nitanju.**

**Julia Pearson, the court appointed Guardian ad Litem** states: "Mrs. McEaddy was very forthcoming with me regarding her involvement with DSS. She was a foster parent for many years with the department and she had two very special needs children in her home, and she was advocating very vigorously on behalf of those two children, and she was very straight with me you know trying to get children in her care what they need. Georgia McEaddy was a foster child and became a foster mother for many years. And I could see that about her, that she would, and even the home study indicated she was a strong advocate………three 51A's were filed with DSS alleging physical abuse, and sexual abuse of the two children in her home as well as neglect regarding some educational needs of the children.

The sexual abuse and physical abuse were not supported during the initial investigation period, but the neglect was supported.

They removed the children and closed her home, and Mrs. McEaddy did appeal that to a fair hearing, it was determined that she did not neglect the child's educational needs, that she was a surrogate parent capable of disagreeing with not only DSS but the Department of Education and was within her sole rights to advocate for the program she felt was best for her child."

**The court showed bias by deleting the guardian ad litem report regarding G.McEaddy.**

G. McEaddy had two special needs siblings residing with her. Each request G. McEaddy asked

the Department of Social Services for, either
came from written recommendations from the
pediatrician, school, or Children's Hospital, or
was in the Massachusetts General Laws.
Nathaniel was diagnosed with Pervasive
Development Disorder long before he lived with G.
McEaddy. He was allowed a parent-aide in his
previous foster home, thus allowing him a parent-
aide and childcare under 110 CMR: Department of
Social Services 7.041 and 7.061, risk due to
physical, development and/or emotional
disability. This was denied.
Nitanju was allowed to attend day care and dance
classes in her former home. The adoption social
worker would not allow Nitanju the same service.
The Department of Social Services refused the
children the services, yet gave the services to
two separate suburban foster parents who housed
Nitanju and Nathaniel.
At the hearing, the Boston Adoption Bureau
objected to include medical reports record from
Children's Hospital, because it would affirm G.
McEaddy's testimony.

**The Court's findings failed to state Nathaniel,
G. McEaddy's former pre-adoptive, had come home,
(G. McEaddy's home) with a black eye given to him
by his teacher.**

Paul Cataldo, (then) Director of DARE Family
Services did not want G. McEaddy to report the
matter to the Department of Social Services.  His
reason was Paula Braissel, the teacher, would
lose her job.  G. McEaddy took Nathaniel to their

27

medical facility.  Dr. Leet reported the matter
to the Department of Social Services.  G. McEaddy
called and spoke to the area director, (then)
Rudy Adams, of the Jamaica Plain Department of
Social Service. Brenda Nelson, Social Worker, had
not been assigned until the end of October 1994.
Mrs. Nelson advocated for Nathaniel. She fully
supported Nitanju's placement.

It appeared Anna Lee Brown, the adoption social
worker did not understand the special needs of
the children.

At trial, Anna Lee Brown stated Nitanju had no
special needs.  The doctors at Children's
Hospital clearly reported something different to
G. McEaddy, written and verbally.  Mr. Kaye
implied Nitanju did not tell the investigator
that G. McEaddy hit her and her brother because
she was not verbal.  Nitanju is verbal, and can
speak. She did not tell the investigator G.
McEaddy hit her because is was not true.  Mr.
Kaye would also imply Nathaniel could not speak.
Nathaniel spoke when and if he wanted to.

**G. McEaddy did not neglect nor abuse the two
siblings.**

The Department of Social Services neglected and
abused them. **e.** G. McEaddy did not sign the
Department of Social Services Service Plan
because the plan omitted information and services
DSS verbally committed to the children.  G.
McEaddy went beyond complying. **f.** G. McEaddy
followed the pediatrician, hospital and school
recommendations for the children. **g.** When

28

Nathaniel went from DARE Family Services, to the
Department of Social Services, G. McEaddy was
asked not to work. She received less money after
Nitanju arrived. **h.** The Children' Hospital report
clearly indicates Nathaniel was coming out of his
disorder. Nathaniel spoke when he wanted to
speak. **i.** When the two siblings were taken from
G. McEaddy's home, they were placed in a
shelter, then went from foster home to foster
home and then an institution. Presently,
Nathaniel is adopted; Nitanju is living with a
guardian.

<u>**j-1**</u>

**j.** G. McEaddy did not stop caring for the baby
because the baby was not spoiled, **nor did she**
**ever say the baby was spoiled**.

 **k. G. McEaddy did not abandon Lonnel.**

 Massachusetts General Laws, 210 3 page 670
defines abandoned: shall mean being left without
provisions for support, and without any person
responsible to maintain care, custody and control
because the whereabouts of the person responsible
is unknown and reasonable efforts to locate such
a person have been unsuccessful.  A brief and
temporary absence from the home, without the
intent to abandon the child shall not constitute
abandonment. **This was not abandonment.** This was
G. McEaddy's testimony, yet it failed to show in
the Findings.
Transcript testimony, 4B-30 line 21-23, G.
McEaddy was with the Boston Public School since

29

1976.  These statements were not included in the
court's Findings.

**The court showed bias in the testimony of the Ms.
Lemoine against G. McEaddy.**

G. McEaddy tried to support Ms. Lemoine.
4B-71-line 7-22 childcare and baby needs were
discussed. 4B72 line 18-4B-78, line 18 trip to
New York, Mary indicated she was beginning to
sell houses. 4B79 line 8-11 Mary asked if G.
McEaddy could watch the baby during Candy's
vacation, which she said was in late July. G.
McEaddy testified, during the trip to New Jersey
with Ms. Lemoine she asked her directly if her
son was abusive. Ms. Lemoine's reply was "no" as
if G. McEaddy had insulted her. Again, G. McEaddy
asked, what was the problem.  Ms. Lemoine's
response was. "Your son has too many women."  G.
McEaddy gave Ms. Lemoine advice a nun once gave
her and that was to care and don't care.  Pretend
it does not bother you and see what will happen.
For Ms. Lemoine to state that G. McEaddy told her
to shut up was not true.

**Ms.  Lemoine  never  indicated  she  was  having
financial problems or difficulty caring for the
baby.  1.** Testimony between Attorney Tellis-Warren
and Ms. Lemoine, 1B line 21-23 Georgia is going
to care for the baby. 1B-60 "and did you ever
tell Ms. McEaddy your friend Candy was going to
care for the child"?   Ms. Lemoine was asked and
testified in Court if her friend Candy would keep
the baby, Ms. Lemoine responded, "yes".

Saturday, July 8, 2000, Ms. Lemoine asked G. McEaddy if she would watch Lonnel on Monday. Monday, July 10, 2000 G. McEaddy came to the house at 7:00 a.m., it was then, and only then, Ms. Lemoine informed G. McEaddy she was returning to work and needed her to baby sit. Ms. Lemoine knew G. McEaddy worked with the school department, and would be returning to school in September. (4B 30 line 21-23) G. McEaddy testified the Boston Public School Department employed her. She strongly urged Ms. Lemoine to find childcare so the baby would be accustomed to that person prior to September. Ms. Lemoine found childcare, which began July 24, 2000. Ms. Lemoine had no refrigerator in her apartment. G. McEaddy purchased one for her. G. McEaddy was to purchase a washing machine, but found out the baby was gone.

**k. The court erred in placing the child in an atmosphere of affluence and notoriety** as opposed to a loving nurturing environment of the child's blood relative, his grandmother, G. McEaddy. The obligation of the court is to make every reasonable effort to keep families together is also codified as part of the Department of Social Services regulations, 110 C.M.R., and the Commonwealth of Massachusetts General Laws. **Many of the testimony did not appear in the Court's Findings.** The court showed bias by ignoring anything G. McEaddy positively said during the testimony in its findings.

31

G. McEaddy testified to her education. Her educational records were subpoenaed and the court returned the envelope to her unopened. The court was bias in failing to acknowledge G. McEaddy's education in the Findings. The court acknowledged the Wilson's education in the Findings. The Court's wording of the perspective adoptive family live in a wooded, suburban neighborhood of single-family residences. The home is neat and organized. It is located at the end of a **cul-de-sac** where there is little traffic. G. McEaddy resides in a wooded suburban, townhouse residence. Her home is neat and organized, and June Street is a secluded residential area. The Court showed socioeconomic bias in the Findings. G. McEaddy testified to her work history, yet it was not in the Court's findings.

Ken and Marlene Wilson, are people with no consanguinity.  The Wilson's resides at 13347 Olive Blvd, Chesterfield, MO. Ken Wilson is a hockey sportscaster. [iv]

**G. McEaddy will be able to financially care for Lonnel.** Julia Pearson, Court appointed Guardian ad Litem testified: 2A-58 "…Mrs. McEaddy wants to help raise Lonnel.  I have no doubt that is a strong desire of hers and she would bend over backwards to make sure that his needs are met."; 2B-80 Line 14-23 of the transcripts states, Dr. Steven Shapse, (for the Boston Adoption Bureau) testified someone either informed him, or he read in a report, G. McEaddy was abusive.  He was asked, if this were not true should G. McEaddy be

considered a caretaker, he said, "yes." This failed to be noted in the findings. The Guardian Ad Litem and Mary Lemoine each stated if the abuse reports were not true, they would have given G. McEaddy consideration. This was not in the Court's Findings.

**The court erred by not adjudicating paternity of father until June 23, 2001, thus not allowing visitation.** [v]

**G. McEaddy is a fit guardian.**

G. McEaddy has worked in the field of human services for over forty years or better. She has advocated in this field for the rights of people. In lieu of the Appeals Court and Probate and Family Courts understanding her professionalism, their conclusions were demeaning. G. McEaddy has worked with the Department of Social Services on issues, was a foster parent for many years, she has worked with the Legislators, on issues concerning the City of Boston all for the betterment of our society. In the above, she was respectfully listened to. G. McEaddy comes forth, trying to undo a wrongful adoption, and the courts justify the wrongs of the adoption agency and the court, helping and supporting the Boston Adoption Bureau each step of the journey. The Probate and Family/Appeals Courts are audaciously saying the Boston Adoption Bureau did no wrong. The Boston Adoption agency was legally and morally incorrect, as well as the two courts which heard, or reviewed this case. Transcript-5A 69-123 Georgia McEaddy called Mr. Kaye and asked

33

what paper was the process of service publication
[vii] in.  Mr. Kaye said "It wasn't, why?"
The Boston Adoption Bureau falsified information
in the pre-trial hearing, the hearing and
Appellate Brief regarding the appellant.  The
Boston Adoption Bureau **never** called nor wrote G.
McEaddy. The Boston Adoption Bureau **never** invited
G. McEaddy to their office.  G. McEaddy invited
herself to the office only to be told she was not
a party to the case (winter 2001). [vi] [viii] When the
Court and the Boston Adoption Agency learned G.
McEaddy knew what they had done with her
grandchild; they put her on trial.  They looked
at her fitness, prolonging the trial so that they
could say it is in the best interest for the
child to remain with the Wilson's.

**The Commonwealth of Massachusetts Probate and
Family Court, as well as the Appeals Court failed
to release a copy of the complete transcripts to
G. McEaddy, pro se.**

She is well educated in the field of growth and
development of children as well as school
psychology. G. McEaddy observed during this pre-
trial hearing, that the adoption agency and the
Court were clearly biased, adamantly stating that
the only ones who could raise this child were the
Wilson's, with no consideration to Mr. Williams'
family.

G. McEaddy applied for guardianship to keep
Lonnel within the child's blood family.  G.
McEaddy has worked in the field of human services
for forty years or better.  She was a foster

34

child. The care and nurturing of a child keeping her families together, is **_extremely sensitive_** to her.

**ADOPTION OF GABRIELLE,** 39 MASS. APP. CT 489. CF. **Adoption of Lars,** 46 Mass. App. CT. 30, 37 (1998) (visitation by biological parents is an element in an evaluation of the child's best interest) In the present case the Court applied impermissible standards in deciding to embrace the Boston Adoption Bureau's plan. The Court fraudulently allowed an adoption agency to come in, allowing a child to illegally leave without due process, violating the civil rights of the child's family. The report from the Office for Children said the adoptive family's home study was incomplete, as well as other violations. The court also employed impermissible standards in approving the Boston Adoption Bureaus' incomplete adoption plan, an adoption plan that should never begun.

The court is required to find that neither the Boston Adoption Bureau nor the child's attorney made any reasonable effort to reunite the family. Neither the agency, nor the attorneys, nor court did this.

The Appellate, Probate and Family Courts and the Adoption Agency did not want the affidavits from professionals and medical information because it would affirm G. McEaddy's testimony. The court must make findings, which detail in nature why G. McEaddy is currently unfit. There must be nexus between G. McEaddy's perceived shortcoming and a serious risk of peril from abuse or neglect to the child.

The Appeals Court also held the Boston Adoption Bureau to a lesser standard of effort based on

35

the investigation report by the Commonwealth of
Massachusetts Office of Child Care Services,
complaint number 26105 which had seven
regulations of non-compliance of the law. The
biological mother informed the father nine days
*after* the baby was placed with the present
adoptive family, and the Suffolk and Probate
family Court found her information to the father
acceptable.

**m. The court showed bias in the testimony of Desire Sapp against G. McEaddy.** The court and the adoption agency had no proof that D'Arnell was G. McEaddy's grandson, yet G. McEaddy was slandered in the Findings regarding D'Arnell. Expert DNA test results and findings state he is not her grandson.

**The Suffolk Probate Court and Appeals Court's findings were prejudicial in not allowing the pro se Appellant transcripts.** Her Fifth Amendment rights were violated. The court made a finding harm would come to the child if moved. Foster children are moved daily.

The Commonwealth of Massachusetts Appeals,
Probate and Family Courts failed to release the
transcripts to G. McEaddy, pro se. The Adoption
folder was not included in the record to the
Appeals Court. G. McEaddy filed a motion to the
Appeals Court asking them for the adoption
record. This was denied September 29, 2003. The
decision was rendered September 26, 2003. G.
McEaddy was repeatedly denied the adoption record and
transcripts to try to cover the errors of the Suffolk Probate Court.
Seeking relief, G. McEaddy went to the appeals court and they too
denied her rights as pro se to have material. G. McEaddy was set
up to fail.

G. McEaddy asked the Full Appellate Court to return the child to Massachusetts and allow immediate custody. No action was taken on the matter. Rescript had gone to the Family and Probate Court.

Although the father would like to have custody of the child, he also supported having the child placed with G. McEaddy.

**The Court pre-determined the outcome of the trial.**

No Judges in these cases addressed the concern to the lack of due process.

The court and the attorneys failed their fundamental obligation to legally and morally correct regarding the Sidebar, Transcript, Lines 2A 127 7-14

### Argument

Massachusetts General Laws, Rule 1.6 states: A judge shall perform judicial duties without bias or prejudice.  A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice based upon race, sex, religion, national origin, disability, age sexual orientation or socioeconomic status and shall not permit staff, court officials and other subject to do so.

**To justify their wrong, The Boston Adoption Bureau, the Suffolk County Probate and Family Court willfully, materially, intentionally and negligently misrepresented facts and were libel in their Probate and Family Court Brief/ Appellate Briefs regarding G.McEaddy. The Appeals Court agreed.**

37

On or before September 24, 2000, a Justice in the
Suffolk County Family and Probate Court allowed
the grandson of G. McEaddy to illegally leave the
Commonwealth of Massachusetts with a wealthy
family.  The judge did this action without the
assurance everything was professionally done.
When the father learned of the departure of his
son, he sought to have him returned.  He tried
first through the adoption agency, then through
the legal system.  A trial took place, but the
mind of the court had been set.  The child should
remain where he was due to false profile evidence
on the part of the adoption agency and judge. The
father and grandmother before him were
substandard compared to his present family. The
judge gave no consideration to the extant
siblings who ask, "Grandma, what happened to my
brother."

The court prejudicially misjudged G. McEaddy. The
case went to the Appeals Court. Having broken her
leg, ankle and foot, G. McEaddy struggled when
she could to the Appeals Court to read page after
page of the transcript, for the judge refused her
the rights of the attorney's to have their own
copy. G.McEaddy sought relief on the Appeals
level for the Transcript, but Motion after Motion
denied her Civil, Human and Constitutional
rights. As the Lamb sought the lamb in the days
of old, she is seeking custody of her grandson.
The definition of a family used to be, the
mother, father, and grandparents, aunts, uncles,
nieces, nephews and cousins.  Individuals related

38

by consanguinity or affinity.  Today, the family
encompasses a variety of individuals from
stepparents and grandparents, to gay and lesbian
partners to common law spouses, married spouses,
single parents, and others. The court has began
to adapt itself to accommodate the modified
infrastructure of today's' families.

A grandmother is being deprived of a natural
grandmother and child relationship based upon a
unilateral decision of one parent to exclude the
father. A mother has the unilateral power to
choose and an adoptive family based upon her
unilateral exclusion of the biological father.
The father and grandmother came forward to
preserve their liberty immediately after the
mother informed him of her surrendering their
child. The mother, Boston Adoption Bureau and
Suffolk County Courts, unilaterally prevented
them from a relationship. This statutory scheme
grants rights to the natural mother, the Boston
Adoption Bureau from preventing other kinship
from having or building a relationship with the
child.

Statements in this case were falsified to deny
G.McEaddy her grandson.

Petitioner is the paternal grandmother who was
victimized by all respondent judges intentionally
violating the command in §30, of M.G.L. c. 208,
the child-removal statute, which does not allow
the removal of children without the opposing
consent or showing of just cause. Petitioner
opposed the removal of Lonnel. The court never

39

made an effort to find the family. The petitioner
never was consulted.

The petitioner was victimized by judge's
intentional violation of M.G.L. c. 209 B, §5(a),
the Massachusetts Child Custody Jurisdiction Act.
This Act does not allow the removal of children
to another state without a hearing at which the
non-consenting parent was present. There should
have the opportunity to cross-examine the Boston
Adoption Bureau attorney, or adoptive parents Ken
and Marlene Wilson. The evidentiary hearing held
before the court allowed the child's removal out
of state without the presence of the father or
grandmother.

Those acts of intentionally failing to comply, as
legislatures contemplated, with duly ratified
statutes not only deprived G. McEaddy of due
process, notice, and an evidentiary hearing. By
doing so, the judges unlawfully suspended the
Laws, in contravention of Article XX of the
Massachusetts Declaration of Rights. The Boston
Adoption Bureau RA14, refuses to acknowledge they
did not follow due process under the Federal and
State Constitutions. Federal and Massachusetts's
laws clearly state notification should be made.
The Court asked Mr. Williams if he knew the name
of the adoptive parents, and the state where they
reside. Mr. Williams replied, "yes" Mary told me.
The Internet showed that they reside in
Chesterfield, Missouri. The adoption case file
should have been given to G. McEaddy after the
trial. His records should be made available,

40

without being impounded until the court made its
final decision. The court is shielding their
failure to abide by the law and placed G. McEaddy
and her son on trial with false statements and
accusations.

G. McEaddy testified the Boston Adoption Bureau
*never* called nor wrote G. McEaddy. The Boston
Adoption Bureau *never* invited G. McEaddy to their
office. G. McEaddy invited herself to the Boston
Adoption Bureau. Mr. Kaye informed her she was
not a party to the case. When the Court and the
Boston Adoption Agency learned G. McEaddy knew
what they had done with her grandchild, they put
her on trial. They looked at her fitness,
prolonging the trial so that they could say it is
in the best interest of the child to remain where
he is.

**If the Interstate Compact was involved in the adoption process, why
did they allow a child to leave the state without the biological father's
consent?**

The court exhibited tendencies of biases by
failing to expeditiously give the family a speedy
trial, adjudicate paternity of father until March
11, 2002. The child and G. McEaddy's families
were denied all rights to visitation.

The court made a finding harm would come to the
child if moved, yet, foster children are moved
daily.

The Commonwealth of Massachusetts Appeals,
Probate and Family Courts failed to release the
transcripts to G. McEaddy, pro se.  The Adoption

41

folder was not included in the record to the
Appeals Court. G. McEaddy filed a motion to the
Appeals Court asking them for the adoption
record.  This was denied September 29, 2003. The
decision was rendered September 26, 2003.
G. McEaddy was repeatedly denied the adoption
record and transcripts to try to cover the errors
of the Suffolk Probate Court.  Seeking relief, G.
McEaddy went to the appeals court and they too
denied her rights as pro se to have material.  G.
McEaddy was set up to fail. G. McEaddy asked the
Full Appellate Court to return the child to
Massachusetts and allow immediate custody. No
action was taken on the matter. Rescript had gone
to the Family and Probate Court.
Although the father would like to have custody of
the child, he also supported having the child
placed with G. McEaddy.

The court made a finding harm would come to the
child if moved. Foster children are moved daily.
The Commonwealth of Massachusetts Appeals,
Probate and Family Courts failed to release the
transcripts to G. McEaddy, pro se.  The Adoption
folder was not included in the record to the
Appeals Court. G. McEaddy filed a motion to the
Appeals Court asking them for the adoption
record.  This was denied September 29, 2003. The
decision was rendered September 26, 2003.
G. McEaddy was repeatedly denied the adoption
record and transcripts to try to cover the errors
of the Suffolk Probate Court.  Seeking relief, G.

42

McEaddy went to the appeals court and they too denied her rights as pro se to have material. G. McEaddy was set up to fail. G. McEaddy asked the Full Appellate Court to return the child to Massachusetts and allow immediate custody. No action was taken on the matter. Rescript had gone to the Family and Probate Court.

Although the father would like to have custody of the child, he also supported having the child placed with G. McEaddy. No Judges in these cases addressed the concern to the lack of due process.

The irrevocable removal of a child from its parents and the severance of legal relations between parent and children are exceptionally far reaching exercises of the state's power.

### Conclusion

Evidence has clearly shown The Boston Adoption Bureau, Suffolk County Courts did not follow the laws set forth by our Constitution both Federal and State, nor Federal and State Statues. By failing to do so, a child was removed out of state, away from his family. Both the adoption agency and Court failed to unify the biological family.

**G.** McEaddy's prayer is you will right the wrong of the Boston Adoption Bureau as well as the Suffolk County Probate and Family Court, the Appeals Court and return her grandson to her custody.

# APPENDIX

**ENTRY**

1. Petition to Dispense with Parental Consent to Adopt. Please note, Kevin Lemoine are of Parts Unknown, dated 9/4/00 by Attorney Jeffrey M. Kaye.

2. Judge John Smoot's Findings, Commonwealth of Massachusetts, Suffolk County Probate and Family Court, Dated March, 11,2002

3. Side Bar Conference

4. Motion for the removal of child's attorney, July 3, 2001,denied

5. Paternal Grandmother's Motion for Costs of Transcripts, denied

6. Letter from Patricia Tellis-Warren dated March 19,

7. 2002

8. Motion for Transcripts dated April 19,2002, denied

9. Letter from Harold Robertson to Ashley Ahern, dated May 5, 2003

10. Ken Wilson's (adoptive father) life. Lonnel's name now Keaka,

   (information found on the Internet)

9.Parentage Test Results, Tested Child: Lonnel Elliott Williams

10.Parentage Test Results, April 16, 2003, Results: Loniel Williams not the father of D'Arnell E. Williams

11.Commonwealth of Massachusetts Suffolk County Appeal's Court Rescript

12.Commonwealth of Massachusetts Executive Office of Health and

Human Services, Office of Child Care Services Investigation

Reports, March 16, 2001, July 12, 2001, April 4, 2001


Georgia McEaddy
Appendix
Page 2
Entry

13.Children's Hospital May 23, 1997 Evaluation for Nitanju

14.Children's Hospital May 30, 1997 Evaluation for Nathaniel

15.Letter to Anna Lee Brown from Bernice P. Updyke, Director of

EDCO, dated October 31, 1997.

16 Letter dated July 11, 1997 from the Department of Social Services to Georgia McEaddy

17.Letter from the former director of DARE Family Services to the

Boston Public School Department dated February 27, 1995.

18.Affidavits of:     Dr. Mary Lou Buyse

19.                   Melvin H. King

21                    Freda Wiley


22. Statements from:  Josefina Perez

23.                   Carolyn E. Smith

24.                   Nellie Yarborough

Petition to Dispense with Consent to Adoption of:

Lonnel Elliot Williams
(name of child)

## M.G.L. c. 210, § 3

To the Justices of the Probate and Family Court:

RESPECTFULLY represents____ **Boston Adoption Bureau, Inc.**
(the agency's name and address)

**14 Beacon Street, Boston, MA   02108**

by **Marilyn Speiser, Executive Director**
(the agency's representative and his/her title)

1. Petitioner has had care of ___ **Lonnel Elliot Williams** ___ born on
(name of child)

**June 23, 2000 in Boston, Massachusetts** ___ by means of
(date and place of birth)

**Surrender of parental rights pursuant to M.G.L. Ch. 210, Sec. 2**
(Explain: i.e. voluntary custody; surrender; court order)

and has had legal custody of the child since ___ **September 12, 2000**
(date)

~~by Court Decree~~ ___
(name of court and docket number, if any)

2. The parents of the child are:

**Mary Lemoine**                          **Kevin Lemoine**
(name of mother)                          (name of father, legal)

**15 Moultrie Street, #1**                **Of Parts Unknown**
(street address)                          (street address)

**Dorchester, MA   02124**
(city or town)  (state)  (zip code)       (city or town)  (state)  (zip code)

if applicable **Loniel Williams and**
**Any Unknown Father of Parts Unknown**
(name of alleged biological (putative) father)

___
(street address, city or town, state, zip code)

3. (a)  That the mother of said child executed a valid Adoption Surrender on **September 12, 2000**
(date)

pursuant of the provisions of M.G.L. c. 210, § 2 and is not a party to this action.  The mother at the time
of surrender was __ **42** __ years of age.

(b)  That the father (legal) of said child executed a valid Adoption Surrender on __ **September 12, 2000**
(date)

___ pursuant to the provisions of M.G.L. c. 210, § 2 and is not a party to this action. The father
(date)

at the time of surrender was ___ years of age.

4. That the mother/father of said child ~~is~~/are not under a disability, ~~to wit,~~ ___

5. That the ~~mother~~/father of said child lack(s) the current ability, capacity, fitness and readiness to assume
parental responsibility for said child.

6. That the petitioner's plan for adoption of the child will serve the child's best interests.

7. That the ~~mother~~/father of the child is/~~are~~ not in the military service of the United States or of its allies.  I
believe this to be true to my best information, knowledge, and belief.

WHEREFORE YOUR PETITIONER PRAYS that this Honorable Court enter a decree under the provisions of
the General Laws of Massachusetts, Chapter 210, Section 3, dispensing with the need for the consent of or
notice to the within named mother/father on any legal proceeding affecting the custody, guardianship, adoption
or other disposition of the child.

Date ___ **9/14/00** ___                  ___
(authorized signature of agency's representative)

CJ-P 89 (2/98)                            (OVER)

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

SUFFOLK DIVISION                                    DOCKET NO. 00A0196

### IN THE MATTER OF LONNEL ELLIOT WILLIAMS

Decree to Dispense with Parental Consent

After hearing, it is decreed that:

1.  Loniel Williams, the father of Lonnel Elliot Williams, lacks the ability, capacity, fitness, and readiness to assume parental responsibility for Lonnel who was born on June 23, 2000.

2.  The plan of the Boston Adoption Bureau which provides for the adoption of Lonnel by his current caretakers is in the best interests of Lonnel.

3.  The rights of Loniel Williams to receive notice of or to consent to the adoption of Lonnel by his current caretakers are terminated.

4.  Each December, Loniel Williams and/or his mother, Georgia McEaddy, may send to the Boston Adoption Bureau a letter which may contain photos of family members, stories from the family history, and greetings to Lonnel. The letter shall be forwarded to the adoptive family by the Boston Adoption Bureau. The adoptive parents may choose to share none, some, or all of the contents of the letter with Lonnel.


March 11, 2002                          _____
                                                John M. Smoot
                                                Associate Justice

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

SUFFOLK DIVISION                                        DOCKET NO. 01P0855

## IN THE MATTER OF LONNEL ELLIOT WILLIAMS

Decree of Dismissal

After hearing, it is ordered that the petition for guardianship filed by Georgia

McEaddy on April 20, 2001 is dismissed.

March 11, 2002                        _____
                                              John M. Smoot
                                              Associate Justice

7.    The Boston Adoption Bureau listed Lonnel's putative birth father, Loniel Williams, on the 210 petition as being of parts unknown. On September 27, 2000, an order of notice by publication issued.

8.    On October 12, 2000, Loniel Williams filed an appearance in opposition to the 210 petition.

9.    On October 12, 2000, Loniel Williams filed a complaint to establish his paternity of Lonnel. [Docket No. 00 W 2422]

10.   On October 12, 2000, the mother filed a voluntary acknowledgment of parentage form executed by herself and by Loniel Williams.

11.   On October 20, 2000, this court appointed Attorney Michelle Mannix to represent Loniel Williams.

12.   On November 7, 2000, this court allowed Loniel Williams' motion for paternity testing.

13.   In December 2000, Loniel Williams asked his attorney to withdraw.

14.   On January 4, 2001, this court appointed Attorney Harold Robinson to replace Attorney Michelle Mannix as counsel for Loniel Williams.

15.   On January 8, 2001, the Boston Adoption Bureau filed a motion for the appointment of a guardian ad litem.

16.   On February 13, 2001, CBR Laboratory reported that the paternity test results indicated that Loniel Williams is Lonnel's father.

17.   On February 20, 2001, Loniel Williams ("Mr. Williams" or "father") filed a motion for temporary custody. This court denied the motion on March 22, 2001.

18.   On February 20, 2001, Mr. Williams also filed motions for expedited discovery and for a speedy trial date. The Boston Adoption Bureau assented to these motions. This court ordered that discovery be completed by May 1, 2001, that a pre-trial conference be held on June 11, 2001 and that a trial take place on July 23, 24 and 25, 2001.

19.   On March 22, 2001, this court appointed Attorney Julia Pearson as a guardian ad litem to evaluate and report on the issues of the fitness of the father and the best interest of the child.

20.   On April 10, 2001, the mother filed a motion for appointment of counsel. On April 13, 2001, this court appointed Jennifer Appleyard to represent the mother.

21.   On April 26, 2001, Lonnel's paternal grandmother, Georgia McEaddy ("Ms. McEaddy"),

36. The mother has four children: Amy Bissell (born 1978), Kyle Lemoine (born 1984), Emily Lemoine (born 1993) and Lonnel Williams (born 2000). Amy is living independently. Kyle and Emily are in the legal custody of Kevin Lemoine.

37. Prior to her separation from Kevin Lemoine, the mother worked as an assistant vice-president of commercial lending at the Milford National Bank in Milford, Massachusetts.

38. In 1996, the mother was convicted of embezzling 2.3 million dollars of bank funds. This was her first criminal conviction. She was sentenced to thirty-seven months in prison.

39. In December 1996, the mother was incarcerated in a federal prison in Danbury, Connecticut where she served twenty-seven months of her thirty-seven month sentence.

40. From April of 1999 until September of 1999, the mother resided in a transitional halfway house in Boston.

41. In April 1999, the mother began work as an office assistant at Sports Podiatry Resources in Brookline.

42. In late April or early May 1999, the mother met Mr. Williams at the halfway house.

43. Mr. Williams was assigned to the halfway house after his release from prison. He served six years for distribution of cocaine base, possession of a firearm with an obliterated serial number and possession of ammunition. (3B-10)

44. Contrary to the rules of the halfway house and the conditions of their probation, the mother and the father began a sexual relationship at the halfway house.

45. In September 1999, the mother was released from the halfway house and rented an apartment at 15 Moultrie Street in Dorchester where she continues to reside.

46. Later that same month, the father was released from the halfway house and he moved into the mother's Dorchester apartment. (1A-146)

47. Both the mother and the father violated the terms of their probation by associating with each other since each had a felony conviction.

48. In October or November of 1999, the mother determined that she was pregnant. (1A-147)

49. At that time, the mother informed the father that she was pregnant. (1A-147)

50. In November of 1999, the mother spent Thanksgiving Day with Mr. Williams' family. At this time, the mother told Ms. McEaddy that she was pregnant.

4

Afterward, Ms. McEaddy told the mother that she was unable to care for Lonnel any longer in part because Ms. McEaddy felt that the mother had spoiled the child by holding him too much. The mother placed Lonnel in day care at Children's Services of Roxbury.

64.   Mr. Williams' father died of his illness. Ms. Lemoine gave Mr. Williams $1000.00 to help bury his father. (1B-90)

65.   When Mr. Williams returned from his father's funeral, he moved back into the mother's apartment until July 24, 2000, at which time he gave the mother his keys to the apartment, took his personal items, and left. At this time, he was engaged in sexual relationships with other women. (Exhibit 2; 1A-167)

66.   The mother did not see Mr. Williams again until August 23, 2000 when he spent the night at her apartment.

67.   The mother next saw Mr. Williams on Labor Day weekend. On Labor Day, Mr. Williams told Ms. Lemoine that she was not a good mother.

68.   The next day, she delivered the baby to him at his aunt's house and told him to take care of the baby. Two hours later, he called her at work with questions about feeding the baby. The mother's caller identification feature indicated that Mr. Williams was calling from a girlfriend's home. The mother retrieved the baby and took the baby to the day care program at Roxbury Children's Services. This two-hour period was the only time that Mr. Williams was responsible for Lonnel's care.

69.   On September 7, 2000, Mr. Williams stopped by the mother's apartment. The mother asked him to "come home and be a father and a man." He said that he could not do that. He called a friend at midnight and asked him to pick him up. When his friend arrived, he left. (Exhibit 2)

70.   On three other occasions in September, he stopped by the apartment but was not admitted. (Exhibit 2)

## PLACEMENT OF CHILD

71.   Marilyn Speiser is the Executive Director of the Boston Adoption Bureau.

72.   In June 2000, the prospective adoptive parents met with Ms. Speiser to determine what needed to be done to adopt Lonnel. (1A- 60)

73.   The mother contacted Ms. Speiser for the first time a few days later and told her the child was due in a few weeks. Ms. Speiser explained the procedures for placing a child for adoption to the mother. (1A-62)

6

adoption surrenders. (1A-70)

86. The Boston Adoption Bureau then filed the 210 petition. (1A-71)

87. The pre-adoptive parent's home-study indicated that the prospective adoptive parents were capable parents who had raised two biological children and were raising an adopted child who is biracial. (1A-73)

88. Lonnel was placed with the pre-adoptive parents on September 24, 2000. (1A-13, 14)

89. Up to this point, the mother had misled the agency concerning her own background and Mr. Williams' background. The mother told the agency that she had been married only twice. (1A-82) She never told the agency that either she or Mr. Williams had a criminal record. She deceived the agency as to the location of Mr. Williams whom she easily located when she wished to speak to him.

90. On October 2, 2000, the mother met with Mr. Williams and told him about the adoption. He bent her right arm back behind her. She was treated for the injury inflicted and her arm was placed in a brace by her doctor.

91. On October 2, 2000, Ms. McEaddy contacted Ms. Speiser to inquire about Lonnel's adoption. (1A-73, 74)

92. On October 3, 2000, the mother went with Mr. Williams to a notary public to sign a voluntary acknowledgment of paternity. (Exhibit 2)

93. On October 5, 2000, Mr. Williams called the mother and asked her why she didn't tell the adoption agency his location. (Exhibit 2)

94. On October 6, 2000, the mother went to the Dorchester District Court and obtained a restraining order against Mr. Williams under G. L. C. 209A.

95. Thereafter, the mother told Ms. Speiser that Mr. Williams had a criminal record for acts of violence, that Mr. Williams had recently assaulted the mother when he found out about her placing the child for adoption, that assault and battery charges were pending against Mr. Williams, and that violation of a 209A restraining order charges were also pending. The mother also told Ms. Speiser that Ms. McEaddy had been investigated by the Department of Social Services ("DSS"). (1A-75, 76)

96. It was at this time that the Boston Adoption Bureau requested the appointment of a guardian ad litem to investigate the circumstances surrounding Mr. Williams and his family.

## ANALYSIS

97. The mother's primary reason for proceeding with the adoption process was to secure for

8

109.   Mr. Williams earned $520.00 a week at F.J. Alfred.

110.   From the first week of August 2000 to the end of August 2000, Mr. Williams worked at
       Cheviot Corporation. (4A-75)

111.   Mr. Williams worked for Miracle Works doing carpentry work for approximately eight
       days during the first two weeks of September 2000. (3B-7; 4A-75, 76)

112.   Mr. Williams was unemployed from September 2000 until December 2000.

113.   Beginning on September 26, 2000, Mr. Williams attended a mandatory two week training
       program required for his union employment.  An apprentice must take the training
       program every six months. (3B-9)

114.   From the last week in December 2000 until March 26, 2001, Mr. Williams worked for
       Continental Construction Company. (3B-6)

115.   Mr. Williams began another mandatory work training program on March 26, 2001. (3B-
       9)

116.   Evaluations of Mr. Williams made in connection with the mandatory work training
       programs concluded that Mr. Williams is careless, works slowly, wastes time, learns with
       difficulty, evades responsibility and shows little or no initiative.  The evaluations were
       completed by different instructors. (Exhibit 9)

117.   Mr. Williams was unemployed from mid-April 2001 through June 2001.  He was
       voluntarily unemployed at this time.   He received unemployment benefits of $240.00
       every two weeks. (4A-78, 80)

118.   At the time of the trial, Mr. Williams was employed by Cadigan and Kimball Corporation
       of Newburyport, Massachusetts as a carpenter's apprentice.  He had worked for Cadigan
       and Kimball since June 2001. (3B-5, 6)

119.   At the time of trial, Mr. Williams was earning $17.00 per hour. (3B-6)

120.   Since his release from prison, Mr. Williams has had a pattern of working two months out
       of six. (2A-98) At the time his work records were obtained from the carpenter's union,
       Mr. William's was not on the union list of individuals looking for work even though he
       was unemployed at the time.

121.   Mr. Williams' work history since his release from prison indicates that he is not able to
       provide for Lonnel.  Furthermore, his failure to contribute financial support to the mother
       and to Lonnel when he was employed indicates an unwillingness to provide for Lonnel.
       When given an excellent opportunity to establish himself in a trade, he showed no
       initiative, worked carelessly, and evaded responsibility.

10

135. D'Anell Edward Maceo Williams was born on October 14, 2000. (2A-196, 198; Exhibit 6) D'Anell's mother is Desare Sapp. (Exhibit 6) She lives in Bourne, Massachusetts.

136. Desare Sapp and Mr. Williams met in December 1999.

137. Mr. Williams visited Ms. Sapp in Bourne on weekends once or twice per month. (2A-198)

138. Both Mr. Williams and Georgia McEaddy were present at D'Anell's birth. (2A-198; 3B-62) Mr. Williams did not see Ms. Sapp or his son D'Anell again until the end of December when Ms. Sapp was in Boston for a funeral. The visit lasted no longer than a half hour. (2A-199, 208; 4A-130, 131) Mr. Williams has seen D'Anell only three times since the child's birth and all together for no more than an hour. (2A-210-211) Mr. Williams acknowledged that his relationship with D'Anell has been minimal. (3B-63)

139. The name D'Anell is a combination of Desare and Loniel. Edward Maceo is the name of Mr. Williams's uncle. The name Williams was given to the child at Mr. Williams's insistence. (2A-213, 214; 4A-127, 128) Mr. Williams said he could not find the time to have himself added to D'Anell's birth certificate. (2A-214)

140. Ms. Sapp has filed a complaint to establish paternity against Mr. Williams. (2A-214, 215)

141. Mr. Williams had not spoken to Ms. Sapp for several months before she testified in this hearing on July 24, 2001. Mr. Williams had not seen Ms. Sapp since December 2000. Mr. Williams had not seen D'Anell since December 2000. (2A-209)

142. Mr. Williams did not tell the GAL about D'Anell. (2A-18)

143. Mr. Williams testified that he had formed the belief that Ms. Sapp was actively using crack cocaine. He testified that he did nothing to inquire about D'Anell's well-being or to ensure the child's safety. (4A-133, 134)

144. There is no evidence to suggest that Georgia McEaddy filed for guardianship of D'Anell in an effort to ensure the child's safety.

145. In December 2000, Mr. Williams gave Ms. Sapp a pack of diapers, a couple of outfits and a pair of shoes. (2A-211) Mr. Williams never offered to send money to Ms. Sapp to support his son D'Anell despite several requests for support. (2A-210; 4A-131, 132)

146. On one occasion, Ms. Sapp asked Mr. Williams to send down some sneakers for the child but Mr. Williams indicated that he was between jobs and she never heard from him again. (2A-210)

147. After hearing her son testify, Ms. McEaddy stated that it was in Lonnel's best interests to

12

CRIMINAL AND VIOLENT ACTS

158. In 1985 or early 1986, Mr. Williams was charged with menacing a police officer in New York. He was sentenced to probation. (4A-54, 55)

159. In 1988, Mr. Williams was convicted of assault and battery with a dangerous weapon after stabbing someone. (4A-34, 35)

160. In 1990, Mr. Williams was charged with malicious destruction of property for breaking a girlfriend's car window. (4A-32, 33)

161. In 1993, Mr. Williams was convicted of intent to distribute cocaine base, possession of a firearm with an obliterated serial number, and possession of ammunition. (3B-10) As a result of these convictions, Mr. Williams was incarcerated from July 9, 1993 until September 21, 1999 in a federal prison. From April 21, 1999 until September 21, 1999 he was in the halfway house. (3B-8, 10)

162. Mr. Williams will be on probation until September 2004. (3B-11)

163. The cocaine in Mr. Williams's possession at the time of this arrest is not the only cocaine that has come into his house. (4A-24) Mr. Williams was earning $100.00-$200.00 each week dealing drugs. (4A-30)

164. In August 2000, Mr. Williams was charged with armed robbery and assault and battery with a dangerous weapon. (4A-10, 11) The charges were dismissed. (4A-12)

165. Four weeks before the birth of his youngest son, D'Anell, Mr. William's got into an altercation with a neighbor of D'Anell's mother.

166. Mr. Williams started drinking in the morning inside Ms. Sapp's home. Ms. Sapp was outside the living room window with her children. The neighbor, Marlene Lopes, was inside the Sapp home. In the afternoon, Ms. Sapp heard yelling inside the home. Ms. Sapp went inside and saw Mr. Williams and Ms. Lopes holding each other's shirts at the collar. Ms. Sapp asked both to leave. (2A-200, 201, 202, 203, 204)

167. Shortly after Ms. Sapp asked Mr. Williams and the neighbor to leave her house, the police came to Ms. Sapp's house looking for Mr. Williams. The police searched the house for Mr. Williams. Ms. Sapp went outside and saw her neighbor with blood on her shirt, her pants and on her face. An ambulance was present, and the crew was checking her to see what was wrong.

168. After the police left, Mr. Williams came back to the home of Ms. Sapp. He told Ms. Sapp that he hit the neighbor in the face "because she wouldn't get out of my face." (2A-207).

181.    Ms. McEaddy was unable to testify as to the amount of rent charged for her apartment. (5A-104)

182.    Ms. McEaddy has no reliable income and would be unable to meet Lonnel's basic needs. She testified that she would not apply for welfare funds and would rely, in part, on Mr. Williams to pay support. (5A-106, 107)

183.    Ms. McEaddy was present at the hospital on the day of the Lonnel's birth. (1B-10)

184.    Ms. McEaddy volunteered to babysit the child. (1B-59) Ms. McEaddy helped the mother care for the baby the first week or two after the mother returned home. (1A-124, 163; 1B-17)

185.    The mother stayed home from work for two weeks. (1B-63) After the mother returned to her employment, Ms. McEaddy would care for the baby from about 7:00 a.m. to 5:00 p.m. (1B-64)  This continued for approximately two weeks. (1B-65)

186.    Ms. McEaddy stopped caring for the child saying that the child was spoiled and would not sleep. Ms. McEaddy said she could not care for the child. (1A-164)  Thereafter the mother relied on Children's Services of Roxbury. (1B-66)

187.    Ms. McEaddy saw the child once a week during July 2000. (1A-165)

188.    Ms. McEaddy picked  up the child from daycare occasionally to help the mother. (1A-125)

189.    When Ms. Lemoine voiced concerns to Ms. McEaddy about Mr. Williams, Ms. McEaddy told her that she needed to shut up and Mr. Williams would come around. (1B-118)

190.    Before the mother returned to employment, Ms. McEaddy accompanied the mother when the mother applied for welfare funds. (1B-118, 122)

191.    Ms. McEaddy has had numerous conflicts with people working for social service agencies. This problem contributed to a decision by DSS to close her residence as a foster home. (1B-158)

192.    Ms. McEaddy was also present when her grandson D'Anell was born, and she visited D'Anell a week after his birth. Ms. McEaddy did not see D'Anell again until nine months later when Ms. Sapp brought D'Anell with her to court when she  testified at the trial of this case. (2A-212)

193.    As with Mr. Williams, the probable explanation for the disparate treatment for two grandsons close in age is that Lonnel's case carries the potential for litigation and notoriety. Lonnel's case received significant pre-trial publicity.

206.    DSS determined that Ms. McEaddy was not able to meet the needs of these children. The children were removed and Ms. McEaddy's home closed. (2B-109, 110; 5A-112)  That decision was upheld by a Fair Hearing Committee. (Exhibit 14)

## BOSTON ADOPTION BUREAU

207.    Boston Adoption Bureau is an agency which facilitates voluntary surrenders by birth parents and provides support services to adoptive parents who are seeking a child. (1A-59)

208.    The adoption bureau primarily places infants. (1A-100)  These infants are generally received into care through parental placement. (1A-102)

209.    The adoption bureau has placed approximately 1,000 children over an 18 year period. (1A-58)

210.    Lonnel's situation involves an identified adoption in which the prospective adoptive parents know of the birth mother prior to the adoption bureau's involvement. (1A-60)

211.    The Massachusetts Executive Office of Health and Human Services investigated the Boston Adoption Bureau's handling of Lonnel's case and found several violations of its rules. (1A-96-96)

212.    The violations were administrative in nature and did not impact the substantive rights of the parties involved in this litigation. (1A-97)

## PROSPECTIVE ADOPTIVE FAMILY

213.    The prospective adoptive family is a married couple. It is the second marriage for each adoptive parent. (1A-73) They have been married for about 10 years. (Exhibit 11)

214.    The prospective adoptive parents are Caucasian and in their late forties or early fifties. (2A-78)

215.    Each has a child from a prior marriage. The older of these two children has graduated from college. The younger of these two children is a senior in college. (2A-64, 79)

216.    The couple has adopted a biracial child named Sophia who is about six months older than Lonnel. (1A-73; 2A-142, 143, 2B-65) Sophia is in a diverse preschool. She has toys and books representative of many cultures. (Exhibit 3)

217.    The prospective adoptive father works outside the home. He is a college graduate. (2A-139) The nature of the adoptive father's employment allows him to be home full time four to six months a year. (2B-58)

18

231.    The guardian ad litem's impression was that Mr. Williams thought it would be easy for Lonnel to make a transition to Mr. Williams. (1B-180)

232.    It is accurate that Mr. Williams did not initially understand that Lonnel would suffer a loss if removed from the pre-adoptive home. He did not understand that Lonnel would be searching for the pre-adoptive parents. After the court investigation, depositions, trial testimony of other witnesses and consultation with his own expert, Mr. Williams conveyed in his own testimony an indication that he knew the loss for Lonnel would be substantial. He believed that he could overcome it.

233.    Mr. Williams lives a dangerous lifestyle which he has not changed to meet the needs of any of his other children.

234.    Even while under the microscope of a court investigation, Mr. Williams did not change his behavior of inconsistent visits and inconsistent support toward his other children  In fact, he tried to hide the existence of his youngest child. (1B-182)

235.    If Lonnel is separated from his pre-adoptive family, the loss of the pre-adoptive family and the loss of the secure and familiar environment he is in will cause him to feel anger, suffer grave anxiety, and experience disorientation. (2B-21, 22)  If separated, Lonnel will likely have difficulties with relationships in the future and problems with social ability. (2B-25, 26)

### DR. BACHOP

236.    Mr. William's called Michael Bachop, a clinical psychologist, to testify concerning the best interest of the child. (3A-82)

237.    Dr. Bachop interviewed Mr. Williams for one and one half hours. He interviewed Ms. McEaddy for approximately forty-five minutes on the phone. He did not observe Lonnel.

238.    Dr. Bachop was not aware of certain facts which he acknowledged might have impacted his testimony. These facts include:

      a.    That after the birth of Mr. William's youngest child, D'Anell, Mr. Williams and Ms. McEaddy had virtually no contact with D'Anell. (3A-142)

      b.    That Mr. Williams saw his two older children irregularly, once or twice per month and that his son, Tevin, never spent an overnight at Mr. Williams' home. (3A-143, 144)

      c.    That Mr. Williams had been convicted of violations of an order of protection from abuse. (3A-150, 151)

20

246.    Lonnel has formed a strong, positive bond with the pre-adoptive family.  The bond has existed for most of Lonnel's life.  The removal of Lonnel from his pre-adoptive home would cause serious psychological harm to Lonnel.

247.    Mr. Williams lacks the capacity to meet Lonnel's needs.  He particularly lacks the capacity to meet the special needs Lonnel would have should he be removed from the pre-adoptive home.

248.    Ms. McEaddy has not documented an ability to meet Lonnel's most basic needs.

249.    It is in Lonnel's best interests to remain in his pre-adoptive home where he is healthy, happy, and thriving.

250.    It is not in Lonnel's interests to have visitation with either Mr. Williams or Ms. McEaddy.  Such visitation would place a terrible strain on the pre-adoptive family and, parenthetically, on Lonnel.

251.    Mr. Williams' history of violent acts and criminal convictions precludes visitation.

252.    Ms. McEaddy's long and consistent background of combativeness with professional social workers has at times gone beyond strong advocacy and moved into the area of contemptuous and abusive conduct.

253.    It is important that Lonnel have access to and knowledge about his heritage.  The decree provides for one-way communication from Mr. Williams and Ms. McEaddy to the pre-adoptive family through the Boston Adoption Bureau.

        The evidence is clear and convincing that:

254.    Mr. Williams does not have the ability, capacity, or fitness to assume parental responsibility of Lonnel.

255.    The entry of a decree dispensing with the need for the consent of Mr. Williams or notice to Mr. Williams of any petition for adoption of Lonnel is in Lonnel's best interests.

256.    The plan proposed by the Boston Adoption Bureau for Lonnel's adoption by his pre-adoptive family best serves Lonnel's interests and best protects his emotional and physical health and safety.

**WITNESSES**

257.    The following witnesses testified at trial:

                Mary Lemoine - biological mother

                Attorney Julia Pearson - Guardian ad Litem

22

Exhibit 12.    Letter from Attorney Jeffrey Kaye and Marilyn Speiser dated April 4, 2001 to Ms. Foran - Director of Residential Placement - Reply letter dated July 11, 2001 - Amended Investigation Report dated July 12, 2001 from the Office of Child Care Services

Exhibit 13.    51B report dated July 16, 1997

Exhibit 14.    Fair hearing decision concerning Georgia McEaddy dated April 24, 1998

Exhibit 15.    Curriculum Vitae - Michael Bachop  Ph.D.

Exhibit 16.    Police Report from Bourne Police Department dated September 16, 2000

Exhibit 17.    Assorted photos of Lonnel

Exhibit 18.    Home study review of Georgia McEaddy dated March - April 1995

Exhibit 19.    Addendum dated July 7, 1995 to the home study of Georgia McEaddy

Exhibit 20.    Letter dated June 23, 1994 to Georgia McEaddy from Sowjanya Kasaraneni - Emergency Shelter Coordinator - DARE

Exhibit 21.    Letter dated November 10, 1994 to Georgia McEaddy from Paul Cataldo - Program Director - DARE

Exhibit 22.    Letter dated November 16, 1994 to Georgia McEaddy from Paul Cataldo - Program Director - DARE

Exhibit 23.    Family resource re-evaluation of Georgia McEaddy (by DSS - not dated but reference made to dates in 1997)

Exhibit 24.    Foster Family Service Report dated July 5,1994

Exhibit 25.    Memo to Paul Cataldo, Mia Alvarado, Sowjanya Hasaranei from Georgia McEaddy dated June 29, 1994 responding to letter dated June 23, 1994

Exhibit 26.    Letter dated August 18, 1994 to Georgia McEaddy from Dawn Shearer - Mentor Supervisor - DARE

Exhibit 27.    Memo to DARE Family Services from Georgia McEaddy dated September 22, 1994

Exhibit 28.    Memo to Paul Cataldo from Georgia McEaddy dated September 30, 1994 regarding Sydney Cooper

Exhibit 29.    Memo to Paul Cataldo from Georgia McEaddy dated November 4, 1994 regarding meeting of November 4, 1994

**Side Bar Conference Found in the Court Transcripts**

**(2A 12 7-14)**

**Mr. Kaye:** I'm sorry your honor. The issue that I have is that I would like to keep this as clean as possible. I'm certainly willing to come to the court & counsel what the adoptive father does, but when it comes to names and what he does, it's going to clearly – what he does will clearly identify him to the parties and these people.

**The Court:** I'm sorry what he does will what?

**Mr. Kaye:** May clearly identify him to parties.

**The Court:** The nature of his employment?

**Mr. Kaye:** The nature of his employment, yes.

**Ms. Tellis Warren:** Now I'm more interested.

1

**Mr. Kaye:** He's involved with the media.

**The Court:** So he's a journalist.

**Mr. Kaye:** No, Can I say, and then maybe the attorney's keep it to themselves?

**The Court:** All right, were all Officers of the Court. So, I have a commitment from counsel not to disclose to their clients the occupation, until we have further discussion, unless I lift the order, all right?

**Mr. Kaye:** He's a sportscaster on a major network in the Midwest and a very prominent sportscaster for his area, which is a very large area. I believe that one who's known to this area, they may not know who he is but clearly, if he's identified as that, it's very easy to find him. And I'm not sure what he does. I'm not sure what the relevance is to the case.

**Ms.Tellis Warren:** I can address that, if you want?

**The Court:** Yes, go ahead.

3

those lines.  That way it would have
similar stature, without the notoriety
and perhaps would serve as compensation
for wealth and so forth.  It may very
well be true; he may hold some similar
title in the organization.

**Ms. Tellis Warren:** Your Honor, if I can
I really do not care so much—I really
want to know what type of occupation he
has.  It doesn't bother me not to say
he's a sportscaster; I don't care about
that.  I care about his education.  I
care about how much money he has.  I
care about the house.  I don't think it
makes a difference--.

**Mr. Kaye:** I'm going to submit a

                    .

**Ms. Tellis Warren:** Whether he's a
sportscaster or a vice-president of a
company.

**Mr. Kaye:** We have a          copy of
the home study, so possibly that could
--.

5

**Ms.Tellis-Warren:** Your Honor, I would like to ask the guardian ad litem if she's aware of his occupation and so much as what difference that may have made in her opinion. So I'll accept any --.

**The Court:** Okay, if you ask in such a way without revealing the occupation, "Are you aware;" and " Did it play a role?" Whatever questions you deem appropriate.

**Ms.Tellis-Warren:** Okay Your Honor, on a cross examination it would be my intention, perhaps to inquire whether his prominence and celebrity played any part in her decision making process that the child's best intent would be served remaining where he is?

**Ms. Tellis-Warren:** Which is my second question?

**Mr. Robertson:** But I would not go into specifics of that. I think that's a fair question.

7

**Ms. Tellis Warren:** Well, it's just that there's a real situation, and you're asking a hypothetical one, and I assume the hypothetical one is absolutely not --.

**The Court:** All right so forget that. If you say did his position, his occupation, influence you, why doesn't that cover it?

**Ms. Tellis Warren:** I would say : Did his position in the community, the small community in which he lives, the larger community in which he lives, make a difference to you?

**The Court:** That's Fair

**Mr. Kaye:** That's Fair

**Mr. Robertson:** I want to ask the question, "Are you aware of prominence in the community, are you aware of a certain kind of recognition in the community"? And I want to ask the question, "Are you aware of a certain amount of celebrity and what if any, impact did that have on your

9

**Mr. Robertson:** Right

**The Court:** All right, okay.

**Mr. Robertson:** Correct


(Court and Court Reporter Conference)


**The Court:** Very good. The court will have the full transcript with everything in it and then if you want to compare, so you'll know what you left out. If you have any trouble with it you can come in and we'll talk about it.

        : Your Honor, in that case, since we do have the guardianship case here, as well I would ask the court to impound the guardianship, as well as the paternity and 210 cases.

The Court: I'm sorry, impound the---?

        : We're trying the guardianship which is not an impounded case and the transcript is a part of the record. So I ask the court to impound the guardianship case.

11

JUL - 3 2001

**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court Department**

_____ Division

Docket No. 01 P 0855

Georgia McEaddy
**Plaintiff/Petitioner**

v.

Lonnel Williams
**Defendant/Respondent**

**MOTION FOR**

removal of Matter Beaulieu
as attorney for Lonnel Williams

Now comes Georgia McEaddy , the plaintiff/defendant/petitioner/respondent,
(name of moving party)

in this action who moves this Honorable Court as follows: remove the above named
attorney from case due to a possible conflict of
interest. Plaintiff also request the Court to
consider a Black attorney to the case. The above named
attorney houses his business at the same location as
the Boston Adoption Bureau

---

<table>
<tr><td>

**NOTICE OF HEARING**

This Motion will be heard at the Probate & Family

Court in _____
(city)

on _____
(month/day/year)

at _____
(time of hearing)

</td><td>

Georgia McEaddy
(signature)

Georgia McEaddy
(PRINT name)

49 Jun St
(street address)

Roslindale    MA  02131
(city or town)  (state)  (zip code)

</td></tr>
</table>

Date: _____    Tel. No. (617) 325 - 7513

---

The within motion is hereby ALLOWED — DENIED. without hearing.

_____
_____
_____

7/2/01
**Date**

J Smoot
**Justice of the Probate and Family Court**

---

**INSTRUCTIONS**

1. Generally, refer to Mass.R.Civ.P./Mass.R.Dom.Rel.P. 6 and 7; Probate Court Rules 6, 29, and 29B.
2. If the opposing party is represented by an attorney who has filed an appearance, service of this motion MUST be made on the attorney.
3. Certificate of Service on Reverse side must be completed.
4. All motions shall be accompanied by a proposed order which shall be served with the motion.

CJ-D 400 (4/98)

# COMMONWEALTH OF MASSACHUSETTS
## THE TRIAL COURT
### PROBATE AND FAMILY COURT DEPARTMENT

Suffolk, ss.

Docket No. 00A 0196
Docket No. 01P 0855

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
In re Lonnel Williams, a Minor.          \*
                                         \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Paternal Grandmother's Motion for Costs of Trial Transcripts

Now Comes Paternal grandmother, Georgia McEaddy, and moves this Honorable Court to authorize the payment of costs of her obtaining transcripts of the trial of the above-referenced matters.

As reasons for the same, Ms. McEaddy states that said transcripts are necessary in order to do findings of fact in this matter. Furthermore, she is indigent and cannot afford said costs, as verified by the Affidavit of Indigency filed herein.

**WHEREFORE**, Ms. McEaddy asks that said costs be allowed and payment be authorized from the Indigent Court Cost Fund.

Dated: July 30, 2001

Submitted on behalf of
**GEORGIA McEADDY**
By her attorney,

Patricia Fellis - Warren
BBO # 494240
Cambridge & Somerville Office of Greater Boston
Legal Services, Inc.
432 Columbia Street, Suite 16
Cambridge, MA 02141
(617) 603-2744
FAX (617) 494-8222

Filed in Court
JUL 30 2001
Assistant Register

The copy of the trial transcript shall be retained by counsel and may be viewed by counsel and her client. No additional copies shall be made or disseminated.

Suffolk ss                    Probate and Family Court
                              7/31  200 1
The within motion is allowed
                              John M Smoot
                    Judge of Probate and Family Court

Commonwealth of Massachusetts
**The Trial Court**

Suffolk   Division   Probate and Family Court Department   Docket No. 01 P 0857

McEaddy
_Plaintiff/Petitioner_

v.

Commonwealth of MA
_Defendant/Respondent_

**MOTION FOR**

**Speedy Hearing**

Now comes Georgia McEaddy, the — plaintiff — defendant — petitioner — respondent
(name of party filing this motion)

in this action who moves this Honorable Court for a speedy hearing on a — (motion) — complaint — petition —

for release of transcripts/file to plaintiff

I am asking for a speedy hearing for the reasons given in the affidavit I have filed with this motion.

Georgia McEaddy
(signature)

Georgia McEaddy
(PRINT name)

49 June Street
(street address)

Roslindale   MA   02131
(city or town)   (state)   (zip code)

Date: 4/19/02

Tel. No. (617) 325-7513

| | |
|---|---|
| **Suffolk, ss    Probate and Family Court**<br>**TRIAL DEPARTMENT**<br>If this motion is denied,<br>the hearing will be on _____<br><br>_____    _____<br>Date           Trial Clerk | (See Affidavit on other side of this Motion) |

NO ACTION                     Smart
                              Assoc. Justice
                              5/8/02

The within motion is hereby **ALLOWED — DENIED**

for **hearing** on _____, 200__ at _____ .m.

The party filing this motion must give **notice** of the hearing by — in hand — mail — _____ no later than

_____, 200__. Otherwise, the hearing cannot take place.

_____                    _____
Date                              Justice of the Probate and Family Court

Commonwealth of Massachusetts
The Trial Court

Suffolk   Division   Probate and Family Court Department   Docket No. 01 P 0857

McEaddy
Plaintiff/Petitioner

v.

Commonwealth of MA
Defendant/Respondent

**MOTION FOR**
**Speedy Hearing**

Now comes Georgia McEaddy , the — plaintiff — defendant — petitioner — respondent
(name of party filing this motion)

in this action who moves this Honorable Court for a speedy hearing on a — motion — complaint — petition —

for release of transcripts/file to plaintiff

I am asking for a speedy hearing for the reasons given in the affidavit I have filed with this motion.

Georgia McEaddy
(signature)

Georgia McEaddy
(PRINT name)

49 June Street
(street address)

Roslindale      MA      0213
(city or town)      (state)      (zip code)

Date: 4/19/02

Tel. No. (617) 325-7513

Suffolk, ss      Probate and Family Court
TRIAL DEPARTMENT
If this motion is denied,
the hearing will be on _____

_____      _____
Date      Trial Clerk

(See Affidavit on other side of this Motion)

NO ACTION      [signature]
Assoc. Justice
5/8/02

The within motion is hereby **ALLOWED — DENIED**

for **hearing** on _____, 200__ at _____ .m.

The party filing this motion must give **notice** of the hearing by — in hand — mail — _____ no later than

_____, 200__. Otherwise, the hearing cannot take place.

_____      _____
Date      Justice of the Probate and Family Court

# GREATER BOSTON
## LEGAL SERVICES

**Cambridge & Somerville Legal Services Office**

March 19, 2002

Ms. Georgia McEaddy
49 June Street
Roslindale, MA 02131

Re:    **Lonnel Williams, a Minor**
       Suffolk Probate Court Docket Nos. 00A 0196 and 01P 0855

Dear Ms McEaddy:

Enclosed is a copy of Judge Smoot's decision in the matter of your grandson, Lonnel Williams.

I am sorry we were not able to convince the Judge to return the child to either you or your son, Lionel.   As I informed you earlier, I did not submit suggested Findings to the Court.  Unfortunately, with everything else which occurred this past fall and because of the enormous amount of time required, I was unable to get it done.  The Court did allow me a couple of extensions, but I was still unable to do the findings.

As I explained, proposed findings from the attorneys are *mere suggestions* to the Court, the Court is under obligation to submit its own findings, to reach its own decision.  I did not want to hold the Judge up any longer from making a decision by waiting for my findings as that would have meant the baby would stay that much longer with the proposed adoptive family

I believe we put on the best case we could have under the circumstances and that the Judge heard our arguments; however, he was obviously persuaded that the child's best interests were served by having him adopted outside the family.

**You have thirty (30) days from the date of the Judge's decision or until April 10, 2002 to file an appeal if you disagree with this decision.**

I will not be appealing on your behalf.   I am enclosing a copy of my office's retainer which I am

HARMON & ROBERTSON, P.C.

ATTORNEYS AT LAW

85 MERRIMAC STREET, FOURTH FLOOR

BOSTON, MASSACHUSETTS 02114

(617) 742-5900

FAX (617) 742-5911

NANCY T. HARMON
HAROLD ROBERTSON

IMPOUNDED

May 5, 2003

Ashley Ahearn, Clerk
Appeals Court
1500 New Courthouse
Boston, MA 02108

Re: <u>Matter of Lonnel Williams, 2002-P-1668</u>

Dear Ms. Ahearn:

You called me on Friday regarding the above. I attempted to
return your call but there was a voice mail problem. Hence,
this letter.

I served a corrected brief in this case on counsel and Ms.
McEaddy on March 26, 2003. I had already served the
transcript on counsel on February 27, 2003. I did <u>not</u> serve
Ms. McEaddy with a copy of the transcript pursuant to an
Order by Judge Duffly of January 28, 2003 keeping an order
of the trial court in effect regarding her access to the
transcript. I indicated to Ms. McEaddy my understanding of
that Order was she was not to receive a copy of the
transcript unless and until there was a further Order from
the Appeals Court.

Enclosed herewith are copies of the Certificates of
Service, Judge Duffly's Order, and Judge Smoot's Order in
the Suffolk Probate Court.

Kindly let me know if there is anything additional I may
provide in this matter, and I will await further direction
regarding Ms. McEaddy's copy of the transript.

Thank you.





Train with an NHL Pro this Sur



BLUENOTESHOP
TOLL FREE:1-800-258-3716

Game Day | Live Scoreboard | News Releases | Publications | Forum | Gallery | Affiliates | Conta

**Team**   Schedule   Statistics   Tickets   Fan Stuff   Kids   History

Players | Coaches | Front Office

**Front Office**



SPONSORED BY:

**ST. LOUIS BLUES**
MasterCard®Credit Card
**APPLY TODAY!**

# Ken Wilson
TV Play-by-Play

Ken Wilson, 49, enters his 18th season as the "Voice of the St. Louis Blues."
Baby!" exclamation at climatic moments has become a major part of Blues h
the years.

A graduate of the University of Michigan, Wilson delivered play-by-play of co
minor league hockey prior to reaching the NHL with the Chicago Blackhawks
has broadcast NHL games for ESPN and Sportschannel America, as well as th
Games for Turner Broadcasting.

A four-time Mid-America Emmy winner for his hockey play-by-play, Wilson is
noted major league baseball broadcaster. He has broadcast for the Oakland ∕
California Angels, St. Louis Cardinals, Cincinnati Reds, Chicago White Sox an
Mariners.

Ken and his wife Marlene have three sons, Ryan, Grant and Keaka, and one ∕
Sophia. The Wilson's make their home in Chesterfield, Missouri.

COMMONWEALTH OF MASSACHUSETTS

**APPEALS COURT**
**CLERK'S OFFICE**
1500 NEW COURT HOUSE
BOSTON, MASSACHUSETTS 02108
(617) 725-8106

September 26, 2003

Georgia McEaddy
49 June Street
Roslindale, MA 02131

RE:     No. 2003-P-0847

**BOSTON ADOPTION BUREAU, INC. & another**
                    vs.
    **GEORGIA MCEADDY & another**

NOTICE OF DOCKET ENTRY

        Please take note that on September 26, 2003, the following
entry was made on the docket of the above-referenced case:
Decision: Rule 1:28 (LK-KN-T). Order affirmed. *Notice. (See
image on file.)

Very truly yours,

The Clerk's Office

Dated: September 26, 2003

To:   Jeffrey M. Kaye, Esquire
      David A.F. Lewis, Esquire
      Matthew H. Beaulieu, Esquire
      Georgia McEaddy
      Harold N. Robertson, Esquire

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

02-P-1668

ADOPTION OF GASTON.[*]

## MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

This is an appeal from a decree entered on March 11, 2002, wherein (a) the biological father was found currently unfit to parent his son and the severance of the legal parental relationship was determined to be in the child's best interests; (b) the paternal grandmother was determined not to be a suitable guardian and her guardianship petition was dismissed; and (c) it was determined that adoption of the child by his current caretakers was in his best interest. After reviewing the parties' briefs and other submissions, including the record of proceedings below, we are satisfied that, for substantially the reasons stated and upon the authorities cited in the brief of the Boston Adoption Bureau at 10-31, neither error nor abuse of discretion warranting any relief has been made to appear.

Decree affirmed.

By the Court (Lenk, Kantrowitz & Trainor, JJ.),

Clerk

Entered: September 26, 2003

[*] A pseudonym.

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

03-P-847

ADOPTION OF GASTON.✓

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

This is an appeal by the biological father from the denial by a single justice of this court of father's second motion to stay appellate proceedings. For substantially the reasons stated and upon the authorities cited by the Boston Adoption Bureau at 7-15 of its brief and by the child at 1-2 of his brief, we discern neither error nor abuse of discretion in the denial of the father's motion for a stay of appellate proceedings.

Order affirmed.

By the Court (Lenk, Kantrowitz & Trainor, JJ.),

Clerk

Entered:   September 26, 2003.

✓A pseudonym.

# Children's Hospital
300 Longwood Avenue, Boston, MA 02115                    Telephone 61. 355-6750

## DEVELOPMENTAL EVALUATION PROGRAM

PATIENT NAME:        HOBLEY, NATHANIEL
MEDICAL RECORD#      033-92-98
DATE OF BIRTH:       10/24/88
DATE OF VISIT        05/30/97

ATTENDING  Bruce Cushna, PhD.

### PSYCHOLOGICAL STUDY

DATE OF BIRTH:        10/24/88
CHRONOLOGICAL AGE:    8-1/2 years.

PROCEDURES: 1. Weschler Preschool and Primary Scale (attempted).
            2. Binet Picture Naming Vocabulary.
            3. Drawing of basic geometric designs.
            4. Clinical observations.

BACKGROUND: Nathaniel is well known to this Medical Center. He is followed closely in Neurology by Dr. David Holtzman, who has tried a variety of medications to treat his hyperactivity. He has also been followed by Dr. Szymanski in the Center on Autism and Related Disorders. Nathaniel has been considered to have a Pervasive Developmental Disorder with autistic features and also oppositional behavioral problems and significant mental retardation. His social background is troubled; all his siblings have been removed from their natural parents. This disturbed social situation and succession of foster placements for Nathaniel is well documented in the hospital records. He is currently residing with a specialized foster mother, Ms. Georgia McEaddy. His sister Natanju also resides with Ms McEaddy. Initially he was schooled in the Boston Public Schools in programming for autistic children, but for the past two years has been enrolled in Dr. Miller's language program at LCDC in Jamaica Plain. The school reports indicate rather good progress over both years and advanced communication skills. However, there has been difficulty in keeping Nathaniel focused and on topic. The school reports that he can work on tasks up to about 45 minutes and that he has fairly good child/adult interactions, albeit at a compromised level. The current situation is complicated by increased behavioral outbursts. Ms. McEaddy reports that he is becoming more and more resistant and less willing to follow directives at home. She attributes much of this problem to inconsistencies between her handling of the child and the way he is held to limits at school. She is highly desiring a transfer to a more behavioral oriented program for the coming school year. This is the first contact with Nathaniel with this psychologist, although he had seen Nantanju twice previously. However, the Children's Hospital records thoroughly describe Nathaniel's progress over time.

OBSERVATIONS: Nathaniel was occupied in the waiting room and did not want to come with the examiner to the testing room. He was accompanied by Georgia McEaddy and Nantanju, and Ms. McEaddy wanted to remain with Nathaniel during testing, which was not felt feasible due to the fact that Nantanju was very distracting to him. However, the examiner was able to work with Nathaniel for about 45 minutes alone at the beginning of the morning when he was fresh and seemed most willing to cooperate. He worked on the Object Assembly puzzles and had considerable difficulty in rotating some of the pieces. He required maximal time to complete the puzzles, although it was noted that he eventually got all of them correctly. His timing would be appropriate to that of a 5 year old. The attempt was made to do the Animal Pegs color-matching task in order to measure attention span. However, Nathaniel was becoming very resistant at this point, to the degree of continually knocking pegs on the floor, of intentionally mismatching colors and in general becoming uncooperative. At this point we

# DEVELOPMENTAL EVALUATION PROGRAM

PATIENT NAME: HOBLEY, NATHANIEL
MEDICAL RECORD# 033-92-98
DATE OF BIRTH: 10/24/88
DATE OF VISIT: 05/30/97

ATTENDING: Bruce Cushna, PhD.

the current time and some consideration and assistance must begin in that particular area. Also Ms. McEaddy seems somewhat stressed and frustrated by her interaction with the school at this time and some mediation must take place to smooth this out.

2. Of course, Nathaniel will be continued to be seen in Neurology by Dr. Holtzman. However, notations from Dr. Holtzman at the current time would indicate that he would prefer a type of vacation from medications. Also, in this area there is a lot of concern about what the real reaction to these medications is and are. It would seem that there needs to be some type of consultation type of effort to coordinate programs for both Nathaniel and Nantanine in the near future time. We are hopeful that this will be taken care of by the contacts with the Department of Social Service in coming weeks.

3. It is self obvious that Nathaniel's behavior is addressed and much of the more stringent programming must take place between the home and the school. The situation ... with the complexity here and the hostility ... the resolution of this problem will take much more than one morning contact. This follow-up must occur, however, over the next few weeks in the interest of these children.

_Bruce Cushna_

Bruce Cushna, Ph.D.
Senior Associate in Psychology

CC: David Holtzman, M.D.
Neurology Department, Fegan 11
Children's Hospital

CC: Ms. Annalee Brown
Morton Street DSS
123 Morton Street
Jamaica Plain, MA 02130

CC: Ms. Georgia McEaddy
49 June Street
Roslindale, MA 02131

Authenticated by the electronic signature of
Bruce Cushna, PhD on 06/12/97

ORIGINATED BY: Bruce Cushna

Page 3

# Children's Hospital

300 Longwood Avenue, Boston, MA 02115                    Telephone (617) 355-6000

## DEVELOPMENTAL EVALUATION PROGRAM                    MAY 23, 1997

PATIENT NAME:        HOBLEY, NITANJU
MEDICAL RECORD#      100-01-73
DATE OF BIRTH:       01/28/92
DATE OF VISIT:       04/03/97

ATTENDING:        .   Bruce Cushna, PhD

PSYCHOLOGICAL STUDY

DATE OF BIRTH:           01/28/92
CHRONOLOGICAL AGE:       5-2/12 years

PROCEDURES:    1. Weschler Preschool and Primary Scale of Intelligence - R
               2.  Drawing of Basic Geometric Designs
               3.  Draw-a-Person Test
               4.  Clinical and Caregiver Interviews

BACKGROUND:  Nitanju has been seen by the 2-6 Team one year previously.
She comes from a sibship of 4.  She and her brother Nathaniel have been
placed together with Georgia McEaddy in Roslindale.  Nathaniel attends
school at L.C.D.C.; Nitanju attends the Brumfeld Academy in Dorchester.
There are also another brother and sister in separate foster homes.  Ms.
McEaddy would like to obtain foster care of Nitanju's sister as well.  Ms.
McEaddy reports substantial gains in Nitanju's development in the 2 years
in which she has resided with her.  Also she feels that Nitanju is much
more communicative and able to follow directions.  However, there are
concerns about Nitanju's inability to settle down and some unusual
flapping movements as well as short attention span.  Nitanju goes for
weekly psychotherapy with Mary Ann Bynoe, at Codman Square Mental Health
Center. She also has had a recent evaluation in Children's Hospital
Neurology by Dr. David Holtzman, who felt Nitanju was easily distracted
and that there were indications of learning disabilities, but no "focal or
lateralizing neurologic abnormalities".  Dr. Holtzman also follows
Nathaniel.

OBSERVATIONS:  Nitanju was pleased to be back in this Clinic and took
pride in demonstrating many accomplishments/  However, she was extremely
flighty, even in the waiting room, moving from activity to activity in
rapid sequence.  She also jumped about considerably and had a lot of
bodily movement which did not subside during the 1-1/2 hours of
evaluation.  It was not possible for her to remain seated for more than 5
minutes, and she not only jumped about the room, but climbed up on the
window ledge and chairs.  It was necessary during verbal testing to allow
her to move about the room in order to obtain optimal performance.  When
this was done, she answered such items as Information and Vocabulary with
facility. Vocabulary was advanced with a scaled score of 14, to the 6-1/2
year level or more than a year beyond chronological age.  Also her
Information background was rich, and she could account for most factual
things as kindergarten children do, including sequencing the days of the
week and answering such fact as there being 5 pennies in a nickel.
Counting skills were reasonably good, although she needed to be reminded
to hold to correspondence.  Her comparatives of greater than, less than or
equal to, were all carried out well, as were Similarities in her
understanding the concept of set as well as common attributes.  In
drawing, she was extremely impulsive, frequently saying she could not
perform, then proving that indeed she was quite capable.  She drew
adequate squares, but then proceeded to draw facial features within them.

AUTHENTICATED BY THE ELECTRONIC SIGNATURE OF Bruce Cushna, PhD ON 05/23/97.

# Children's Hospital

300 Longwood Avenue, Boston, MA 02115                    Telephone (617) 355-6000

## DEVELOPMENTAL EVALUATION PROGRAM                    MAY 23, 1997

PATIENT NAME:        HOBLEY, NITANJU
MEDICAL RECORD#      100-01-73
DATE OF BIRTH:       01/28/92
DATE OF VISIT:       04/03/97

ATTENDING:           Bruce Cushna, PhD
Nitanju's ability to discuss fears and emotional reactions undoubtedly
related to the successful course of this therapy to date. However, she is
a very needy child who has made remarkable progress over the time in which
she has been followed here. Yet, this needs to be sustained by therapy
provision on a continuing basis. Commendations are due to the fine work
that has been done over the course of this treatment.

3. Behaviorally, Natanju does respond to firm limits and one-on-one adult
direction. The need for reward and reinforcement were discussed fully
with the foster mother. It would seem that she is providing adequate
avenues for motivation and structuring needed to help Nitanju advance
these causes. Her structuring of disciplined situations was also
discussed as well as the need for sound behavioral procedures. The need
for time out room provisions and also for consistency in reacting to
consequences was reviewed thoroughly. Ms. McEaddy's current program does
indeed seem adequate and it would be well for her to have behavioral
consultation to be able to reinforce the needs for consistency and close
adherence to such programming.

4. Once Nitanju's attentional problems have been addressed, and if she is
placed upon medication, it may be well to see her again in six months to
see what further advancements are made and to make the attempt to further
document what is believed at this time to be brighter abilities and
qualities.


Bruce Cushna, Ph.D.
Senior Associate in Psychology


CC: Department of Social Services
    Attn: Anna Lee Brown
    123 Morton Street
    Jamaica Plain, MA 02130;

CC: Ms. Mary Ann Bynoe
    Codman Square Mental Health Center
    637 Washington Street
    Dorchester, MA 02124

CC: Mary Lee Boyce, M.D.
    199 Center Street
    West Roxbury, MA 02132

CC: David Holtzman, M.D., Ph.D.
    Dept. of Neurology
    Children's Hospital, Fegan 11


AUTHENTICATED BY THE ELECTRONIC SIGNATURE OF Bruce Cushna, PhD ON 05/23/97.

# C B R  L A B O R A T O R I E S

WWW.CBRLABS.CO

800 HUNTINGTON AVE., BOSTON, MA 02115 • 800-850-2466 • FAX 617-731-567

**Parentage Test Results**

February 13, 2001

Attorney Harold Robertson
Harmon & Robertson, P.C.
85 Merrimac Street, Fourth Floor
Boston, MA 02114

Dear Mr. Robertson:

Re: Paternity test results on:

|  | Race | Lab No. Blood draw |
|---|---|---|
| Tested Man: Loniel Williams (B) | | 2000-26202 11/27/00 |
| Child:     Loniel Williams | | 2000-26201 12/07/00 |

Case 6571

| T E S T | OBSERVED PHENOTYPES | | Paternity |
|---|---|---|---|
| | Child | Tested Man | Index |
| DNA Locus/Probe | | | |
| D2S44/pYNH24 | 1380 | 1380 | 5.19 |
| Hae III | 1670 | 1850 | |
| D10S28/TBQ7 | 1210 | 1210 | 9.62 |
| Hae III | 5980 | 3990 | |
| D17S79/SLI986 | 510 | 510 | 22.7 |
| Hae III | 1580 | 1430 | |
| D6S132/SLI1090 | 5110 | 5110 | 10.9 |
| Hae III | 2870 | 1160 | |

Loniel Williams cannot be excluded as the biological father of
Loniel Williams. The combined paternity index is 12400. The genetic
findings are 12400 times more characteristic of paternity than of
non-paternity. The probability of paternity is 99.992% assuming a
50% prior probability. Paternity is practically proven.

99.941% of accused non-fathers would be excluded as the father by
the above tests.

cc:    Attorney Jeffrey Kaye

14:19:29

Alvin E. Davis, III, M.D.
Laboratory Director
RH/eag



# The Commonwealth of Massachusetts
## Department of Revenue
### Child Support Enforcement Division

Alan L. LeBovidge
Commissioner
Marilyn Ray Smith
Deputy Commissioner

April 16, 2003

Mr. Lenell Williams
33 Wenonah Street
Dorchester, MA. 02121

RE:    Custodial Parent:Desare Sapp
       Child: D'Anell Edward Williams

Dear Mr. Williams:

The Child Support Enforcement Division of the Massachusetts Department of Revenue (DOR) received the results of the paternity tests conducted in the paternity action filed against the putative father named above. A copy of the results is enclosed.

The test results indicate that you are not the father of the child named above. Notice of further court proceeding will be mailed to you under separate cover.

Please contact me at the number below within seven (7) days of the date of this letter if you have any questions regarding this case. Assuming there is no challenge to the paternity test results, in sixty (60) days DOR will take the steps necessary to close this case.

Thank you.

Sincerely,

Barbara Dillon DeSouza, Counsel
Massachusetts Department of Revenue
Child Support Enforcement Division
239-245 Causeway Street, 3rd Floor
Boston, MA 02139
(617) 619-0800 ext. 32628

BDD:lrb
Encl.

# AFFIDAVIT OF BLOOD TESTING RESULTS

STATE OF LOUISIANA, PARISH OF JEFFERSON
RELIAGENE CASE #     2003-114308
PARISH/COUNTY:  METROPOLITAN, MA
CHILD SUPPORT CASE NO.:  03-003186578

I, Megan D. Shaffer, having been duly sworn under oath state the following:

1. ReliaGene Technologies, Inc. was requested to perform paternity tests on the following individuals for the purpose of reasonably proving or disproving the probability of the Defendant's paternity of the child(ren) set forth below:

    Alleged Father:  **LONIEL WILLIAMS**

    Mother:  **DESSERE SAPP**

    Child:  **D ANELL WILLIAMS**

2. My full name is: Megan Danielle Shaffer.

3. I am qualified as an examiner of inherited characteristics included but not limited to those found in blood and tissue samples and to administer the test.

4. My address is: ReliaGene Technologies, Inc., 5525 Mounes Street, Suite 101, New Orleans, LA 70123.  My telephone number is: (504) 734-9700 or 1-800-PATERNITY.

5. My qualifications are as follows, to wit:
    - Highest Degree: Ph.D. in Microbiology and Immunology
    - Present Position: Assistant Director at ReliaGene Technologies, Inc.
    - Past and Present Memberships:
        American Society for Microbiology
        Association for Research In Vision and Ophthalmology

6. My education is as follows, to wit:
    - B.S. Degree 1993, Major-Biology
    - Ph.D. Degree 2000, Major-Microbiology and Immunology

7. My experience is as follows, to wit:
    - Over 7 years of laboratory and research experience in Microbiology
    - Assistant Director of ReliaGene Technologies, Inc.
    - Author of numerous scientific research papers and abstracts

8. Identification of individuals:   The tested individuals were identified when the samples were collected, as follows, to wit: By photograph, fingerprint, and/or identification card. See attached Identification/Chain of Custody document(s).

9. Who Collected Test Samples: See attached Identification/Chain of Custody Client Identification document(s).

10. How Test Samples Were Collected: Test samples were collected as follows, to wit: see attached Identification/Chain of Custody document(s).

11.  When Test Samples Were Collected: Test samples were collected on the following date(s) and time(s), to wit: See attached Identification/Chain of Custody document(s).

12.  Where Test Samples Were Collected: Test samples were collected at the following location(s), to wit: See attached Identification/Chain of Custody document(s).

13.  The chain of custody of the test samples from the time collected until the tests were completed is as follows, to wit: See attached Identification/Chain of Custody document(s), which is signed by the individual collecting samples, as well as the individual packing and sealing the samples. The samples were delivered to the laboratory. The specimen container was examined for integrity. The Identification/Chain of Custody document(s) was(were) signed by the person opening the samples in the laboratory. There was no evidence of tampering during transit and, once received by the laboratory, the samples were then at all times in the care and custody of ReliaGene Technologies in an electronically secured facility under my direct supervision. Furthermore, the Chain of Custody documentation was made at or near the time of sample collection and was made in the course of regularly conducted business activity.

14.  The results of the tests are follows, to wit: See attached laboratory report. Furthermore, the report containing the results of the initial testing has been prepared under my direct supervision.

15.  If the tested man could not be excluded, the defendant's probability of paternity of the child(ren), as calculated by an expert based on the test results, is as follows, to wit: See attached laboratory report.

16.  The procedure performed to obtain the test results are as follows, to wit: ReliaGene Technologies, Inc. performs paternity determinations by DNA analysis in accordance with medically accepted procedures as defined by the Standards of American Association of Blood Banks and the conclusions are correct as reported. The testing fees have been previously agreed upon by the client.

ReliaGene Technologies, Inc. is accredited by the Parentage Testing Committe of the American Association of Blood Banks and by the New York State Department of Health (CLIA # 19D0665242, PFI # 1978).


Signature
_Megan D. Shaffer, Ph.D.
- Assistant Director

SWORN TO AND SUBSCRIBED BEFORE ME
THIS ___9___ DAY OF _____ 2003

RONALD M BEAGLE, NOTARY PUBLIC
COMMISSIONED FOR LIFE

# Parentage Test Results

## Case 114308
### METROPOLITAN, MA, p69

**RELIAGENE**
TECHNOLOGIES, INC.

| | | | | |
|---|---|---|---|---|
| Tested Man: | LONIEL WILLIAMS | (B) | 03-13446 | 03/27/03 |
| Mother: | DESSERE SAPP | (B) | 03-13444 | 03/13/03 |
| Child: | D ANELL WILLIAMS | | 03-13445 | 03/13/03 |

**SUMMARY OF FINDINGS:**    LONIEL WILLIAMS is not the biological father of D ANELL WILLIAMS.

| TEST | OBSERVED PHENOTYPES | | | |
|---|---|---|---|---|
| | Mother | Child | Tested Man | |
| D16S539 | 9, 11 | 11, 12 | 11, 14 | Inconsistent |
| D19S433 | 13.2, 15.2 | 15.2, 16 | 11, 15.2 | Inconsistent |
| D21S11 | 27, 29 | 29 | 27, 28 | Inconsistent |
| D3S1358 | 15 | 15, 18 | 15, 16 | Inconsistent |
| D8S1179 | 13, 14 | 13, 14 | 10, 14 | |
| FGA | 22, 25 | 22, 25 | 19, 23 | Inconsistent |
| TH01 | 7, 8 | 7, 9.3 | 9, 9.3 | |
| vWA | 16, 17 | 14, 17 | 17 | Inconsistent |

**Conclusion:**

*Our opinion of NON-PATERNITY is based on the above noted inconsistencies. The term "inconsistency" means that the band sizes of the tested man do not match the obligate paternal band sizes in the child. Based on the absence of these DNA markers (as determined by DNA analysis) the tested man cannot be the biological father of the child.*

This is to certify that all the biological samples were drawn and forwarded to Reliagene Technologies, Inc., as stated in the attached Chain of Custody Documentation. Reliagene Technologies, Inc. is accredited by the Parentage Testing Committee of the American Association of Blood Banks. The conclusions are correct to the best of my knowledge. In calculating the PI value, where applicable, the mutation frequency is taken into consideration.

Sudhir K. Sinha, Ph.D., Lab Director
Michael Murray, Ph.D., Assoc. Director
Jaiprakash Shewale, Ph.D., Asst. Director
Megan D. Shaffer, Ph.D., Asst. Director

Date: 4/9/3

5525 Mounes Street, Suite 101, New Orleans, Louisiana, 70123
Phone 800-256-4106 or 800-PATERNITY (728-3764) or 504-734-9700
Fax 800-256-4556 or 504-734-9787 • www.reliagene.com

# ReliaGene Technologies, Inc.

**R E L I A G E N E**
**TECHNOLOGIES, INC.**

5525 Mounes Street, Ste. 101   New Orleans, LA 70123   800-PATERNITY / 504-734-9700

## SOP #101W    CHAIN OF CUSTODY DOCUMENT

DATE: _3-13-2003_

## MOTHER:

Name: Last _Sapp_                First _Desare_                MI _M_

Social Security # ~~■■■■■■■■~~        Client Race _Black_    DOB _6-7-1970_ Type of ID _MASS DTA_

ID # ~~■■■■■■■~~

Have you received a blood transfusion in the last 90 days? ✓NO ___ YES   (if yes to either of these questions, 4 buccal
Have you ever received a bone marrow transplant? ___NO ___YES    swabs must be collected )

| SAMPLE #—F | 03 – 13444 | NLY—— |

Under the pains and penalty of perjury, I certify the above information is correct. I grant permission for biological specimens
to be taken for the purpose of disputed parentage study. I understand the results may be used in statistical evaluations.

CLIENT SIGNATURE: _Desere Sapp_

MOTHER'S RIGHT
THUMBPRINT

## CHILD:

Name: Last _Williams_                First _D'Anell_                MI _E_

Social Security # ~~■■■■■■■■~~        DOB _10-14-2000_ Type of ID _S.S. card_ ID# ~~■■■■■■~~

Have you received a blood transfusion in the last 90 days? ✓NO ___ YES   (if yes to either of these questions, 4 buccal
Have you ever received a bone marrow transplant? ___NO ___YES    swabs must be collected )

| AMPLE # ---F | 03 – 13445 | NLY—— |

Under the pains and penalty of perjury, I certify the above information is correct. I grant permission for biological specimens
to be taken for the purpose of disputed parentage study. I understand the results may be used in statistical evaluations.

CLIENT SIGNATURE: _Desere Sapp_
If under 18, legal guardian

CHILD'S RIGHT
THUMBPRINT

## ALLEGED FATHER:

Name: Last _____                First _____                MI _____

Social Security # _____        Client Race _____ DOB _____ Type Of ID _____

ID # _____

Have you received a blood transfusion in the last 90 days? ___NO ___YES   (if yes to either of these questions, 4 buccal
Have you ever received a bone marrow transplant? ___NO ___YES    swabs must be collected )

| SAMPLE #----FOR LAB USE ONLY--- |

Under the pains and penalty of perjury, I certify the above information is correct. I grant permission for biological specimens
to be taken for the purpose of disputed parentage study. I understand the results may be used in statistical evaluations.

ALLEGED FATHER'S RIGHT
THUMBPRINT

CLIENT SIGNATURE: _____        Print Name: _____

## USE SEPARATE DOCUMENT FOR EACH ADDITIONAL CHILD AND/OR ALLEGED FATHER

Fill out the following for each individual:
(Even if all parties are not being drawn at this time)

# Samples collected

Client's initials verifying
samples labeled correctly

Mother: _Sapp, Desare_

☐ blood
☒ buccals     4

_D.S_

Child: _Williams, D'Anell_

☐ blood
☒ buccals     4

_D.S_

eged Father: _Williams, Lenell_

☐ blood
☐ buccals     —

____

**TO BE COMPLETED BY PHLEBOTOMIST AND/OR WITNESS AT DRAW SITE:**

I, _Athea Scarborough_ , hereby certify that I have collected specimens from the person(s) listed
(Print name of person collecting specimens)

on this document at _11:am_ on _3-13-2003_
                        (Time of day)          (Today's month, day and year)

in _Suffolk Probate Court Boston, MASS_ , as well as packaged the
   (Location: Site, City, State)

specimens for shipment to ReliaGene Technologies, Inc.  Under the pains and penalty of perjury, all the above
information is correct.

PHLEBOTOMIST SIGNATURE: _Athea Sca_

I hereby certify that I have witnessed the actual collection of specimens from the individual(s) listed above for
shipment to ReliaGene Technologies, Inc. Under the pains and penalty of perjury, all the above information is correct.

FIELD REPRESENTATIVE SIGNATURE: _Sylvia Lorenzi_
                                 (NOT TO BE COMPLETED IF THERE IS NO FIELD REPRESENTATIVE)



3-13-2003

Sapp, Desare (M)
Williams, D'Anell (C)    SL
_Desare Sapp_

**ALLEGED FATHER
MUST
SIGN AND DATE
THE PHOTO**


**STAPLE**

**PHOTO OF**

**ALLEGED FATHER**

**HERE**

**DO NOT WRITE BELOW THIS LINE - FOR LAB USE ONLY**

Under the pains and penalty of perjury, I certify that I received the specimens obtained from the individual(s)designated above.
here is no evidence that the package has been opened or tampered with.  The specimens are intact. Samples received at:

GI    JRE: _____

ATE: _3/18/03_     TIME OF DAY: _10:06_

ReliaGene Technologies, Inc.
5525 Mounes St. Ste. 101
New Orleans, LA  70123
800-PATERNITY  / 504-734-9700

# REGISTRY DIVISION OF THE CITY OF BOSTON

### COUNTY OF SUFFOLK, COMMONWEALTH OF MASSACHUSETTS, UNITED STATES OF AMERICA

Certificate **R № 017546**

*I, the undersigned, hereby certify that I hold the office of* ..............................
*City Registrar of the City of Boston and I certify the following facts appear on the records of Births, Marriages and Deaths kept in said City as required by law.*

---

**STATE USE ONLY**

**The Commonwealth of Massachusetts**
DEPARTMENT OF PUBLIC HEALTH
REGISTRY OF VITAL RECORDS AND STATISTICS
**STANDARD CERTIFICATE OF LIVE BIRTH**

**CHILD**

| | | |
|---|---|---|
| 3C. CITY/TOWN BOSTON | | 3D. REGISTERED NUMBER |
| 3B. COUNTY SUFFOLK | | V 7824 |

3A. FACILITY NAME-IF NOT IN FACILITY, NUMBER AND STREET
BRIGHAM AND WOMENS HOSPITAL

| NAME 4A. FIRST | 4B. MIDDLE | 4C. LAST |
|---|---|---|
| D'ANELL | EDWARD MACEO | WILLIAMS |

| 5. SEX MALE | 6A. PLURALITY SINGLE | 6B. BIRTH ORDER --- | 7. TIME 10:03 AM | 8. DATE OF BIRTH (Month, Day, Year) OCTOBER 14, 2000 |
|---|---|---|---|---|

**CERTIFIER**

| 9A. NAME AVIVA LEE-PARRITZ | | 9B. TITLE MD |
|---|---|---|

| 9C. CERTIFIER TYPE AT-BIRTH | 9D. LICENSE NUMBER 73393 | |
|---|---|---|

| 9E. NUMBER AND STREET 75 FRANCIS ST | 9F. CITY/TOWN BOSTON | 9G. STATE MA | 9H. ZIP CODE 02115 |
|---|---|---|---|

**MOTHER**

| NAME 10A. FIRST DESARE | 10B. MIDDLE MARIE | 10C. LAST SAPP | 10D. MAIDEN SURNAME SAPP |
|---|---|---|---|

| BIRTHPLACE 11A. CITY/TOWN BOSTON | 11B. STATE/COUNTRY MASSACHUSETTS | 12. DATE OF BIRTH (Month, Day, Year) JUNE 7, 1970 |
|---|---|---|

| RESIDENCE (Do not use mailing address) 13A. NUMBER AND STREET 14 WHITE PINE RD | 13B. CITY/TOWN BOURNE | 13C. COUNTY BARNSTABLE | 13D. STATE MA | 13E. ZIP CODE 02532 |
|---|---|---|---|---|

**FATHER**

| NAME 14A. FIRST --- | 14B. MIDDLE --- | 14C. LAST --- | 16. DATE OF BIRTH (Month, Day, Year) --- |
|---|---|---|---|

| BIRTHPLACE 15A. CITY/TOWN --- | 15B. STATE/COUNTRY --- | 17B. RELATIONSHIP TO CHILD MOTHER |
|---|---|---|

**INFORMANT**

17A. I (WE) CERTIFY THAT THE PERSONAL INFORMATION APPEARING ABOVE IS TRUE AND CORRECT.

*Desare Sapp*

| 17C. DATE SIGNED (Month, Day, Year) OCTOBER 16, 2000 | 17D. MAILING ADDRESS (if different from item # 13 above) NUMBER AND STREET | CITY | STATE | ZIP CODE |
|---|---|---|---|---|

**CLERK**

| 18. DATE OF RECORD (Month, Day, Year) OCT 2 0 2000 | 19. SUPPLEMENT FILED (Month, Day, Year) | 20. CLERK/REGISTRAR *Judith A. McCarthy* |
|---|---|---|

21. DPH USE ONLY



# BellaGene Technologies, Inc.

5825 Mounes Street, Ste. 101, New Orleans, LA 70123
504-734-9700 · 800-256-4106 · 800-PATERNITY

## CHAIN OF CUSTODY DOCUMENT

| Date | Jurisdiction | State |
|---|---|---|
| 3-27-03 | Sifolk | Boston, MA |
| Client Case # 03-003,186,578 | Reference # | |

## Mother

| Last Name (Please Print) | First Name | | MI |
|---|---|---|---|

Race (Check one) ☐ Caucasian  ☐ Black  ☐ Hispanic  ☐ American Indian  ☐ Other (Please Specify)_____

| Social Security # | DOB | Type of Identification | Identification # |
|---|---|---|---|

Address _____  City _____  State ____  Zip ____

Have you received a blood transfusion in the past 90 days? ☐ Yes ☐ No   Have you ever received a bone marrow transplant? ☐ Yes ☐ No
(If yes to either of the questions, four buccal swabs must be collected)
I hereby certify that the above information is correct. I have granted permission for biological samples to be taken for the purpose of disputed parentage study. I understand that the results of this study may be used in statistical evaluations.

Print Name _____  Signature _____  Date _____

Mother's Right Thumbprint

## Child

| Last Name (Please Print) | First Name | | MI | Sex ☐ Male ☐ Female |
|---|---|---|---|---|

| Social Security # | DOB | Type of Identification | Identification # |
|---|---|---|---|

Have you received a blood transfusion in the past 90 days? ☐ Yes ☐ No   Have you ever received a bone marrow transplant? ☐ Yes ☐ No
(If yes to either of the questions, four buccal swabs must be collected)
I hereby certify that the above information is correct. I have granted permission for biological samples to be taken for the purpose of disputed parentage study. I understand the results of this study may be used in statistical evaluations.

Print Name _____  Signature: _____  Date _____
(If under 18, legal guardian)

Child's Right Thumbprint

## Alleged Father

| Last Name (Please Print) | First Name | | MI |
|---|---|---|---|
| Williams | Laniel | | E |

Race (Check one) ☐ Caucasian  ☒ Black  ☐ Hispanic  ☐ American Indian  ☐ Other (Please Specify)_____

| Social Security # | DOB | Type of Identification | Identification # |
|---|---|---|---|
| | 4-19-68 | MA LIC | |

Address 33 Wenonah St   City Dorchester  State MA  Zip 02121

Have you received a blood transfusion in the past 90 days? ☐ Yes ☒ No   Have you ever received a bone marrow transplant? ☐ Yes ☒ No
(If yes to either of the questions, four buccal swabs must be collected)
I hereby certify that the above information is correct. I have granted permission for biological samples to be taken for the purpose of disputed parentage study. I understand the results of this study may be used in statistical evaluations.

Print Name Laniel Williams   Signature Laniel Williams   Date 3/27/05

03 – 13446

Alleged Father's Right Thumbprint

## Please complete for any other parties in this case not listed above

| Name | Relation | Social Security # |
|---|---|---|
| | | |
| | | |

USE A SEPARATE DOCUMENT FOR EACH ADDITIONAL CHILD AND/OR ALLEGED FATHER

**Sample Inventory** (Client should sign to verify samples are labeled properly)

| Relation | Sample Type | # Swabs/ Tubes | Client Signature (Verifying that samples were labeled properly) |
|---|---|---|---|
| Mother | ☐ blood tube(s)<br>☐ buccal swabs | | |
| Child | ☐ blood tube(s)<br>☐ buccal swabs | | |
| Alleged Father | ☐ blood tube(s)<br>☑ buccal swabs | 4 | *Lol Wts* |

**Collection Site** (Name, City, State)
*Suffolk Prob., Boston, MA*

**Collection Date** *3-27-03*   **Collection Time** *9:20 a.m.*

I hereby certify that I have collected, packaged, and sealed the samples collected from the person(s) listed on this document.

**Specimen Collector's Name** *Althea Scarborough*

**Specimen Collector's Signature** *Althea Scarbul*

**Witness Verification** (if applicable)

**Witness' Name** *Sandra Fernandez*

**Witness' Signature** *Sandra Fernandez*

**Payment Information** (if applicable)

☐ Cashier's Check   ☐ Money Order

Amount Enclosed $ _____

Collector's Initials _____

**ReliaGene Use Only**

Amount Received $ _____

Money Order/Check # _____

Initials _____ Date _____

---

**Mother or Legal Guardian Must Sign and Date Photo**

Staple

Photo

of

Mother and Child(ren)

Here

**Alleged Father Must Sign and Date Photo**
*3-27-2003*



*Williams, Loniel (AF) Sc*
*Lol Wts*

---

**DO NOT WRITE IN THE SPACE BELOW – FOR RELIAGENE USE ONLY**

I hereby certify that I have received the specimens obtained from the individual(s) designated above. There is no evidence that the package had been opened or tampered with. The specimens are intact.

Print Name *Christine Vigne*

Signature *Chou*

₃ *3-29-03*   Time of Day *9:00*

ReliaGene Technologies, Inc.
5525 Mounes St., Suite 101
New Orleans, LA 70123
(504) 734-9700 or (800) PATERNITY



*The Commonwealth of Massachusetts*
*Executive Office of Health and Human Services*
*Office of Child Care Services*
*Central Office*
*One Ashburton Place*
*Boston, Massachusetts 02108*

ARGEO PAUL CELLUCCI
GOVERNOR

JANE SWIFT
LIEUTENANT GOVERNOR

WILLIAM D. O'LEARY
SECRETARY

ARDITH WIEWORKA
COMMISSIONER

TELEPHONE
(617) 626-2000
FAX: (617) 626-2028
TTY: (617) 626-2066

March 16, 2001

Georgia McEaddy
49 June Street
Roslindale, MA 02131

Re:   Your Records Request: Boston Adoption Bureau, Inc.

Dear Ms.McEaddy:

In response to your request for public records regarding Boston Adoption Bureau, Inc. the Office of Child Care Services (OCCS) has compiled the documents necessary to satisfy your request. Pursuant to Massachusetts General Laws (G.L.) chapter 66, section 10(a) OCCS is forwarding to you the following records:

(1)   Investigation report dated February 8, 2001
(2)   Statement of Noncompliance dated February 8, 2001

Any information that identifies any complainant, witness, third party, or other information that would constitute an unwarranted invasion of personal privacy has been redacted, pursuant to G.L. c. 4 §7(26)(a), (c) and (f).

In accordance with 950 CMR 33.03 and 32.06(3), OCCS assesses a copying fee of $1.40 for 7 pages at a rate of $0.20 per page, as well as the actual cost of postage at $.34. Please forward to my attention your total payment of $1.74, payable to the Commonwealth of Massachusetts.

You have the right to appeal the denial of a record or any portion of a record to the Supervisor of Public Records, Office of the Secretary of State, in accordance with G.L. c.66, §10(b) and 950 CMR 33.25. Your appeal must be filed in writing within thirty (30) days and must include a copy of the letter by which the request was made, as well as OCCS' response.

If you have any questions in this matter, please call me at (617) 626-2084.

Sincerely,

*Matthew J. Donovan*

Matthew J. Donovan
Constituent Service Liason

cc:    Jerome Curley, Beverly Regional Director

The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Office of Child Care Services
**66 Cherry Hill Drive, Beverly, Massachusetts 01915**
Date: February 8, 2001

---

### INVESTIGATION REPORT

Complaint #:      26105     Facility # 400537
Name of Facility:     Boston Adoption Bureau, Inc.
Address:          14 Beacon Street, Boston, MA 02108

## I.  Complaint/Incident Summary

The office received a complaint on Boston Adoption Bureau.  The reporter indicated the following:

A Biological mother surrendered her infant to the agency on 9/11/00.  She did this without informing the biological father and paternal grandmother who have been involved with the child. The biological mother is married and her husband is on the birth certificate, however she did tell the agency the birth father's whereabouts is "unknown".

When the biological father and paternal grandmother found out about the surrender they notified the agency. The biological father has signed a statement of paternity. The complainant alleges that the program did not give notification to the biological father. The child is now placed in a pre adoptive home out of state. The biological family has obtained an attorney.

## II.  Summary of Investigation Activity

The licensor had several  telephone contacts with the agency executive director and conducted a scheduled site visit on October 2, 2000. A review of the birth parent and adoptive parent record was conducted.

## III. Summary of Findings

An interview with the agency executive director and agency attorney revealed:

The agency believes that the biological mother, a Massachusetts resident and the adoptive parents who reside out of state were connected through an agency  called "Silverspoons" through an advertisement in the telephone book.  The agency indicated that the prospective adoptive couple then called the agency on August 11, 2000. The adoptive couple indicated to the agency that a biological mother wanted to surrender her infant, born June 23, 2000, to the prospective adoptive couple.

The agency executive director indicated that she met with the biological mother for the first time on August 15, 2000.

The agency executive director indicated that on August 23, 2000, the biological mother and her then husband , (he is not the biological father and they subsequently divorced) met with the executive director and the

prospective foster mother. The infant was placed in foster care on August 26, 2000. The executive director indicated that the biological mother identified the biological father of the infant, her former boyfriend. The executive director indicated however, that the biological mother said that the biological father was "down south somewhere", but she was not sure where he was. The agency did not request the biological mother to sign an affidavit indicating she did not know the whereabouts of the biological father, nor was there documentation of the executive director asking her for his last known address. The executive director indicated that the biological mother refused birth parent counseling. The refusal of the birth mother to accept birth parent counseling was not documented in the birth parent record

During an interview it was learned that the executive director indicated that after the placement of the infant in foster care, the agency needed to transfer the infant to a new foster home as the foster mother had developed a medical condition with the sciatic nerve in her back which would require surgery. The biological mother indicated that she didn't want the infant to be transfered to a new foster home, rather she wanted the infant to go directly to the prospective adoptive family. The infant was returned to the biological mother on August 31, 2000. The infant was placed in a second foster home on September 12, 2000. The infant was placed with the adoptive family on September 24, 2000.

An interview with the executive director and agency attorney revealed that the biological mother paid fifteen dollars a day for foster care. The interview with agency attorney and executive director revealed that the agency charges birth mothers for foster care. Record review revealed that the agency also charged the adoptive couple for the same foster care a total of $540.00, which is $30.00 per day. The agency makes payments to the foster parents of $25.00 per day. A review of the submitted policies and procedures revealed that the policy states that "all services to birth parents are free of charge" however the policy further states that "foster care services for birth parents shall be provided free of charge if the birth parent surrenders the child to the agency. If the birth parent decides to parent the child, and voluntarily removes the child from foster care she shall be assessed a fee of $15.00 for each day the child is in foster care."

During the interview with the agency executive director and agency attorney it was learned that on September 12, 2000 the biological mother as well as her recently divorced former husband signed the surrender of the infant at the agency. The agency attorney indicated that a 210 petition to terminate the biological fathers rights was then filed in Suffolk Probate and Family Court. As the biological fathers whereabouts was listed as "unknown" the court issued a citation for publication, however, that same week the biological father came forward to the court and the agency.

A phone interview on November 28, 2000 with the agency attorney revealed that the agency has not as yet made a request of the Department of Social Services to examine parental responsibility claims filed with respect to the infant. The agency attorney indicated this request "usually" takes place in the first few months of a case, prior to the 210 petition being approved by the courts.

A review of the birth parent record revealed that the agency's intake evaluation dated September 12, 2000 is not complete as the evaluation does not document any dates times or places of any meetings with the biological parent nor does it document that the agency was aware that the biological parent had previously been a client of another adoption agency regarding the placement of this infant.

The agency placed the infant with the adoptive family as a legal risk placement on September 24, 2000.

On October 5, 2000 the agency was contacted by the biological paternal grandmother and biological father in

search of the infant.

A review of the adoptive couples record revealed the adoptive couple record does not contain documentation of an agency application. The review also revealed that the biological parent signed the agencies complaint policy the day of the surrender, September 12, 2000.

A review of the adoptive couples' record revealed no evidence of a written agreement nor a written contract with the receiving agency.

Adoptive parent record review revealed a homestudy of the adoptive home dated July 29, 1999 and an update of the homestudy dated August 23, 2000 both done by an out of state social worker . The placement of the infant was done by the agency, however this licensor was unable to find documentation of a homestudy update by Boston Adoption Bureau.

A record review of the adoptive parent record failed to reveal signed copies of the required agency's complaint policy.

A record review of the adoptive family record as well as the infant and biological parent record revealed lack of documentation of case notes.

## IV. Non-compliances

See attached plan for compliance

**Licensor/Investigator:**
Michael Curran

# Statement of Non-compliance

| Complaint Number: | 26105 | | Date of Report: | 02/08/2001 |
|---|---|---|---|---|

**Facility Information:**
Facility ID: **400537**          Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

**Licensee Information:**
Licensee ID: **1400517**          Tel: 617-227-1336
Licensee Name: Boston Adoption Bureau, Inc.
Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.04(01)(b) | Adoptive parent record review revealed lack of a written agreement with the agency which conducted the adoptive family homestudy, and is the receiving agency for post placement supervision and Boston Adoption Bureau, the placement agency. Licensee shall submit written plan for OCCS approval describing the agencies plan for documentation describing clearly which services are provied directly by the agency, by referral, or through written agreements with other persons and copies of those agreements | | | |
| 5.06 | Record review of the childs record revealed incomplete intake evaluation. Licensee shall submit a plan detailing how the agency shall, prior to accepting any parents surrender of his/her child for adoption, complete a full evaluation by qualified professionals, unless such an evaluation has been documented in the referral or application. | | | |
| 5.09(03), 5.09 | Interview with agency administrators, record review and review of agencies policies and procedures revealed that the agency charges birth parents for the cost of foster care of a child the agency has placed in a foster home "if the birthparent decides to parent the child, and and voluntarily removes the child from foster care." "The birth parent is assessed a fee of $15.00 for each day the child is in care." Licensee shall submit a revised policy which clearly indicates that birth parents shall neither benefit nor suffer financially as a result of their pregnancy. | | | |

# Statement of Non-compliance

| Complaint Number: | 26105 | | Date of Report: | 02/08/2001 |

**Facility Information:**

Facility ID: **400537**
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

Tel: 617-227-1336

**Licensee Information:**

Licensee ID: **1400517**
Licensee Name: Boston Adoption Bureau, Inc.
Boston, MA 02108

Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.10(05)(e) | Record review of the adoptive family record revealed lack of a homestudy update by Boston Adoption Bureau. Licensee shall submit a plan that details how agency shall perform a limited adoptive parent assessment if the licensee receives a adoptive parent assessment performed in another state in accordance with the laws of such state, completed not more than 12 months prior to the current application for approval. | | | |
| 5.13(02)(a) | Record review of the childs record revealed an incomplete face sheet. Licensee shall submit a written plan detailing how the licensee shall maintain a written record for each child which includes a face sheet which identifies the child by the required information. | | | |
| 5.13(03)(a) | Record review of the adoptive family record revealed a lack of the adoptive family's written application. Licensee shall submit a plan detailing how the agency shall maintain a written record which shall include an adoptive parents written application. | | | |
| 5.13(03)(d) | Record review of the adoptive family record revealed a lack of case notes. Licensee shall submit a plan detailing how the licensee shall maintain a written record for adoptive parents which includes case notes documenting services set forth in CMR 5.10. | | | |

# Statement of Non-compliance

| Complaint Number: 26105 | Date of Report: 02/08/2001 |
|---|---|

**Facility Information:**

Facility ID: **400537**        Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

**Licensee Information:**

Licensee ID: **1400517**        Tel: 617-227-1336
Licensee Name: Boston Adoption Bureau, Inc.

Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|

Michael Curran
Licensing Specialist

**I have reviewed the above non-compliances and have specified my plan and date of correction for each non-compliance.**

LICENSEE'S SIGNATURE _____    DATE: _____

# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Office of Child Care Services
**66 Cherry Hill Drive, Beverly, Massachusetts 01915**
Date: July 12, 2001

---

## AMENDED INVESTIGATION REPORT

Complaint #:       26105    Facility # 400537
Name of Facility:     Boston Adoption Bureau, Inc.
Address:          14 Beacon Street, Boston, MA 02108

## I.  Complaint/Incident Summary

The office received a complaint on Boston Adoption Bureau. The reporter indicated the following:

A Biological mother surrendered her infant to the agency on ███████. She did this without informing the biological father and paternal grandmother who have been involved with the child. The biological mother is married and her husband is on the birth certificate, however she did tell the agency the birth father's whereabouts is "unknown".

When the biological father and paternal grandmother found out about the surrender they notified the agency. The biological father has signed a statement of paternity. The complainant alleges that the program did not give notification to the biological father. The child is now placed in a pre adoptive home out of state. The biological family has obtained an attorney.

## II.  Summary of Investigation Activity

The licensor had several telephone contacts with the agency executive director and conducted a scheduled site visit on October 2, 2000. A review of the birth parent and adoptive parent record was conducted.

## III.  Summary of Findings

An interview with the agency executive director and agency attorney revealed:

The agency believes that the biological mother, a Massachusetts resident and the adoptive parents who reside out of state were connected through an agency called "Silverspoons" through an advertisement in the telephone book. The agency indicated that the prospective adoptive couple then called the agency on ███████████. The adoptive couple indicated to the agency that a biological mother wanted to surrender ██████████ ████████ to the prospective adoptive couple.

The agency executive director indicated that she met with the biological mother for the first time on ███████ ██████

The agency executive director indicated that on ███████████, the biological mother and her then husband , (he is not the biological father and they subsequently divorced) met with the executive director and the

prospective foster mother. The ▓▓▓ was placed in foster care on ▓▓▓▓▓▓▓▓▓. The executive director indicated that the biological mother identified the biological father of the ▓▓▓, her former boyfriend. The executive director indicated however, that the biological mother said that the biological father was "down south somewhere", but she was not sure where he was. The agency did not request the biological mother to sign an affidavit indicating she did not know the whereabouts of the biological father, nor was there documentation of the executive director asking her for his last known address. The executive director indicated that the biological mother refused birth parent counseling. The refusal of the birth mother to accept birth parent counseling was not located in the birth parent record when it was reviewed by the licensor during the visit to the program. On ▓▓▓ ▓▓▓▓▓, the agency submitted additional documentation which did indicate in writing that the birthmother had refused counseling.

During an interview it was learned that the executive director indicated that after the placement of the ▓▓▓▓ in foster care, the agency needed to transfer the ▓▓▓▓ to a new foster home as the foster mother had developed a medical condition with the sciatic nerve in her back which would require surgery. The biological mother indicated that she didn't want the ▓▓▓▓ to be transfered to a new foster home, rather she wanted the ▓▓▓▓ to go directly to the prospective adoptive family. The ▓▓▓▓ was returned to the biological mother on ▓▓▓▓▓▓▓. ▓▓▓▓. The ▓▓▓▓ was placed in a second foster home on ▓▓▓▓▓▓▓▓▓▓. The ▓▓▓▓ was placed with the adoptive family on ▓▓▓▓▓▓▓▓▓.

 An interview with the executive director and agency attorney revealed that the biological mother was "charged" fifteen dollars a day for foster care. The interview with agency attorney and executive director revealed that the agency charges birth mothers for foster care. Record review revealed that the agency also charged the adoptive couple for the same foster care a total of $540.00, which is $30.00 per day. The agency makes payments to the foster parents of $25.00 per day. A review of the submitted policies and procedures revealed that the policy states that "all services to birth parents are free of charge" however the policy further states that "foster care services for birth parents shall be provided free of charge if the birth parent surrenders the child to the agency. If the birth parent decides to parent the child, and voluntarily removes the child from foster care she shall be assessed a fee of $15.00 for each day the child is in foster care." In a letter to the Office dated ▓▓▓▓, the agency director stated that the birthmother did not have to pay for foster care. A compliance plan was submitted which addressed the confusion in the agency's policy regarding foster care services.

During the interview with the agency executive director and agency attorney it was learned that on ▓▓▓▓▓▓ ▓▓▓▓▓▓ the biological mother as well as her recently divorced former husband signed the surrender of the ▓▓▓▓ at the agency. The agency attorney indicated that a 210 petition to terminate the biological fathers rights was then filed in Suffolk Probate and Family Court. As the biological fathers whereabouts was listed as "unknown" the court issued a citation for publication, however, that same week the biological father came forward to the court and the agency.

 A phone interview on ▓▓▓▓▓▓▓▓▓▓▓ with the agency attorney revealed that the agency has not as yet made a request of the Department of Social Services to examine parental responsibility claims filed with respect to the ▓▓▓▓. The agency attorney indicated this request "usually" takes place in the first few months of a case, prior to the 210 petition being approved by the courts.

A review of the birth parent record revealed that the agency's intake evaluation dated ▓▓▓▓▓▓▓▓▓▓▓ is not complete as the evaluation does not document any dates times or places of any meetings with the biological parent nor does it document that the agency was aware that the biological parent had previously been a client of another adoption agency regarding the placement of this ▓▓▓▓.

The agency placed the ▓▓▓▓ with the adoptive family as a legal risk placement on ▓▓▓▓▓▓▓▓▓▓▓. On ▓▓▓▓▓▓▓▓▓▓ the agency was contacted by the biological paternal grandmother and biological father in search of the ▓▓▓▓.

A review of the adoptive couples record revealed the adoptive couple record does not contain documentation of an agency application. The review also revealed that the biological parent signed the agencies complaint policy the day of the surrender, ▓▓▓▓▓▓▓▓▓▓▓▓.

A review of the adoptive couples' record revealed no evidence of a written agreement nor a written contract with the receiving agency.

Adoptive parent record review revealed a homestudy of the adoptive home dated ▓▓▓▓▓▓▓▓▓ and an update of the homestudy dated ▓▓▓▓▓▓▓▓▓▓ both done by an out of state social worker . The placement of the ▓▓▓▓ was done by the agency, however this licensor was unable to find documentation of a homestudy update by Boston Adoption Bureau.

A record review of the adoptive parent record failed to reveal signed copies of the required agency's complaint policy.

A record review of the adoptive family record as well as the ▓▓▓▓ and biological parent record revealed lack of documentation of case notes.

## IV. Non-compliances

See attached plan for compliance

**Licensor/Investigator:**
   Michael Curran

Marilyn Speiser, Executive Director
Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

Re: Boston Adoption Bureau, Inc.

November 08, 2002

Dear Marilyn Speiser,

Enclosed please find the report resulting from my recent visit to your program.  As you will note, there are non-compliances which must be corrected prior to renewal of your license.  Therefore, please read carefully the enclosed report and complete, sign and return the enclosed Plan for Compliance by December 13, 2002.

Following receipt of an acceptable Plan for Compliance, a regular adoption and foster care placement  license will be issued.


If you have any questions regarding this report, please feel free to contact me.

Respectfully,


Michael Curran
Licensing Specialist

The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Office of Child Care Services
66 Cherry Hill Drive, Beverly, Massachusetts 01915

VISIT NARRATIVE
November 8, 2002
Boston Adoption Bureau, Inc.

14 Beacon Street
Boston, MA 02108

Executive Director:     Marilyn Speiser, LICSW

## I. Program Summary

A licensing renewal study was conducted at the agency on June 27, 2001 and September 6, 2002. The renewal study activities included an interview with the executive director, chief counsel and social worker. A review of the childrens, foster and adoptive parent records and logs was conducted as well as staff personnel records. Visits, interviews and home inspections of adoptive and foster parent homes was also conducted. Responses to adoptive parent surveys were received and reviewed. An exit interview with the executive director and chief counsel was conducted on October 24, 2002.

## II. Program Synopsis

Facility #: 400537 and 400517

License #: 146298 and 146299

Expiration Date: 5/20/2001

Ages Served: 0 - 18

Program Type: adoptions

Characteristics of Children Served: During this licensing period, domestic newborn and                                             infants, in need of adoption services.

Number of adoption placements: October, 2001 to September, 2002 a total of 14                                                    adoption placements.

Current Number of Approved Homes: foster care: 3

adoption: 5

### III. Additional Observations

The responses to the Office of Child Care Services survey included many positive comments from adoptive families. Some of the written comments received regarding the agency and its staff included: " We really enjoyed our social worker that came to our house, she was very helpful and had a lot of information to share with us", "Honest and straight forward... They provided good advice and kept us calm", "Truthful straight forward communication.", "Their utmost concern and care for the children, their comprehensive knowledge and complete thoroughness for details. They were a pleasure to deal with and made the process a wonderful experience." "They protected us from some very bad decisions we could have made. These are some smart, committed people".

### IV. Updates and Changes

None noted at the time of this licensing study.

### V. Corrective Action Required

See attached Plan for Compliance. Please complete and return your plan within thirty days.

### VI. Technical Assistance / Recommendations / Comments

The licensor wishes to thank the agency director, staff, foster and adoptive parents for their cooperation and assistance during the course of this unusually long licensing renewal study.

Michael Curran
Licensing Specialist

# Statement of Non-compliance

| | |
|---|---|
| **Facility Information:**<br><br>Facility ID:  **400537**<br>Facility Name: Boston Adoption Bureau, Inc.<br>14 Beacon Sreet<br>Boston, MA 02108<br><br>Tel:  617-227-1336 | **Date of Report:  10/28/2002**<br><br>**Licensee Information:**<br><br>Licensee ID:  **1400517**<br>Licensee Name:  Boston Adoption Bureau, Inc.<br><br>Boston, MA 02108<br><br>Tel: 617-227-1336 |

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN  (Describe how, when and by whom, e.g. , correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.03(02)(a)04 | A review of submitted documetation revealed a lack of a current agency budget. Licensee shall submit a written plan of financial capability projected for at least a 12 month period. | | | |
| 5.03(02)(a)04( d) | A review of the agency's policies and procedures revealed that the licensee's written policy describing the licensee's, the birth parents', the foster parents', the adoptive parents' and the adoptive parent[ applicants' respective financial responsibilities, if any, for the entire foster and adoption process is incomplete. Licensee shall submit a policy and fee schedule that details: cost of clinical hour; details of contracted services; an explanation of escrow accounts; an explanation of how the agency helps less affluent persons to become adoptive parents; explanation of agency placement fee's. | | | |
| 5.03(02)(a)05 | A review of submitted documentation revealed an incomplete agency grievance and appeal procedure.  Licensee shall submit a complaint policy which includes a provision that the complaint will be handled by someone other that the person who worked directly on the complainants case and grievance appeal procedure which shall include the opportunity for the complainants to avail themselves of  at least one level of administrative review above line staff and their immediate supervisors. | | | |

02102809314797

02/25/2003

# Statement of Non-compliance

| | Date of Report: **10/28/2002** |
| --- | --- |
| **Facility Information:** | **Licensee Information:** |
| Facility ID: **400537** | Licensee ID: **1400517** |
| Facility Name: Boston Adoption Bureau, Inc. | Licensee Name: Boston Adoption Bureau, Inc. |
| 14 Beacon Street | |
| Boston, MA 02108 | Boston, MA 02108 |
| Tel: 617-227-1336 | Tel: 617-227-1336 |

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
| --- | --- | --- | --- | --- |
| 5.03(02)(a)09, 5.04(05)(f) | A review of submitted policies and procedures revealed an incomplete agency plan for staff training. Licensee shall sumit a revised plan for staff training which shall include, but not be limited to, current issues in placement. | | | |
| 5.03(02)(a)10, 5.09(04)(b) | A review of the agencies submitted written procedure for the evaluation of children and the development of service plans revealed counseling and medical services are offered to birthmothers from the time of referral to the agency until a couple of months after the birthmother surrenders. The licensee shall submit written procedures for the development of service planning which indicates that the licensee shall make available at no cost to the birthparents, either directly or by referral, any necessary services to the birth parents following adoption placement of their child. These services shall include counseling concerning adoption related issues such as identity, roles and relationships. | | | |
| 5.03(02)(a)12, 5.10(05)(b) | A review of the licensee's submitted policies and procedures revealed that the agency's assessment procedures states that "If necessary, all other members of the adotive parent applicant's household will be interviewed relative to the adoptive process." Licensee shall submit a revised assessment procedure which indicates that the licensee shall interview all other members of the applicants household, appropriate to the age of the member of the household. | | | |

02/25/2003

# Statement of Non-compliance

| | Date of Report: 10/28/2002 |
|---|---|

**Facility Information:**

Facility ID:       400537

Facility Name: Boston Adoption Bureau, Inc.

14 Beacon Street

Boston, MA 02108

Tel:   617-227-1336

**Licensee Information:**

Licensee ID:       1400517

Licensee Name:  Boston Adoption Bureau, Inc.

Boston, MA 02108

Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.03(02)(a)12 | A review of the agencies submitted procedures for assessment of foster homes states that "If the prospective foster family has already a homestudy, they need only complete an update." Licensee shall submit a revised procedure which indicates that the licensee may perform a limited foster parent assessment if the licensee receives a foster parent assessment completed not more than twelve months prior to the current application for approval. | | | |
| 5.03(02)(b)03 | A review of submitted agency policies and procedures revealed that the agency policy states that the agency "does not place into its care any child above the age of three(3) and therefore no educational plans are necessary". Licensee shall submit revised policy for meeting the educational needs of the children served which includes referals to such services such as Early Intervention. | | | |
| 5.03(03)(a)02 | A review of submitted documentation revealed an incomplete plan for involving adult adoptees in the development of agency policy. Licensee shall submit revised agency plan which involves adult adoptees in the development of agency policy. | | | |
| 5.03(03)(a)03 | A review of the agency's written policy and procedures revealed an incomplete and inconsistent procedure for internal investigations and reporting allegations of child abuse and neglect. Licensee shall submit a complete agency policy and procedure for internal investigations and reporting allegations of child abuse and neglect. | | | |

02/25/2003

# Statement of Non-compliance

| | |
|---|---|
| **Facility Information:** | **Date of Report: 10/28/2002** |

**Facility Information:**

Facility ID:    **400537**                                    Tel:  617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
                14 Beacon Street
                Boston, MA 02108

**Licensee Information:**

Licensee ID:    **1400517**                                  Tel: 617-227-1336
Licensee Name:  Boston Adoption Bureau, Inc.

                Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.03(03)(a)04 | A review of submitted agency policies and procedures revealed inconsistent description of agency salary ranges. Licensee shall submit agency salary ranges. | | | |
| 5.03(03)(b)02, 5.09(04), 5.10(19) | A review of submitted agency policy and procedures revealed a lack of a written description of follow-up services. Licensee shall submit a complete written description of follow-up services | | | |
| 5.04(01)(a)04 | A review of submitted agency policies and procedures revealed that the agency policy regarding services to adult adoptees states that "Since the age of our oldest child placed is only eight years old, the agency has not had the need to adopt a policy with respect to services to be provided to adult adoptees. The agency will develop a policy as the need arises." The agency was established in 1983. Licensee shall submit an updated agency policy regarding services to adult adoptees. | | | |
| 5.04(01)(a)05 | Administrators interview revealed the lack of an agency annual evaluation. Licensee shall submit a statement of purpose which shall include a plan for the annual evaluation of its services, which shall give special attention to its performance in promoting permanency for the children in its care. | | | |

02/25/2003

0210280371470?

# Statement of Non-compliance

Date of Report: **10/28/2002**

**Facility Information:**

Facility ID: **400537**
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

Tel: 617-227-1336

**Licensee Information:**

Licensee ID: **1400517**
Licensee Name: Boston Adoption Bureau, Inc.

Boston, MA 02108

Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.04(05)(f)04 | A review of agency personnel records revealed inconsistent documentation of employee annual evaluation. Licensee shall submit written assurance that the agency shall maintain a personnel record for each employee which includes an annual evaluation. | | | |
| 5.04(05)(f)05 | A review of agency personnel records revealed an incomplete documentation of employee training. Licensee shall submit written assurance that the licensee shall maintain personnel records for each employee which includes documentation of training and number of training hours. | | | |
| 5.09(01)(i), 5.04(03)(g) | A review of birthparent records revealed that the signed acknowledgement of the receipt of the agency's grievance and appeal procedure revealed that the written grievance and appeal was received by the birth parent, at the time of the surrender of the ████. Licensee shall submit written assurance that the agency shall make available to all persons receiving services, a copy of the complaint policy. | | | |
| 5.09(03)(g) | A review of adoptive parent records revealed an "Identified Adoption Agreement" which includes the statement that "payments may be made directly for legally valid reasonable birthmother expences." Licensee shall submit written assurance that no payment shall be made directly to birthparents, or to anyone on behalf of the birthparent, by anyone other than by the licensee. | | | |

02/25/2003

# Statement of Non-compliance

| | |
|---|---|
| **Facility Information:** | Date of Report: **10/28/2002** |
| Facility ID: **400537**<br>Facility Name: Boston Adoption Bureau, Inc.<br>14 Beacon Street<br>Boston, MA 02108      Tel: 617-227-1336 | **Licensee Information:**<br>Licensee ID: **1400517**<br>Licensee Name: Boston Adoption Bureau, Inc.<br>Boston, MA 02108      Tel: 617-227-1336 |

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.10(01)(e) | A review of the agency's submitted policies and procedures revealed that the the agency's financial responsibility statement states that "adoptive parents are presented with a fee schedule describing services and fee's when they receive their application". The licensee shall submit revised agency financial responsibility statement that indicates that the agency shall provide in writing, to all prospective adoptive applicants and upon request to any person, the agency's policy regarding financial responsibilities. | | | |
| 5.10(02)(c),<br>5.03(02)(a)12 | A review of the agency's submitted policies and procedures revealed an incomplete agency philosophy and policy regarding discipline of children. The licensee shall submit a complete written agency philosophy and policy regarding discipline of children. | | | |
| 5.10(05)(d) | A review of agency homestudy assessments revealed inconsistent written documentation of: health history of applicants; attitude of extended family's towards the adoption; recommendation as to the age, sex and characteristics of children. Licensee shall submit written assurance that the agency shall document a complete written homestudy report. | | | |
| 5.13(03)(d) | A record review of foster and adoptive parent records revealed inconsistent documentation of case notes. Licensee shall submit written assurance that the agency shall maintain foster and adoptive parents records which incudes case notes. | | | |

02/25/2003

# Statement of Non-compliance

| | Date of Report: **10/28/2002** |
|---|---|

**Facility Information:**

Facility ID:   **400537**          Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
                14 Beacon Street
                Boston, MA 02108

**Licensee Information:**

Licensee ID:   **1400517**          Tel: 617-227-1336
Licensee Name: Boston Adoption Bureau, Inc.

                Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| | | | | |

Michael Curran
Licensing Specialist

**I have reviewed the above non-compliances and have specified my plan and date of correction for each non-compliance.**

LICENSEE'S SIGNATURE _____          DATE: _____

0210280933I4797

02/25/2003

# Statement of Non-compliance

| Complaint Number: | 26105 | | Date of Report: | 02/08/2001 | |
|---|---|---|---|---|---|

**Facility Information:**
Facility ID:    **400537**                         Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

**Licensee Information:**
Licensee ID:    **1400517**                         Tel: 617-227-1336
Licensee Name:  Boston Adoption Bureau, Inc.

Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.04(01)(b) | Adoptive parent record review revealed lack of a written agreement with the agency which conducted the adoptive family homestudy, and is the receiving agency for post placement supervision and Boston Adoption Bureau, the placement agency. Licensee shall submit written plan for OCCS approval describing the agencies plan for documentation describing clearly which services are provied directly by the agency, by referral, or through written agreements with other persons and copies of those agreements | | | |
| 5.06 | Record review of the childs record revealed incomplete intake evaluation. Licensee shall submit a plan detailing how the agency shall, prior to accepting any parents surrender of his/her child for adoption, complete a full evaluation by qualified professionals, unless such an evaluation has been documented in the referral or application. | | | |
| 5.09(03). 5.09 | Interview with agency administrators, record review and review of agencies policies and procedures revealed that the agency charges birth parents for the cost of foster care of a child the agency has placed in a foster home "if the birthparent decides to parent the child, and and voluntarily removes the child from foster care." "The birth parent is assessed a fee of $15.00 for each day the child is in care." Licensee shall submit a revised policy which clearly indicates that birth parents shall neither benefit nor suffer financially as a result of their pregnancy. | | | |

# Statement of Non-compliance

| Complaint Number: | 26105 | Date of Report: | 02/08/2001 |
| --- | --- | --- | --- |

**Facility Information:**
Facility ID:   **400537**                                    Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
                        14 Beacon Street
                        Boston, MA 02108

**Licensee Information:**
Licensee ID:   \  **1400517**                          Tel: 617-227-1336
Licensee Name: Boston Adoption Bureau, Inc.
                        Boston, MA 02108

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Onl |
| --- | --- | --- | --- | --- |
| 5.10(05)(e) | Record review of the adoptive family record revealed lack of a homestudy update by Boston Adoption Bureau. Licensee shall submit a plan that details how agency shall perform a limited adoptive parent assessment if the licensee receives a adoptive parent assessment performed in another state in accordance with the laws of such state, completed not more than 12 months prior to the current application for approval. | | | |
| 5.13(02)(a) | Record review of the childs record revealed an incomplete face sheet. Licensee shall submit a written plan detailing how the licensee shall maintain a written record for each child which includes a face sheet which identifies the child by the required information. | | | |
| 5.13(03)(a) | Record review of the adoptive family record revealed a lack of the adoptive family's written application. Licensee shall submit a plan detailing how the agency shall maintain a written record which shall include an adoptive parents written application. | | | |
| 5.13(03)(d) | Record review of the adoptive family record revealed a lack of case notes. Licensee shall submit a plan detailing how the licensee shall maintain a written record for adoptive parents which includes case notes documenting services set forth in CMR 5.10. | | | |

# Statement of Non-compliance

| Complaint Number: | 26105 | | Date of Report: | 02/08/2001 |
|---|---|---|---|---|

**Facility Information:**

Facility ID:   **400537**                        Tel: 617-227-1336
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

**Licensee Information:**

Licensee ID:   **1400517**
Licensee Name: Boston Adoption Bureau, Inc.

Boston, MA 02108                        Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g. , correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| | | | | |

Michael Curran
Licensing Specialist

**I have reviewed the above non-compliances and have specified my plan and date of correction for each non-compliance**

LICENSEE'S SIGNATURE _____        DATE: _____

APR 0 6 2001

**BOSTON ADOPTION BUREAU, INC.**

Licensed in New Hampshire

Marilyn Speiser, LICSW
*executive director*

Jeffrey M. Kaye, ESQ.
*chief counsel*

April 4, 2001

The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Office of Child Care Services
Beverly Office
66 Cherry Hill Drive, Suite 100
Beverly, MA  01915


Attn: Lucille Foran
      Director of Residential and Placement


RE: Boston Adoption Bureau, Inc.
    Complaint #26105


Dear Ms. Foran,

     Thank you once again for agreeing to meet with Marilyn and
myself on March 14, 2001, to discuss the nature of this
particular complaint (#26105).  While I certainly thought our
meeting was constructive, in allowing us to focus on the real
problematic areas of this case, nevertheless, we are still left
with very vague notions of why the Office for Child Care Services
feels that this complaint and non-compliances arise to the level
of "serious".  Initially, in phone conversations you inferred
that had the Agency followed the proper regulatory roadmap, this
baby would not have ended up in placement.  Hindsight is always
20-20, as the saying goes, but this Agency denies violating any
statutory or regulatory requirements that would have ferreted out
the whereabouts of this birthfather prior to placement, and in
fact, none are cited.  I would also disagree with your parting
statement at the meeting in which you indicated because of the
number of non-compliances the "Office" considers  this of a
"serious nature".  Again, in addressing each non-compliance
separately it appears that some were merely different
interpretations of vague, regulatory language, others were
bookkeeping omissions, later corrected, and one non-compliance
had even been approved in our prior licensure.

     We will address herein what we find to be inaccuracies  in
Mr. Curran's narrative as well as the non-compliances cited.  The

## BOSTON ADOPTION BUREAU, INC.

"Summary of Findings" written by Mr. Curran was both factually accurate, in most respects, and thorough. However, the Agency would like to address some key points in the summary that are inaccurate and which he impliedly faults the Agency for carelessness. This case, as many which have gone before, and many which will occur again in Massachusetts and every other state in the United States, involves a sophisticated birthmother who deliberately lies to an Agency naming the birthfather but saying that she does not know his whereabouts, how to contact him or anyone in his family. She is totally committed to placing her baby for adoption, having contacted the potential adoptive parents herself, and fully knows the birthfather's rights would need to be terminated in Court. The following we find to be inaccuracies in the "Summary of Findings":

1. (page 1 - last paragraph) - There was no meeting on ████████ with the birthmother, her then husband, the executive director and the foster mother. There was a meeting with the executive director and the foster mother on ████████ when she placed her child in foster care.

2. (page 2) - The birthmother indicated to Ms. Speiser initially that the birthfather was "down south somewhere". Ms. Speiser then asked for additional information and the birthmother then indicated he was "somewhere in South Carolina".

3. (page 2 - last sentence, 1st paragraph) - The Agency did document in both the Intake Evaluation, the Service Plan and the case notes that the birthmother refused to accept counseling. (see attached intake and service plan)

4. (page 2) Statutory language in M.G.L.A. Chapter 210, section 2 is narrowly construed and since this child was born in wedlock, and not out of wedlock, no such affidavit was required. The birthmother did indicate that the birthfather's last known address was her address before he left.

5. (page 2) The biological mother did not pay $15.00 per day nor any monies for the baby while in foster care. We did not, nor would we ever, charge two fees for the same service.

6. (page 2) There is no statutory or regulatory timeframe to submit a request with DSS for a parental responsibility claim in the context of filing a petition pursuant to M.G.L.A. Chapter 210, section 3. Two requests were

**BOSTON ADOPTION BUREAU, INC.**

subsequently submitted and todate the birthfather has still not filed a claim.

I would hope that in the future there can be some kind of dialogue prior to the issuance of such a strongly worded warning in your letter of February 9, 2001, which has now become part of our permanent record. The Agency's response to the cited non-compliances are attached. We look forward to resolving these non-compliances and concluding our re-licensure expeditiously. We also look forward in the future towards working cooperatively with our licensing authorities to resolve any issues which may arise.

Thank you for your courtesy in this matter.

Very truly yours,

Marilyn Speiser

Jeffrey M. Kaye

/amc

cc. Michael Curran
    Kelly Buckley

# Statement of Non-compliance

Complaint Number:  26105

**Facility Information:**

Facility ID:  400537
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108                     Tel: 617-227-1336

**Licensee Information:**                     Date of Report: 02/08/2001

Licensee ID:  140517
Licensee Name:  Boston Adoption Bureau, Inc.

Boston, MA 02108

Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.04(01)(b) | Adoptive parent record review revealed lack of a written agreement with the agency which conducted the adoptive family homestudy, and is the receiving agency for post placement supervision and Boston Adoption Bureau, the placement agency. Licensee shall submit written plan for OCCS approval describing the agencies plan for documentation describing clearly which services are provided directly by the agency, by referral, or through written agreements with other persons and copies of those agreements. | See attachments for compliances | | |
| 5.06 | Record review of the childs record revealed incomplete intake evaluation. Licensee shall submit a plan detailing how the agency shall, prior to accepting any parents surrender of his/her child for adoption, complete a full evaluation by qualified professionals, unless such an evaluation has been documented in the referral or application. | See attachments for compliances | | |
| 5.09(03), 5.09 | Interview with agency administrators, record review and review of agencies policies and procedures revealed that the agency charges birth parents for the cost of foster care of a child the agency has placed in a foster home "if the birthparent decides to parent the child, and and voluntarily removes the child from foster care." "The birth parent is assessed a fee of $15.00 for each day the child is in care." Licensee shall submit a revised policy which clearly indicates that birth parents shall neither benefit nor suffer financially as a result of their pregnancy. | See attachments for compliances | 4/5/01 | |

# Statement of Non-compliance

Complaint Number:    **26105**

**Facility Information:**

Facility ID:    **400537**
Facility Name: Boston Adoption Bureau, Inc.
14 Beacon Street
Boston, MA 02108

Tel: 617-227-1336

Date of Report: **02/08/2001**

**Licensee Information:**

Licensee ID:    **1400517**
Licensee Name:  Boston Adoption Bureau, Inc.

Boston, MA 02108

Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| 5.10(05)(e) | Record review of the adoptive family record revealed lack of a homestudy update by Boston Adoption Bureau. Licensee shall submit a plan that details how agency shall perform a limited adoptive parent assessment if the licensee receives a adoptive parent assessment performed in another state in accordance with the laws of such state, completed not more than 12 months prior to the current application for approval. | See attachments for compliance | | |
| 5.13(02)(a) | Record review of the childs record revealed an incomplete face sheet. Licensee shall submit a written plan detailing how the licensee shall maintain a written record for each child which includes a face sheet which identifies the child by the required information. | See attachments for compliance | | |
| 5.13(03)(a) | Record review of the adoptive family record revealed a lack of the adoptive family's written application. Licensee shall submit a plan detailing how the agency shall maintain a written record which shall include an adoptive parents written application. | See attachments for compliance | | |
| 5.13(03)(d) | Record review of the adoptive family record revealed a lack of case notes. Licensee shall submit a plan detailing how the licensee shall maintain a written record for adoptive parents which includes case notes documenting services set forth in CMR 5.10. | See attachments for compliance | 4/5/01 | |

Statement of Non-compliance

Complaint Number:    26105

Date of Report:  02/08/2001

Facility Information:

Facility ID:  400537
Facility Name: Boston Adoption Bureau, Inc.
          14 Beacon Street
          Boston, MA 02108

Tel: 617-227-1336

Licensee Information:

Licensee ID:    140517
Licensee Name:  Boston Adoption Bureau, Inc.

                Boston, MA 02108

Tel: 617-227-1336

| REGULATION | STATEMENT OF NON-COMPLIANCE | CORRECTION PLAN (Describe how, when and by whom, e.g., correction has been / will be made. Please be specific) | DATE | Status Of Compliance (OCCS Use Only) |
|---|---|---|---|---|
| | | | | |

I have reviewed the above non-compliances and have specified my plan and date of correction for each non-compliance.

LICENSEE'S SIGNATURE _____  DATE: ___4/5/01___

Michael Curran
Licensing Specialist

02/09/2001

0011241636135 60

# Children's Hospital
300 Longwood Avenue, Boston, MA 02115

Telephone (617) 355-6000

## DEVELOPMENTAL EVALUATION PROGRAM

MAY 23, 1997

PATIENT NAME:     HOBLEY, NITANJU
MEDICAL RECORD#    100-01-73
DATE OF BIRTH:     01/28/92
DATE OF VISIT:     04/03/97

ATTENDING:     Bruce Cushna, PhD

PSYCHOLOGICAL STUDY

DATE OF BIRTH:     01/28/92
CHRONOLOGICAL AGE:     5-2/12 years

PROCEDURES:    1. Weschler, Preschool and Primary Scale of Intelligence - R
               2. Drawing of Basic Geometric Designs
               3. Draw-a-Person Test
               4. Clinical and Caregiver Interviews

BACKGROUND: Nitanju has been seen by the 2-6 Team one year previously. She comes from a sibship of 4. She and her brother Nathaniel have been placed together with Georgia McEaddy in Roslindale. Nathaniel attends school at L.C.D.C.; Nitanju attends the Brumfeld Academy in Dorchester. There are also another brother and sister in separate foster homes. Ms. McEaddy would like to obtain foster care of Nitanju's sister as well. Ms. McEaddy reports substantial gains in Nitanju's development in the 2 years in which she has resided with her. Also she feels that Nitanju is much more communicative and able to follow directions. However, there are concerns about Nitanju's inability to settle down and some unusual flapping movements as well as short attention span. Nitanju goes for weekly psychotherapy with Mary Ann Bynoe, at Codman Square Mental Health Center. She also has had a recent evaluation in Children's Hospital Neurology by Dr. David Holtzman, who felt Nitanju was easily distracted and that there were indications of learning disabilities, but no "focal or lateralizing neurologic abnormalities". Dr. Holtzman also follows Nathaniel.

OBSERVATIONS: Nitanju was pleased to be back in this Clinic and took pride in demonstrating many accomplishments/ However, she was extremely flighty, even in the waiting room, moving from activity to activity in rapid sequence. She also jumped about considerably and had a lot of bodily movement which did not subside during the 1-1/2 hours of evaluation. It was not possible for her to remain seated for more than 5 minutes, and she not only jumped about the room, but climbed up on the window ledge and chairs. It was necessary during verbal testing to allow her to move about the room in order to obtain optimal performance. When this was done, she answered such items as Information and Vocabulary with facility. Vocabulary was advanced with a scaled score of 14, to the 6-1/2 year level or more than a year beyond chronological age. Also her Information background was rich, and she could account for most factual things as kindergarten children do, including sequencing the days of the week and answering such fact as there being 5 pennies in a nickel. Counting skills were reasonably good, although she needed to be reminded to hold to correspondence. Her comparatives of greater than, less than or equal to, were all carried out well, as were Similarities in her understanding the concept of set as well as common attributes. In drawing, she was extremely impulsive, frequently saying she could not perform, then proving that indeed she was quite capable. She drew adequate squares, but then proceeded to draw facial features within them.

AUTHENTICATED BY THE ELECTRONIC SIGNATURE OF Bruce Cushna, PhD ON 05/23/97.

# Children's Hospital
300 Longwood Avenue, Boston, MA 02115                                    Telephone (617) 355-6000

## DEVELOPMENTAL EVALUATION PROGRAM                          MAY 23, 1997

PATIENT NAME:        HOBLEY, NITANJU
MEDICAL RECORD#      100-01-73
DATE OF BIRTH:       01/28/92
DATE OF VISIT:       04/03/97

ATTENDING:       Bruce Cushna, PhD

Nitanju's ability to discuss fears and emotional reactions undoubtedly related to the successful course of this therapy to date. However, she is a very needy child who has made remarkable progress over the time in which she has been followed here. Yet, this needs to be sustained by therapy provision on a continuing basis. Commendations are due to the fine work that has been done over the course of this treatment.

3. Behaviorally, Nitanju does respond to firm limits and one-on-one adult direction. The need for reward and reinforcement were discussed fully with the foster mother. It would seem that she is providing adequate avenues for motivation and structuring needed to help Nitanju advance these causes. Her structuring of disciplined situations was also discussed as well as the need for sound behavioral procedures. The need for time out room provisions and also for consistency in reacting to consequences was reviewed thoroughly. Ms. McEaddy's current program does indeed seem adequate and it would be well for her to have behavioral consultation to be able to reinforce the needs for consistency and close adherence to such programming.

4. Once Nitanju's attentional problems have been addressed, and if she is placed upon medication, it may be well to see her again in six months to see what further advancements are made and to make the attempt to further document what is believed at this time to be brighter abilities and qualities.

Bruce Cushna, Ph.D.
Senior Associate in Psychology

CC: Department of Social Services
    Attn:  Anna Lee Brown
    123 Morton Street
    Jamaica Plain, MA 02130;

CC: Ms. Mary Ann Bynoe
    Codman Square Mental Health Center
    637 Washington Street
    Dorchester, MA 02124

CC: Mary Lee Boyce, M.D.
    199 Center Street
    West Roxbury, MA 02132

CC: David Holtzman, M.D., Ph.D.
    Dept. of Neurology
    Children's Hospital, Fegan 11

# Children's Hospital

300 Longwood Avenue, Boston, MA 02115                              Telephone 617-355-6700

## DEVELOPMENTAL EVALUATION PROGRAM

PATIENT NAME:        HOBLEY, NATHANIEL
MEDICAL RECORD#      033-92-98
DATE OF BIRTH:       10/24/88
DATE OF VISIT:       05/30/97

ATTENDING: Bruce Cushna, PhD

### PSYCHOLOGICAL STUDY

DATE OF BIRTH:        10/24/88
CHRONOLOGICAL AGE:       8-1/2 years.

PROCEDURES: 1. Weschler Preschool and Primary Scale (attempted).
            2. Binet Picture Naming Vocabulary.
            3. Drawing of basic geometric designs.
            4. Clinical observations.

BACKGROUND: Nathaniel is well known to this Medical Center. He is followed closely in Neurology by Dr. David Holtzman, who has tried a variety of medications to treat his hyperactivity. He has also been followed by Dr. Szymanski in the Center on Autism and Related Disorders. Nathaniel has been considered to have a Pervasive Developmental Disorder with autistic features and also oppositional behavioral problems and significant mental retardation. His social background is troubled; all his siblings have been removed from their natural parents. This disturbed social situation and succession of foster placements for Nathaniel is well documented in the hospital records. He is currently residing with a specialized foster mother, Ms. Georgia McEaddy. His sister Natanju also resides with Ms McEaddy. Initially he was schooled in the Boston Public Schools in programming for autistic children, but for the past two years has been enrolled in Dr. Miller's language program at LCDC in Jamaica Plain. The school reports indicate rather good progress over both years and advanced communication skills. However, there has been difficulty in keeping Nathaniel focused and on topic. The school reports that he can work on tasks up to about 45 minutes and that he has fairly good child/adult interactions albeit at a compromised level. The current situation is complicated by increased behavioral outbursts. Ms. McEaddy reports that he is becoming more and more resistant and less willing to follow directives at home. She attributes much of this problem to inconsistencies between her handling of the child and the way he is held to limits at school. She is highly desiring a transfer to a more behavioral oriented program for the coming school year. This is the first contact with Nathaniel with this psychologist, although he had seen Nantanju twice previously. However, the Children's Hospital records thoroughly describe Nathaniel's progress over time.

OBSERVATIONS: Nathaniel was occupied in the waiting room and did not want to come with the examiner to the testing room. He was accompanied by Georgia McEaddy and Nantanju, and Ms. McEaddy wanted to remain with Nathaniel during testing, which was not felt feasible due to the fact that Nantanju was very distracting to him. However, the examiner was able to work with Nathaniel for about 45 minutes alone at the beginning of the morning when he was fresh and seemed most willing to cooperate. He worked on the Object Assembly puzzles and had considerable difficulty in rotating some of the pieces. He required maximal time to complete the puzzles, although it was noted that he eventually got all of them correctly. His timing would be appropriate to that of a 5 year old. The attempt was made to do the Animal Pegs color-matching task in order to measure attention span. However, Nathaniel was becoming very resistant at this point, to the degree of continually knocking pegs on the floor, of intentionally mismatching colors and in general becoming uncooperative. At this point we

# Children's Hospital
300 Longwood Avenue, Boston, MA 02115                                    Telephone 617-355-6000

## DEVELOPMENTAL EVALUATION PROGRAM

PATIENT NAME:      HOBLEY, NATHANIEL
MEDICAL RECORD#    033-92-98
DATE OF BIRTH:     10/24/88
DATE OF VISIT:     05/30/97

ATTENDING: Bruce Cushna, PhD

switched to picture-naming, using the Binet pictures, with which Nathaniel was successful in naming 10. This would roughly score at a 3 year level. He made some common 3 year level mistakes such as calling a knife "cut" and a coat "shirt". The picture naming tasks seemed to please him, and it is believed that this is a directive that he understood easily and one that he is familiar with in school. With attempts at drawing basic geometric designs, he would not cooperate in making any letters, not even N. However, he would produce circles and crosses. When requested to copy a modeled triangle, he produced only perseverative circles. When 3 lines through a common point was modeled for his, he drew a Russian cross instead and seemed unable to get the lines to converge. This task seemed somewhat frustrating to him. We again returned to Animal Pegs in attempts to match animals to colors. He instead knocked the pegs to the floor, began to get out of his seat and slide under the table and eventually went over to the light switch and began flicking it on and off. He seemed to want to have a period of calming himself and so was allowed to sit looking out the window for 2 minutes. We then returned to try other tasks, such as picture completions or matching similar designs. At this time we had been working for about 45 minutes, and it was felt that we were at the end of his endurance as he was becoming notably restless. We went out to the waiting room where he rode the toy car and I talked to Ms. McEaddy about some of the problems. We then returned to the testing room with Ms. McEaddy to see how she might direct him on some of these tasks. The attempts were notably disastrous, and he retreated from most directives. He began putting objects into his mouth and becoming more and more oppositional. For this reason, the rest of the session was spent in discussion with Ms. McEaddy about her desires in terms of his programming. This clearly was the end of the testing session for this day.

DISCUSSION: According to previous hospital records and his school reports of this current year, it would appear that Nathaniel is moving out of some of his more withdrawn and aloof autistic behaviors and is capable of more sustained adult/child contacts. He also seemed to have a good relationship with his sister and in regard to interpersonal relationships, he seems to be developing more sustained contacts. However, at this time the best performance elicited would be in terms of 5 year Object Assembly puzzles. His drawing skills certainly would not derive much more than 3 year level standards, and he would not cooperate in demonstrating any abilities such as picture matching or picture memories. His 3 year old picture-naming vocabulary would also point to a significant degree of retardation, which at age 8 would be of major concern in terms of the type of educational services which need to be planned. The LCDC reports would indicate some progress, but also at a significantly retarded level. For this reason, and because of the increasing resistance and oppositional behavior, it is recommended that cautious planning be undertaken in considering the coming school year.

IMPRESSION: 1. Pervasive Developmental Disorder (299.9).
            2. Moderate mental retardation (318.0).
            3. Oppositional behavior (309.4)

CONSIDERATIONS: 1. Contact was made with Dr. Miller regarding Nathaniel's current school situation to see what contributions they would make for his planning for the coming year. The behavioral issues do seem pronounced at

# Children's Hospital
300 Longwood Avenue, Boston, MA 02115                                    Telephone 617-355-6000

## DEVELOPMENTAL EVALUATION PROGRAM

PATIENT NAME:        HOBLEY, NATHANIEL
MEDICAL RECORD#      033-92-98
DATE OF BIRTH:       10/24/88
DATE OF VISIT:       05/30/97

ATTENDING: Bruce Cushna, PhD

the current time and some consideration and assistance must be given in that area. Also Ms. McEaddy seems somewhat stressed and frustrated by her interaction with the school at this time and some mediation must take place to smooth this out.

2. Of course, Nathaniel will be continued to be seen in Neurology by Dr. Holtzman. However, notations from Dr. Holtzman at the current time seem to indicate that he would prefer a type of vacation from medications. Also, there is a lot of concern about what the real reaction to these medications are. It would seem that there needs to be some type of consolidated team effort to coordinate programs for both Nathaniel and Nantanju at the present time. Who will be the best resource for coordinating this will be taken up by the contacts with the Department of Social Service in coming weeks.

3. It is self obvious that unless Nathaniel's behavior is addressed in much more stringent programming that can be coordinated between the home and the school, the situation will surely deteriorate. Because of the complexity here and the hostility that exists between certain parties, the planning for the resolution of this problem will take much more than one morning contact. This follow-up must occur, however, over the next few weeks in the interest of these children.

*Bruce Cushna*

Bruce Cushna, Ph.D
Senior Associate in Psychology

CC: David Holtzman, M.D.
    Neurology Department, Fegan 11
    Children's Hospital

CC: Ms. Annalee Brown
    Morton Street DSS
    123 Morton Street
    Jamaica Plain, MA 02130

CC: Ms. Georgia McEaddy
    49 June Street
    Roslindale, MA 02131

Authenticated by the electronic signature of
Bruce Cushna, PhD        on    06/12/97

ORIGINATED BY:    Bruce Cushna



William F. Weld
Governor
◆
Argeo Paul Cellucci
Lieutenant Governor
◆
Gerald Whitburn
Secretary
◆
Linda K. Carlisle
Commissioner

# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Social Services
## Morton Street Area Office
123 Morton Street, Jamaica Plain, Massachusetts 02130
Tel (617) 524-5474 ✦ Fax (617) 524-5296

Ms. Georgia McEaddy
49 June Street
Roslindale, MA
    02131

July 11, 1997

Dear Ms. McEaddy;

I am writing for several reasons. First, when we last spoke we had talked about discussing some of Nathaniel's behaviors while at camp. Anna Lee Brown had tried several times to set up some time for this discussion; however was not able to connect with you. Would you be able to come into the office next week, preferably the afternoon of 7/17/97 (Thursday)? I also have times available Tuesday afternoon, all day Wednesday and all day Friday. Please let me know if any of these times would be convenient.

Secondly, to address the issue of PACT payments for Nitanju, I had talked with you about bringing the issue to a Fair Hearing to determine what, if any monies are owed to you. Attached, please find instructions for requesting a Fair Hearing.

Additionally, as we discussed when reviewing the service plan, the Department was to make a referral to the PACT team (Pre and Post Adoption Consultation Team) who would help you address issues of adoption. I have made the referral and I am waiting for a response from the program.

Finally, you had asked me to state, in writing, my reasons for not supporting a transfer from LCDC to the May Institute for Nathaniel. My reasons stem from the need for children, like Nathaniel, to have a consistent educational program. The May Insitute has a different theoretical approach to educationg their students, than the LCDC program. Reports have indicated that Nathaniel has done well with this program and I do not believe that there is sufficient justification to move him. I know that you do not agree

# DARE
## Family Services, Inc.

Boston Public School Department
26 Court Street
Boston MA, 02108

February 27, 1995

To Whom it May Concern,

Nathaniel Hobley is in the permanent custody of the Department of Social Services and in the care of Dare Family Services. Nathaniel is placed into the home of Ms. Georgia Mc Eady, a Dare Family Services' licensed Mentor. Ms. Mc Eady is also Nathaniel's educational advocate.

As you are aware, a January 1995 Core Evaluation resulted in a prototype for Nathaniel which was rejected by Ms. Mc Eady. I strongly support that rejection, and believe that Nathaniel is in need of a .5 prototype.

Nathaniel has pervasive developmental disorder with autistic like behavior. His behavior at the Prescott school has been "erratic", as described by Prescott staff, and quite often requiring one on one teacher/child supervision and instruction. This has been impossible to provide, and the result has been that Nathaniel and the other children in the class are not getting the proper attention or education that they deserve. Nathaniel requires speech and language therapy, intensive behavior modification and physical as well as occupational therapy, on a daily basis. Clearly these needs cannot be met at the Prescott School.

Ms. Mc Eady has done a wonderful job creating a nurturing and behavior management for Nathaniel. He has truly become a member of her family. We may ask that the Boston Public School Department do their part, by placing Nathaniel into a .5 setting that will meet his complete needs.

Please call me at (617) 469-2311 if you have any questions. Thank you for your consideration in this matter.

Sincerely,

Paul A. Cataldo
Program Director

PC/sk

NEW ENGLAND BAPTIST
MEDICAL ASSOCIATES
Affiliated with New England Baptist Hospital and CareGroup

May 15, 2003

AFFIDAVIT of
DR. MARY LOU BUYSE

My name is Dr. Mary Lou Buyse and I state the following as true and accurate:

1.    I am a licensed physician in Massachusetts

2.    I have been the family physician for the McEaddy/Griffith family for eighteen
      (18) years

3.    I have examined and treated every foster child Ms. McEaddy has had placed in
      her home since 1985

4.    Every child's appearance, grooming and attire were excellent

5.    They were healthy or seen when ill

6.    All psychological referrals were made by me

7.    Each foster child was seen by appropriate eye and dental specialist
      as needed

8.    There were never indications of abuse in any form

 Nathaniel Hobley was first seen in this office May of 1994. Weeks earlier he was
released from the Metro Medical West to his foster home, then to Ms. McEaddys' home.
This psychiatric treatment center diagnosed him Pervasive Development Disorder with
Autistic-like features and placed Nathaniel on , Clonidine .02 mg three times a day,
Elavil, 20 mg at bedtime and, Ativan 0.25 mg given for agitation. I weaned him from all
medications. At the time he wore diapers, ate baby food and was pica. By September, he
was toilet trained, ate a regular balanced diet.

| 1996 Centre Street | (617) 469-0470 |
| West Roxbury, MA 02132 | fax (617) 469-0235 |

October 1994, Nathaniel was seen by my colleague, Dr. Leet for a bruised left eye. The Department of Social Service was aware of this. It was stated someone other than Ms. McEaddy bruised his eye.

Nitanju, age three, was placed with Ms. McEaddy as a pre-adoptive child, September of 1995 at which time I examined her. Unlike Nathaniel, Nitanju had verbalization skills, but could not perform the task of many children her age. Nitanju toe-walked, head banged and flipped light switcher on and off.

The 1997 Children's Hospital Psychological reports done on both children clearly states the improvement of both youngsters. Neither one of the children showed any signs of abuse. Both Nathaniel and Nitanju appeared genuinely happy.

I swear this under the pains and penalties of perjury on this __/5__ of May, 2003

_____          __7/15/03__
Dr. Mary Lou Buyse                              Date

## Affidavit of Melvin H. King

I Melvin H. King do swear to the following:

I am a resident of Massachusetts and live at 4 Yarmouth Street, Boston, MA, 02116

I am retired as a professor from the Massachusetts Institute of Technology (MIT) and served as a Massachusetts State Legislator from my district for many years

I have known Georgia McEaddy, her children, Lonnie, Loniel and Dorcas, as well as her Grandchildren, Tasmin, Tevin and Ariana. I met Lonnel once. I have met each of her foster children at my Sunday Brunch.

I have known Georgia for twenty-five years or better. She served as my legislative assistant and is an excellent advocate.

I am impressed at the work she has done with all the children, but, particularly, Nathaniel When Nathaniel began to come to the brunches at my home, he wore diapers, his food had to be mashed, he would not speak and he was easily agitated. Within two months, Nathaniel was toilet trained, his food was not mashed. His agitation diminished and he would smile and laugh. Within a year, Nathaniel was speaking short sentences.

His sister, Nitanju was shy at first, but quickly would express herself and was happy.

I was able to express the growth and development of both children as well as my concern for the disruption of placement at the Fair Hearing.

Georgia did an excellent job raising her children, Lonnie, Loniel and Dorcas. Each was sent to private schools, camps, church. My youngest son and her sons were friends.

At some point Lonnie and Loniel went to New York to live with their father. Lonnie remained, but Loniel returned to Boston. After Loniel returned, he attended English High School.

To me, Georgia taught each child morals, values and manners. Lonnel would receive excellent care once he is returned to his family.

Sworn under the pains and penalties of perjury.

Melven H King
5/30/03

## AFFIDAVIT OF FREDA B. BELL WILEY

I Freda B. Bell Wiley who lives at 49 Ridgecrest Terrace, West Roxbury, MA do swear and affirm the following:

I am the biological mother of Nathaniel and Nitanju Hobley. When Nathaniel was 14-18 months old he was diagnosed with pervasive development disorder.

Until my kids were placed with Georgia all I did was complain about their care from their other foster homes. The only time I had questions about Georgia's care of my kids was before I first met her. It was told to me Nathaniel was taking Xonex and clonadine to control his outburst and that she was not giving him the medications. I complained to DSS and they said the doctor was taking Nathaniel off the medications.

I never complained about Georgia's care of my children, without having a reason. The kids have been free to talk to me about their care and they never complained about their care with her. I'd truly like to know the truth about why my children were removed from her family. I can only give my support of Georgia's a good mother and role model for me, my kids and her family from the few times I would bump into her, Dorcas and my kids and from talking with her at visits with DSS.

I've no idea why my children were removed from Georgia when it seemed to me they were getting well, they were happy, healthy, well groomed, and well adjusted to being with her. I've heard rumors alleging sexual abuse, educational abuse, and not supervising them on a regular basis as well as going without food because Georgia was financially unable to care for my children.

I can't support any of these accusations by DSS because I seen the opposite, when I seen my children with Georgia. In the conversations I had with Nathaniel and Nitanju, they always said they were happy. Nitanju said, Mommy, I miss you and I love you but you know what, I'm having fun at Grandma's house. Can you come live with Grandma, me and Nathaniel?

Georgia referred me to a support group which she attends. When I see her she gives me worthwhile advice in a motherly way when I've asked her for advice.

I signed this under the pains and penalty of perjury:

_Freda B. Bell-Wiley_    5/29/2003
Freda B. Bell Wiley          Date
(617) 327-9185

May 21,2003

TO WHOM IT MAY CONCERN;

This letter is written at the request of the interested party Ms. Georgia Mceaddy of 49 June St-Roslindale, MA. 02131.

Ms. Mceaddy  provided foster care services thru La Alianza Hispana located at 409 Dudley Street in Roxbury, MA. She provided foster care for a young boy of hispanic origin
for whom she cared for in my opinion quite well.
She placed him in a private school, ensure that his homework was done on a timely manner, collaborated with Alianza in ensuring that the child was ready for siblings visit when ever they scheduled. She openly and honestly discussed issues that were afflicting the child at the time. Her attitude and cooperation was always very positive.

Should you have any questions regarding this letter please call me at 617-288-9500 Ext 192 from 8:30am- 4:30 pm

Attentively;

Josefina Perez
Probation Officer
Dorchester District Court



**Massachusetts
Adoption
Resource
Exchange, Inc.**

Carolyn E. Smith
Executive Director

*Sponsors of "Wednesday's Child" and "Sunday's Child"*

May 19, 2003

To Whom It May Concern:

I placed as child with Georgia McEddy being as an adoption social worker for the Italian Home in 1982. I worked for almost two years with Georgia and Leanne the child I placed with Georgia. Georgia was always very cooperative with me. She would call if she had concerns. She would seek my input and use many of my suggestions in dealing with Leanne, who was a difficult child to parent.

I found George McEddy to be a very caring person and not hard to work with.

Sincerely,

Carolyn E. Smith
Executive Director

# DR. BRUMFIELD JOHNSON CHRISTIAN ACADEMY

9 - 19 OTISFIELD STREET · DORCHESTER, MA 02121 · 617-427-7598 · FAX:

November 6, 1997

To Whom It May Concern:

Nitanju Hobley was a student here at the Dr. Brumfield Johnson Christian Academy during the 1996-97 school year.  It was stated by a parent that she was playing with her son's penis. When it was fully investigated it was found that Nitanju only unbuckled the boys belt.

When the social worker, Ms Anna Lee Brown, inquired of the incident, Ms. Salisman and I shared this information with her. Little boys often ask other children and adults to unbuckle their belts because they can't do it.  We are insisting that they don't wear belts they can't unbuckle or open.

I further discussed the ideas of the social worker of my concerns on the telephone and in person of her wanting to meet and discuss Nitanju and Ms. McEaddy without the presence of Ms. McEaddy. In this school we work as a team and Ms. McEaddy supported our teachers 100%.

Nitanju could be stubborn and belligerent at times, but we could always discuss and work with Ms. McEaddy with any problems that arose.

I probably need to state that tuition was $65.00 per week not including transportation, meals and snacks of which Ms. McEaddy faithfully paid.  In April of 1997, Ms. McEaddy informed me of the fact that she was taking her daughter out of school because funds were forthcoming to support her in school.  We regretted that Nitanju had to leave school.  She was doing well in her classes.  We were pleased see to her when she came back to visit us.

We regret that Nitanju and Nathaniel are no longer living with Ms. McEaddy.  They were happy with her and were given good care.

Sincerely

Nellie C. Yarborough,
Principal